**S. AMANDA MARSHALL, OSB #953473**
United States Attorney, District of Oregon
**ALLAN M. GARTEN, OSB #812360**
Allan.Garten@usdoj.gov
**MICHELLE HOLMAN KERIN, OSB #965278**
Michelle.Kerin@usdoj.gov
Assistant United States Attorneys
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
　　　　Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 3:12-CR-00485-SI** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM FOR THE DEFENDANT'S FIRST SENTENCING PROCEEDING** |
| **JON MICHAEL HARDER,** | |
| **Defendant.** | **Hearing: May 12, 2015, 9:00 a.m.** |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................... 2

        A.  SUMMARY OF EVIDENCE ............................................................... 2

        B.  PROCEDURAL POSTURE ............................................................... 4

II.     THE PURPOSE OF THE FIRST SENTENCING PROCEEDING ........................... 6

        A.  COURT'S AUTHORITY ................................................................... 6

            1.  This Court Has Significant Discretion in Conducting the Sentencing
                Hearing And Determining the Appropriate Sentence ................................. 6

            2.  The Parties Understanding is Reflected in the Plea Agreement ................. 7

        B.  WHETHER THE DEFENDANT'S SCHEME TO DEFRAUD EXCEEDED THE
            COUNTS OF CONVICTION ............................................................... 8

            1.  Generally ......................................................................... 8

            2.  Legal Framework to Use in Determining the Defendant's "Scheme to
                Defraud." .......................................................................... 9

                a.  The Scheme to Defraud ....................................................... 9

                b.  Defendant's Knowledge That Representations Were False ................ 11

                c.  Materiality ................................................................... 13

                d.  Specific Intent to Defraud ................................................. 15

                e.  Use of Mail and Wires in Interstate Commerce .......................... 16

        C.  RELEVANT CONDUCT ................................................................. 17

        D.  EVIDENTIARY STANDARDS .......................................................... 20

III.    WHAT THE EVIDENCE WILL SHOW .......................................................... 22

        A.  SUNWEST ENTITITES—STRUCTURE AND ENTITIES ......................... 22

        B.  INVESTMENT OPPORUNITIES AS REPRESENTED BY DEFENDANT ...... 24

     1.  How the Investment Worked ...................................................................... 24

     2.  Specific Material Representations to Investors ........................................... 28

        a.   Investors Were Investing in a Specific Property .................................. 28

        b.  Rents were derived from income from the specific property .............. 30

        c.  Sunwest was a financially successful business ...................................... 30

C.  HOW DEFENDANT EXECUTED THE FRAUD ............................................... 33

     1.  The SPE was a Fiction Because of the Way Sunwest Operated its Business ..................................................................................................................... 34

     2.  Sunwest Did Not Miss a Payment Because it Commingled Funds From All Properties ................................................................................................... 37

     3.  Sunwest Was Not a Financially Sound Company ....................................... 38

        a.  Sunwest significantly commingled and misused investor funds .......... 38

        b.  Over the course of the time alleged, Sunwest experienced significant problems with their cash flow, creditors and vendors ......................... 40

        c.  Defendant's financial statements were not accurate ............................ 42

        d.  Defendant disbursed millions of dollars to himself and on his behalf to fund his opulent lifestyle ....................................................................... 43

D.  UNRAVELING THE FRAUD .......................................................................... 45

     1.  GE Capital and Alvarez and Marsal ........................................................... 46

     2.  Chief Restructuring Officer Clyde Hamstreet ........................................... 48

     3.  Defendant's Bankruptcy ............................................................................. 50

     4.  The SEC's Securities Fraud Case Against Defendant and Sunwest Entities ..................................................................................................................... 52

5.  Jon Harder has Admitted Under Oath, in Large Part, the Government's Case .............................................................................................. 58

E.  DEFENSES ....................................................................................... 64

1.  The TIC and Preferred Member Investors were Told Lies and Material Information Concealed, Regardless of How the ALFs Were Supposed to be Operated ....................................................................................... 65

2.  Defendant Harder's Purported Assistance and Cooperation in the Recovery of Assets for TIC and Preferred Member Investors is Not Relevant Evidence for this First Sentencing Proceeding .......................... 66

a.  Defendant's actions after the fraud was committed are not relevant in determining the scope of defendant's fraud ......................................... 67

b.

c.  Any recovery investors received as a result of the Bankruptcy Proceedings or the SEC Proceedings or the Receiver does not reduce loss .............................................................................................. 68

IV.  LEGAL ISSUES TO BE RESOLVED .................................................... 69

A.  KEY CONCEPTS REGARDING WIRE AND MAIL FRAUD IN EVALUATING DEFENDANT'S EVIDENCE............................................................. 69

1.  The Fraud is Complete as Soon as the Mail or Interstate Wires are Used  69

2.  The Scheme Does Not Need to be Successful .............................................. 70

B.  JON HARDER'S DESIRE OR ABILITY TO REPAY INVESTORS OR FINANCIAL INSTITUTIONS IS NOT RELEVANT ......................................... 70

C.  UNUSUAL OR UNPREDICTABLE MARKET CONDITIONS ARE NOT A DEFENSE TO DEFENDANT'S CRIMES .......................................................... 74

1.  The Financial Crisis and its Consequences Are Not Relevant Whether Defendant Intended to Defraud Investors .................................................. 74

2.  The Financial Crisis Does not Affect Relevant Conduct.............................. 75

V.  CONCLUSION.......................................................................................... 77

# TABLE OF AUTHORITIES

*Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278 (9th Cir. 1982) .............................. 14

*Forsyth v. Humana, Inc.,* 114 F.3d 1467 (9th Cir. 1997) ................................... 70

*Kann v. United States*, 323 U.S. 88 (1944) ....................................................... 73

*Kungys v. United States*, 485 U.S. 759 (1988) .................................................. 14

*Lustiger v. United States,* 386 F.2d 132 (9th Cir. 1967)................................ 11, 12

*Neder v. United States*, 527 U.S. 1 (1999) ............................................13, 14, 15

*Nelson v. United States,* 178 F.2d 458 (9th Cir. 1949) ..................................... 70

*Orr v. Bank of America*, 285 F.3d 764 (9th Cir. 2002)..................................... 16

*Penfold v. Meikle*, 597 F.2d 1273 (9th Cir. 1979)............................................. 14

*Pereira v. United States*, 347 U.S. 1 (1953) ..................................................... 17

*Phillips v. United States*, 356 F.2d 297 (9th Cir. 1965) ................................... 16

*Pritchard v. United States*, 386 F.2d 760 (8th Cir. 1967)................................ 70

*Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187 (9th Cir. 1987) ................... 15

*Schmuck v. United States,* 489 U.S. 705 (1989)................................................ 17

*Serapo v. United States*, 595 F.2d 3 (9th Cir. 1979) .......................................... 6

*Verdugo v. United States,* 402 F.2d 599 (9th Cir. 1968) ................................... 7

*Williams v. New York,* 337 U.S. 241 (1949) ...................................................... 21

*United States v. Alcantar*, 832 F.2d 1175 (9th Cir. 1987) ................................ 72

*United States v. Allison*, 86 F.3d 940 (9th Cir. 1996) ....................................... 20

*United States v. Beecroft*, 608 F.2d 753 (9th Cir. 1979) ...............................13, 16

*United States v. Benny*, 786 F.2d 1410 (9th Cir. 1986) ........................... 13, 16, 72

*United States v. Bernadel*, 490 Fed. Appx. 221 (9th Cir. 2012) ....................... 76

*United States v. Berry,* 258 F.3d 971 (9th Cir.2001) ....................................... 20

*United States v. Blitz,* 151 F.3d 1002 (9th Cir. 1998)..........................................70

*United States v. Blixt*, 548 F.3d 882 (9th Cir. 2008) ...........................................15

*United States v. Bohonus,* 628 F.2d 1167 (9th Cir. 1980) ....................................11

*United States v. Bonanno*, 852 F.2d 434 (9th Cir. 1988)...................................... 10

*United States v. Boone*, 951 F.2d 1526 (9th Cir. 1991) .........................................44

*United States v. Bowman*, 81 Fed.Appx. 104 (9th Cir. 2003) (unpublished) ................ 72

*United States v. Bright,* 353 F.3d 1114 (9th Cir. 2004) ........................................68

*United States v. Britton*, 289 F.3d 976 (7th Cir. 2002) ........................................44

*United States v. Carpenter*, 95 F.3d 773 (9th Cir.1996) ......................................13

*United States v. Carpenter*, ___F.3d___, 2015 WL 1412584, *18
(1st Cir. March 30, 2015)..............................................................................76

*United States v. Ciccone*, 219 F.3d 1078 (9th Cir. 2000)......................................15

*United States v. Cloud*, 872 F.2d 846 (9th Cir. 1989) ...................................10, 12

*United States v. Coin,* 753 F.2d 1510 (9th Cir. 1985) .........................................73

*United States v. Contreras,* 593 F.3d 1135 (9th Cir.2010) ...................................10

*United States v. Copple*, 24 F.3d 535 (3d Cir. 1994) ..........................................71

*United States v. Crowe*, 735 F.3d 1229 (10th Cir. 2013) ......................................77

*United States v. Curtis*, 537 F.2d 1091 (10th Cir. 1976) ......................................70

*United States v. Cusino,* 694 F.2d 185 (9th Cir. 1982) ........................................16

*United States v. Daniel*, 329 F.3d 480 (6th Cir. 2003) .........................................75

*United States v. Fermin Castillo,* 829 F.2d 1194 (1st Cir. 1987) ............................70

*United States v. Frey*, 42 F.3d 795 (3d Cir. 1994) ..............................................70

*United States v. Garlick,* 240 F.3d 789 (9th Cir. 2001) .......................................17

*United States* v. *Garro,* 517 F.3d 1163 (9th Cir. 2008)........................................68

*United States v. Gaudin*, 515 U.S. 506 (1995) .................................................... 14

*United States v. Goldberg*, 455 F.2d 479 (9th Cir. 1972) ................................... 15

*United States v. Green*, 745 F.2d 1205 (9th Cir. 1984) ..................................... 16

*United States v. Grimes*, 967 F.2d 1468 (10th Cir. 1992) ................................... 44

*United States v. Halbert*, 640 F.2d 1000 (9th Cir. 1981) ............................ 13, 15

*United States v. Halbert*, 712 F.2d 388 (9th Cir. 1983) .................................... 13

*United States v. Hamilton*, 499 F.3d 734 (7th Cir. 2007) ................................... 74

*United States v. Harris*, 38 F.3d 95 (2d Cir. 1994) ........................................... 68

*United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000) ....................................... 19

*United States v. Johnson*, 297 F.3d 845 (9th Cir. 2002) ...................... 14, 44, 48

*United States v. Jones,* 472 F.3d 1136 (9th Cir.2007) ......................................... 9

*United States v. LeVeque*, 283 F.3d 1098 (9th Cir. 2002) ................................... 13

*United States v. Littlesun,* 444 F.3d 1196 (9th Cir.2006) ................................... 21

*United States v. Lo,* 231 F.3d 471 (9th Cir.2000) ............................................... 16

*United States. v. Lucas*, 99 F.3d 1290 (6th Cir. 1996) ....................................... 68

*United States v. Lyons*, 472 F.3d 1055 (9th Cir. 2007) ........................... 9, 12, 13

*United States v. Mallory*, 709 F. Supp.2d 455 (E.D.Va. 2010) *aff'd* 461 Fed.Appx. 352 (4th Cir. 2012) ...................................................................................................... 77

*United States v. Marquardt,* 949 F.2d 283 (9th Cir. 1991) ................................. 21

*United States v. Mason*, 902 F.2d 1434 (9th Cir. 1990) ..................................... 15

*United States v. Mastelotto*, 717 F.2d 1238 (9th Cir. 1983) .............................. 17

*United States v. Maze*, 414 U.S. 395 (1974) ...................................................... 17

*United States v. McAlpine*, 32 F.3d 484 (10th Cir. 1994) ................................... 68

*United States v. McCloud*, 837 F. Supp. 2d 778 (N.D. Ill. 2011) ....................... 77

*United States v. McCormick*, 72 F.3d 1404 (9th Cir. 1995) ............................................. 72

*United States v. Merklinger*, 16 F.3d 670 (6th Cir.1994)................................................. 70

*United States v. Miller*, 588 F.2d 1256 (9th Cir. 1978) .................................................. 6, 7

*United States v. Molinaro*, 11 F.3d 853 (9th Cir. 1993) ................................................. 72

*United States v. Montgomery*, 384 F.3d 1050 (9th Cir. 2004) ................................... 11, 12

*United States v. Munoz*, 233 F.3d 1117 (9th Cir. 2000) ...................................................13

*United States v. Namvar,* 2012 WL 5866049, *1 (9th Cir. Nov. 20, 2012)
(unpublished) ......................................................................................................... 72

*United States v. Nash*, 115 F.3d 1431 (9th Cir.1997) ...................................................... 70

*United States v. Niven,* 952 F.2d 289 (9th Cir.1991) ...................................................... 70

*United States v. Olson,* 925 F.2d 1170 (9th Cir. 1991) ................................................... 72

*United States v. Oplinger*, 150 F.3d 1061 (9th Cir. 1998) ................................................ 10

*United States v. Oren*, 893 F.2d 1057 (9th Cir. 1990) ..................................................... 73

*United States v. Paneras*, 222 F.3d 406 (7th Cir. 2000) .................................................. 44

*United States v. Peyton,* 353 F.3d 1080 (9th Cir. 2003)................................................... 10

*United States v. Plache,* 913 F.2d 1375 (9th Cir.1990) .................................................... 16

*United States v. Pollack*, 534 F.2d 964 (D.C. Cir. 1976) .................................................. 70

*United States v. Portalla*, 985 F.2d 621 (1st Cir. 1993) ....................................................21

*United States v. Prows*, 118 F.3d 686 (10th Cir. 1997) .................................................... 44

*United States v. Quattrone,* 441 F.3d 153 (2d Cir. 2006) ................................................. 44

*United States v. Racliff,* 488 F.3d 639 (5th Cir. 2007) ..................................................... 70

*United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981) ...................................................15

*U.S. v. Robers,* 134 S.Ct. 1854 (2014) ............................................................................. 76

*United States v. Rogers*, 321 F.3d 1226 (9th Cir. 2003) .............................................10, 16

*United States v. Rosen*, 130 F.3d 5 (1st Cir. 1997) ............................................................ 70

*U.S. v. Rothberg*, 954 F.2d 217 (4th Cir. 1992) .................................................................. 68

*United States v. Savage,* 67 F.3d 1435 (9th Cir.1995) ........................................................71

*United States v. Sayakhom*, 186 F.3d 928 (9th Cir. 1999) .......................................... 13, 16

*United States v. Schumer*, 458 F.3d 1148 (10th Cir. 2006) ............................................. 70

*United States v. Shaw*, No. 13-50136 Slip Op., p. 15 (9th Cir. March 27, 2015) .............. 73

*United States v. Shipsey*, 363 F.3d 962 (9th Cir. 2004) .............................................16, 72

*United States v. Stapelton,* 293 F.3d 1111 (9th Cir. 2002) ................................................ 11

*United States v. Stewart*, 872 F.2d 957 (10th Cir. 1989) .................................................. 15

*United States v. St. Gelais,* 952 F.2d 90 (5th Cir. 1992) .................................................... 70

*United States v. Tardiff*, 969 F.2d 1283 (1st Cir. 1992) ..................................................... 21

*United States v. Taros*, 310 F.3d 999 (7th Cir. 2002) ........................................................ 70

*United States v. Treadwell,* 593 F.3d 990 (9th Cir. 2010) ............................. 71, 72, 73, 74

*United States v. Tucker*, 404 U.S. 443 (1972) ..................................................................... 6

*United States v. Turk*, 626 F.3d 743 (2nd Cir. 2010) ........................................................ 77

*United States v. Watts*, 519 U.S. 148, 151, 117 S.Ct. 633, 136 L.Ed.2d 554
*reh'ing den.* 519 ........................................................................................... 7, 18, 20

U.S. *United States v. Wellington*, 754 F.2d 1457 (9th Cir. 1985) .....................................12

*United States v. Williams*, 728 F.2d 1402 (11th Cir. 1984) ........................................ 21, 70

*U.S. v. Wolfe*, 71 F.3d 611 (6th Cir. 1995).......................................................................... 68

*United States v. Wong*, 2 F.3d 927 (9th Cir. 1993)............................................................. 19

*United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) ..................................... 10, 11, 12, 14

*U.S. v. Zolp*, 479 F.3d 715 (9th Cir. 2007) ........................................................................ 20

*United States v. Zuleta-Alvarez,* 922 F.2d 33 (1st Cir. 1990) .................................... 20, 21

*United States v. Manion*, 339 F.3d 1153 (9th Cir. 2003) ...................................................15

*United States v. Lothian*, 976F.2d 1257 (9th Cir. 1992)............................................ 16, 70

United States v. *Yusufu,* 63 F.3d 503 (7th Cir. 1995) ........................................................ 69

The United States of America, by and through S. Amanda Marshall, United States Attorney for the District of Oregon, and Allan M. Garten and Michelle Holman Kerin, Assistant United States Attorneys, hereby submits the Government's Sentencing Memoranda for the First Sentencing Proceeding in this matter.  The hearing is set for May 12, 2015 beginning at 9:00 a.m.  The government will demonstrate by clear and convincing evidence that the defendant's relevant conduct and his scheme to defraud exceeded the counts of conviction.

## I.      **INTRODUCTION**

### A.      **SUMMARY OF EVIDENCE**

Despite the length of this first sentencing proceeding, the number of exhibits and witnesses introduced or the amount of briefing presented to this Court, the story of how defendant Jon Harder conducted his vast and devastating crimes is not unusual or remarkable.  To be sure, defendant Harder's crimes are unusual and remarkable given the sheer breadth of the loss (more than $300 million), the large number of his victims (more than 1,000) and the audacity and brazenness in which defendant misrepresented the truth to lenders and investors alike, violating his promises to them in order to maintain his obscene standard of living and continue his scheme to defraud.   But the manner in which he committed his fraud, is much like any garden variety fraud case.  In sum, defendant Jon Harder lied to investors to get money.  He siphoned and secreted information from his employees and principals to get them to lie so he could get money. He manipulated other people to get them to lie to get money.  He lied to and concealed information from banks and lending institutions to get money.  He lied to his own professionals to continue to get money.  Once he got the money, he spent it.  But not as he promised his victims; instead, he spent the money to maintain his incredibly lavish

**PAGE 2**      **GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

lifestyle and prop up his scheme to defraud so he could get even more money. Predictably, defendant's house of cards toppled and his fraud was revealed to virtually everyone who examined it. The fall out for his victims, many of them seniors investing a substantial part of their retirement or savings they earned over a lifetime, is tragic and heartbreaking.

The clear and convincing evidence will demonstrate that the defendant controlled every aspect of the Sunwest enterprise and perpetrated a massive fraud that led investors and creditors to lose hundreds of millions of dollars. Investors were told that they were purchasing ownership interests for a specific real property, held as a single purpose entity (SPE), that would pay them a fixed promised annual return either from profits generated or through reserves funded by their investment, and that Sunwest was a successful, financially sound business that had a history of never missing a payment to investors. These representations were false and concealed the true nature of the investments and the risk to investors from Sunwest's precarious financial position. Instead, defendant ran Sunwest as an integrated unitary enterprise, commingling investor and creditor funds and operational revenue into essentially a single fund, often funneled millions of dollars per month through his own personal bank account, which funded defendant's own lavish lifestyle and covered widespread shortfalls in the payment of operational expenses and investor returns. As early as 2006, funds were being utilized and paid on an almost pure "availability" and "cash flow needs basis," without regard to the source or the intended or required use of the funds, and without the knowledge or consent of affected investors and creditors.

Furthermore, contrary to representations, Sunwest paid some investors and some creditors steady returns on their investments and claims, not from successful

**PAGE 3     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING**
**            PROCEEDING**

management of a particular real property asset, but from cash generated in the operations of other real property assets and from funds obtained by refinancing, from loans from defendant and certain defendant creditors, and from funds raised through offerings to new investors.  These facts were material and were not disclosed to, or known by, investors.

## B.   PROCEDURAL POSTURE

The grand jury returned the 55-count Indictment in September 2012.  Doc. No. 1. On or about January 8, 2015, defendant plead guilty to counts 13 (mail fraud) and 51 (money laundering) of the Indictment and admitted a scheme to defraud investors. Defendant's admissions were limited to two separate properties—a facility in Clovis and one in Hobbs each located in New Mexico. Defendant did admit in his scheme to defraud these investors, that he committed the following acts:

- Defendant, through various Sunwest businesses, including Sunwest Management, Inc., Canyon Creek Development, LLC, and Canyon Creek Financial, LLC (collectively, Sunwest), solicited and received investor funds through two different types of investment offering structures, the Tenancy in Common (TIC) investment and the Preferred Membership Interest (PMI) investment. These investments were offered to investors by means of Private Placement Memorandums (PPMs) that were drafted by outside lawyers with the assistance of lawyers employed by the Sunwest businesses.

- With respect to the PMI investments, the PPMs represented to investors that their funds would be used for a specific property, and for specified purposes.

- In exchange, the investors were to receive Class B preferred membership percentage interests in the LLC that operated the specific property and an annual return of 10% paid monthly.

- Between December of 2007 and February 2008, Defendant Harder, through agents and employees under his control, offered PMI investments in two separate LLCs that were developing assisted living facilities located in Clovis and Hobbs, New Mexico.

/ / /

**PAGE 4**      **GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

- The facilities being developed in Clovis and Hobbs were incomplete and additional funds were needed to complete construction. The PMI investment documents for Clovis and Hobbs represented to investors that their funds would be used to complete construction of the respective facilities.

- Concurrently with the issuance of the Clovis and Hobbs PPMs, defendant decided to use investor funds raised through the Clovis and Hobbs offerings to meet certain Sunwest business expenses and as well certain of his own personal financial obligations. Defendant knew that this use of investor funds was not contemplated by the Clovis and Hobbs PMI investors.

- Neither defendant nor his agents or employees informed the Clovis and Hobbs PMI investors of his intent to use their investment funds in a manner different from what the PPMs had advised, and in a manner that increased the risk of potential investment loss associated with the Clovis and Hobbs investments.

- As the first Clovis and Hobbs investor funds were received in late December of 2007 they were diverted at defendant's direction and used to meet payroll and other Sunwest-related financial obligations. The Clovis and Hobbs PMI investors were not notified of this misuse of their funds.

- Defendant continued to solicit investors for the Clovis and Hobbs projects throughout January and February of 2008. As PMI investor funds were received, they were diverted by defendant to address Sunwest-incurred financial obligations, cash shortfalls of Sunwest affiliates, and his personal financial obligations.

- The misstatements made and facts omitted as part of this scheme were material to the investment decisions made by the Clovis and Hobbs PMI investors. For Clovis, the PMI investment offering raised a total of $3,225,000. For Hobbs, the PMI investment offering raised a total of $2,000,000. Although construction continued at Clovis and Hobbs, neither facility was fully completed by Sunwest.

- On December 21, 2007, defendant, directly and through other persons who were under his supervision and control, did cause to be delivered by commercial interstate carrier investment documents for Clovis Senior Living from L.H. and J.H., for the purpose of executing the scheme and artifice to defraud.

Plea Agreement, ¶5(A)(2).  The plea agreement contemplated that defendant would be

sentenced in two separate sentencing hearings.  Plea Agreement, ¶4.  The first,

beginning May 12, is to determine whether the defendant's scheme to defraud exceeds

**PAGE 5        GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
                PROCEEDING**

the counts of conviction and the relevant conduct related to that scheme.  In making that determination, these admitted facts, which this court must accept as proven beyond a reasonable doubt, are significant.  Defendant's admissions regarding the materiality of misrepresentations and omissions as well as whether diversion of investor funds for purposes outside the PPMs for the counts of conviction, are evidence the court should consider.

## II.    THE PURPOSE OF THE FIRST SENTENCING PROCEEDING

### A.    COURT'S AUTHORITY

The plain, unambiguous written agreement and the clear understanding of the parties is that the hearing beginning May 12, 2015 is the first of two hearings to <u>sentence</u> the defendant Jon Harder—it is not a trial or even a "mini-trial."  <u>It is a sentencing hearing[1]</u>.  As further outlined below, pursuant to the parties plea agreement, the first hearing requires the court to determine for sentencing purposes: (1) whether the defendant's scheme to defraud exceeds the counts of conviction; and (2) the relevant conduct related to the defendant's scheme to defraud.

> 1.    <u>This Court Has Significant Discretion in Conducting the Sentencing Hearing And Determining the Appropriate Sentence.</u>

The court has ample authority to proceed in the manner agreed to by the parties. As a beginning point, the law is clear that a sentencing judge has wide discretion in determining the appropriate sentence to impose. *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).  To this end, a judge may conduct a broad inquiry, largely unlimited as to either the kind of information he may consider or its source. *Id.*;

---

[1] Defendant, under penalty of perjury, and his counsel acknowledged that the proceeding on May 12, 2015 was not a trial, but instead a sentencing hearing with significantly different procedural rules regarding the rules of evidence and the government's burden of proof. See, Transcript, January 8, 2015Defendant's Change of Pleat, pp. 17-23.

*Serapo v. United States*, 595 F.2d 3 (9th Cir. 1979). The justification for this policy is the strong public interest in imposing sentences based upon a complete evaluation of each individual offender and designed to aid in his particular rehabilitation. *United States v. Miller*, 588 F.2d 1256 (9th Cir. 1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *Verdugo v. United States, 402 F.2d 599 (9th Cir. 1968)*, cert. denied, 397 U.S. 925, 90 S.Ct. 931, 25 L.Ed.2d 105 (1969); see also, Fed. R. Crim. P. 32(e).

The United States Supreme Court noted that, "18 U.S.C. § 3661 . . . codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information." *United States v. Watts*, 519 U.S. 148, 151, 117 S.Ct. 633, 136 L.Ed.2d 554 *reh'ing den.* 519 U.S. 1144, 117 S.Ct. 1024 (1997). That statute provides:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. §3661. Thus, this court has the authority to conduct a hearing to determine the full nature of the defendant's scheme to defraud to arrive at an appropriate sentence.

      2.      The Parties Understanding is Reflected in the Plea Agreement.

The parties' understanding and desires regarding the procedure to be used in determining the appropriate sentence are set forth in the plea agreement. The plea agreement states in pertinent part:

> 4.    **Sentencing Procedure**: The parties agree that the defendant's sentencing shall occur in two separate proceedings before the Court: (1) <u>at the first, to begin May 12, 2015, the parties will introduce evidence and the court will make a determination whether defendant's scheme to defraud exceeded the counts of conviction, as alleged in the Indictment, and all relevant conduct related to it.</u> * * * and (2) in November 2015, the court will conduct a second and final sentencing proceeding where the parties will

PAGE 7      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING

present evidence and arguments as to the appropriate sentence the court should impose on the defendant.

The parties have therefore agreed that at the first sentencing proceeding, this court must determine both: (1) whether the defendant's scheme to defraud exceeded the counts of conviction; and (2) the relevant conduct related to the scheme as determined by the court.  There is no dispute between the parties that the purpose of the court's findings of facts in this first sentencing proceeding are to be used to guide the pre-sentence report writer at the United States Probation Office in preparing defendant's PSR and calculating the advisory guideline range.

## B.  WHETHER THE DEFENDANT'S SCHEME TO DEFRAUD EXCEEDED THE COUNTS OF CONVICTION

### 1.  Generally.

One of the purposes of the first sentencing proceeding is to determine whether the "defendant's scheme to defraud exceeded the counts of conviction."  Plea Agreement, ¶4.  While the phrase "scheme to defraud" is not specifically defined in the plea agreement, it is a well-known term to this court and the parties' representatives. The defendant has plead guilty to mail fraud and devising a "scheme to defraud" Sunwest's investors using the mail that was much more limited in scope than that alleged by the government in the Indictment returned by the grand jury.  Thus, the parties have asked the court to determine as a factual matter, solely for sentencing purposes, whether the evidence to be presented demonstrates that defendant's scheme to defraud was broader than the counts of conviction.  The government believes it is at least as broad as alleged in the Indictment.  However, because this is a sentencing proceeding and the court, pursuant to 18 U.S.C. §3661, may consider any type of evidence in sentencing a defendant, the court is not limited in its findings by the

PAGE 8      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING

allegations in the Indictment in any respect—<u>the court may determine that the defendant's scheme to defraud is broader than or more narrow than that alleged in the Indictment for sentencing purposes</u>. In this regard, the government believes the general legal framework for the court's determination about the defendant's scheme to defraud is that found in the mail and wire fraud statutes.

> 2.  <u>Legal Framework To Use in Determining the Defendant's "Scheme to Defraud."</u>

The reach of the mail and wire fraud statutes are quite broad.  "The Supreme Court has interpreted [section] 1343 broadly and twice held that individuals who retain or misappropriate the money or property of others, regardless of how they acquired it, fall within the purview of mail or wire fraud." *United States v. Jones,* 472 F.3d 1136, 1139 (9th Cir.2007)).

Under a mail and wire fraud theory, the government must show that : (1) defendant devised a scheme or plan to defraud <u>or</u> for obtaining money or property by making false promises or statements; (2) defendant knew that the promises or statements were false or fraudulent;  (3) the promises or statements were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;  (4) defendant acted with the intent to defraud; and  (5) defendant used, or caused to be used, the United States mail, UPS, Fed Ex or other common carrier or the wires, radio or television communication in interstate commerce to carry out or attempt to carry out an essential part of the scheme.

> a.  *The Scheme to Defraud.*

The wire and mail fraud statutes support two independent and alternate means of charging: a scheme to defraud, and a scheme to obtain money by false promises,

**PAGE 9      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

representations or statements.  18 U.S.C. §§ 1341, 1343; *see also United States v. Lyons*, 472 F.3d 1055, 1063, 1068 (9th Cir. 2007) *as amended on reh'g in part* (Jan. 11, 2007) (citing *United States v. Peyton,* 353 F.3d 1080, 1091 (9th Cir.2003), *overruled on other grounds by United States v. Contreras,* 593 F.3d 1135, 1136 (9th Cir.2010) (en banc)); *United States v. Woods*, 335 F.3d 993, 997 and 1000 (9th Cir. 2003); *United States v. Bonanno*, 852 F.2d 434, 441 (9th Cir. 1988).  In *Woods*, the Ninth Circuit clarified that mail fraud "can take the form of (1) a scheme or artifice to defraud, or (2) obtaining money or property by means of false or fraudulent pretenses, representations, or promises[,]" and that "[e]ach constitutes an independent and alternate basis for conviction."  335 F.3d at 1000 n.4.  The Indictment in this case alleges both a scheme to defraud, which includes both false representations and the concealment of material facts, as well as a scheme to obtain money through false statements.  Ninth Circuit Model Criminal Jury Instruction 8.121 comment (2010).

The term "scheme" includes "any plan, pattern or cause of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived."  *United States v. Oplinger*, 150 F.3d 1061, 1065 n.2 (9th Cir. 1998) (*United States v. Cloud*, 872 F.2d 846, 850 (9th Cir. 1989).  Each individual component of the scheme need not be illegal, so long as the scheme as a whole involves fraud.  *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003).  In order to establish a scheme to defraud, the government need not prove that any particular false statement was made, but merely the existence of a scheme reasonably calculated to deceive.  *Woods*, 335 F.3d at 997-98. "If a scheme is devised with the intent to defraud, and the mails [and interstate wires] are used in executing the scheme, *the fact that there is no misrepresentation of a single*

PAGE 10       GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
                     PROCEEDING

*existing fact is immaterial.* It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail service of the United States [or interstate wires were] used and intended to be used in the execution of the scheme." *Lustiger v. United States,* 386 F.2d 132, 138 (9th Cir.1967) (emphasis added); see also, *Woods*, 335 F.3d at 998. Put another way, "[t]he fraudulent nature of the 'scheme or artifice to defraud' is measured by a non-technical standard. Thus, schemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Bohonus,* 628 F.2d 1167, 1171 (9th Cir. 1980) (internal quotation marks and citations omitted).

The defendant need not perform every act of the scheme himself to be held responsible. *United States v. Stapelton,* 293 F.3d 1111, 1116-1117 (9th Cir. 2002). In addition, the Ninth Circuit has concluded that omissions of material facts may be used to establish a scheme to defraud. *See, e.g.*, *Woods*, 335 F.3d at 997-98, 1000 (affirming convictions for mail fraud where the court had instructed the jury that "the statements made or the facts omitted as part of the scheme were material"); *see also Montgomery*, 384 F.3d at 1063-64 (affirming a conviction for mail fraud for a defendant who ran a property management business and who "took measures to limit the information contained" in the owners' statements she mailed to her victims, as these omissions furthered the ongoing scheme to defraud by avoiding inquiries from the owners).

   b.  *Defendant's Knowledge That Representations Were False.*

To prove mail or wire fraud the government is required to show that defendant knew the representations were false. *See* Ninth Circuit Model Jury Instructions 8.121, 8.124 comment (2010). The Government does not have to prove every alleged

**PAGE 11  GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING**
     **PROCEEDING**

misrepresentation in an indictment, so long as it proves at least one material

misrepresentation.[2] *United States v. Cloud*, 872 F.2d 846, 851 (9th Cir. 1989); *United

States v. Wellington*, 754 F.2d 1457, 1462 (9th Cir. 1985). The false and misleading

representations and promises underlying a scheme in the wire and mail fraud statutes

are defined quite broadly, and may include affirmative representations, half-truths, the

concealment of material facts, and the deceptive use of words and printed materials.

*Woods*, 335 F.3d at 1000 (9th Cir. 2003) (affirming convictions for mail fraud where the

court had instructed the jury that, in order to find for the government, they had to find

that "the statements made or the facts omitted as part of the scheme were material");

*Lustiger*, 386 F.2d at 138.  The Ninth Circuit has found a scheme sufficient where "the

statements in the advertising materials may not have been literally false, [but] taken as a

whole they were fraudulently misleading and deceptive." *Lustiger*, 386 F.2d at 136.

"[D]eceitful statements of half truths or the concealment of material facts is

actual fraud violative of the mail [and wire] fraud statute[s] . . . [T]he deception need

not be premised upon verbalized words alone. The arrangement of the words, or the

circumstances in which they are used may convey the false and deceptive appearance."

*Lustiger*, 386 F.2d at 138 (internal citations omitted).  A statement is false if it is half

true, or if it conceals facts or information necessary to make the statement as a whole

not misleading. *See United States v. Montgomery*, 384 F.3d 1050, 1063-64 (9th Cir.

2004) (affirming a conviction for mail fraud for a defendant who ran a property

management business and who "took measures to limit the information contained" in

the owners' statements she mailed to her victims, as these omissions furthered the

---

[2] This holding is reinforced by the fact that the Ninth Circuit has held on numerous occasions, that the jury need not be unanimous on the particular false promise or statement alleged in the Indictment in order to convict defendant. *Lyons*, 472 F.3d at 1068; *Woods*, 335 F.3d at 998-99.

**PAGE 12     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

ongoing scheme to defraud by avoiding inquiries from the owners); *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986).  Even "[o]ne who acts with reckless indifference to whether a representation is true or false is chargeable with knowledge of its falsity." *United States v. Sayakhom*, 186 F.3d 928, 942 (9th Cir. 1999) (quoting *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979)); *see also United States v. Munoz*, 233 F.3d 1117, 1136 (9th Cir. 2000) ("This Court has repeatedly held that reckless indifference to the truth or falsity of a statement satisfies the specific intent requirement in a mail fraud case").

### c.    Materiality.

To prove wire fraud, the government must also show that defendant's scheme to defraud or false statements and representations were material.  *Neder v. United States*, 527 U.S. 1, 20-25.  "A false promise, statement or representation is material if it is made to induce action or reliance by another or has a natural tendency to influence or is . . . capable of influencing another's decision." *United States v. LeVeque*, 283 F.3d 1098, 1103-04 (9th Cir. 2002) (quoting *United States v. Halbert*, 712 F.2d 388, 390 (9th Cir. 1983) (internal quotation omitted).  Materiality is a question of fact.  *United States v. Carpenter*, 95 F.3d 773, 776 (9th Cir.1996).  Materiality of statements or promises must be established by the government, *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981), however, the fact finder need not unanimously agree that a specific material false statement was made.  *Lyons*, 472 F.3d at 1068.

A material statement is one that has "a natural tendency to influence, or [be] capable of  influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)); *see also United States v. Woods*, 335 F.3d 993,

**PAGE 13     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

1000 (9th Cir. 2003) (upholding jury instructions that defined a material statement as one "that would reasonably influence a person to part with money or property"); *United States v. Johnson*, 297 F.3d 845, 866-67 (9th Cir. 2002) (upholding the use of the *Gaudin* definition injury instructions). A statement or omission is material "if there is a substantial likelihood that a reasonable [investor] would consider [the statements or omissions] important when making an investment decision." *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278 (9th Cir. 1982). In the case of a non-disclosure, materiality turns on whether a reasonable investor would have considered the omission significant. *See Penfold v. Meikle*, 597 F.2d 1273 (9th Cir. 1979); *United States v. Johnson*, 297 F.3d 845, 866 (9th Cir. 2002) (defining "material" as "promises or statements . . . that would reasonably influence a person to part with money or property.").

The capacity of statements to influence, and thus their materiality, does not hinge on reliance. The Government need not prove that victims relied upon the defendant's misrepresentations or that the victim suffered damages. *Neder v. United States*, 527 U.S. 1, 25 (1999), (the common-law fraud elements of "justifiable reliance" and "damages" have no place in the federal fraud statutes). Indeed, materiality and reliance are disparate inquiries. Materiality focuses on the nature of the statement from the perspective of a reasonable, objective decision maker. Reliance, on the other hand, focuses on a specific individual's actions and is irrelevant in criminal cases. " [A] misrepresentation may be material without inducing any actual reliance. What is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose." *United States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) (quoting *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981) (per curiam)). This is because the mail, wire and bank fraud statutes "did not incorporate all the

**PAGE 14      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
              PROCEEDING**

elements of common-law fraud ... [such as] justifiable reliance ... [which] plainly [has] no place in the federal fraud statutes." *Neder*, 527 U.S. at 24-25, citing *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989) (holding that "the government does not have to prove actual reliance upon the defendant's misrepresentations" under the mail fraud statute); *Blixt*, 548 F.3d at 889; *United States v. Goldberg*, 455 F.2d 479, 481 (9th Cir. 1972) (holding "[i]t is not necessary to show that reliance of the victim was induced by misrepresentation of the defendant, nor is it necessary to show that the victim was misled").

### d.    Specific Intent to Defraud.

The Government must prove that defendant specifically intended to defraud investors.  18 U.S.C. §§ 1341, 1343; *United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003); *United States v. Ciccone*, 219 F.3d 1078, 1082 (9th Cir. 2000); *9th Cir. Crim. Jury Instr.* 8.121, 8.124 (2010).   The intent to defraud "is established by the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension."  *Ciccone*, 219 F.3d at 1083 (quotations omitted);  *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 195-96 (9th Cir. 1987) (holding that the intent to defraud is "satisfied by the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and this intention is shown by examining the scheme itself."); *see also United States v. Rasheed*, 663 F.2d 843, 848 (9th Cir. 1981) ("Fraudulent intent may be, and often must be, proven by circumstantial evidence.").   "While an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all."  *Benny*, 786 F.2d at 1417 (citing *Beecroft*, 608 F.2d at 757).

**PAGE 15      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

The Government can prove specific intent in several ways. *See e.g., Sayakhom*, 186 F.3d at 941 ("inferred from the defendant's statements and conduct"). Intent to defraud "may be established by circumstantial evidence," *United States v. Rogers,* 321 F.3d 1226, 1230 (9th Cir.2003), and the scheme itself may be probative circumstantial evidence. *United States v. Plache,* 913 F.2d 1375, 1381 (9th Cir.1990). Intent also may be inferred from misrepresentations made by the defendants. *See United States v. Lothian*, 976F.2d 1257, 1267-68 (9th Cir. 1992); *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984) (holding that specific intent may be inferred from the scheme itself). The Government may also introduce testimony from victims of the offense explaining their impressions and how they were misled. *Phillips v. United States*, 356 F.2d 297, 307-08 (9th Cir. 1965).

### e.    Use of Mail and Wires in Interstate Commerce.

Finally, the Government must prove that the defendant used, or caused to be used, the mail or wire communications in interstate commerce to carry out an essential part of the scheme. *Shipsey*, 363 F.3d at 971; *Orr v. Bank of America*, 285 F.3d 764, 782 (9th Cir. 2002); *9th Cir. Crim. Jury Instr.* 8.121, 8.124 (2010). "One 'causes' use of . . . wire communications where such use can reasonably be foreseen, even though not specifically intended." *United States v. Cusino,* 694 F.2d 185, 188 (9th Cir.1982). A wire communication is "in furtherance" of a fraudulent scheme if it is "incident to the execution of the scheme," *United States v. Lo,* 231 F.3d 471, 478 (9th Cir.2000), meaning that it "need not be an essential element of the scheme, just a 'step in the plot,'" *United States v. Garlick,* 240 F.3d 789, 795 (9th Cir.2001) (quoting *Schmuck v. United States,* 489 U.S. 705, 711, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)).

/ / /

**PAGE 16      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

A defendant may be found guilty of causing the use of the mail or interstate wires in furtherance of a fraudulent scheme even if he has no actual knowledge or intent regarding the use, as long as it could reasonably be expected that the wires were in some manner to be used in furtherance of the scheme. *United States v. Mastelotto*, 717 F.2d 1238, 1250 n.12 (9th Cir. 1983). *Pereira v. United States*, 347 U.S. 1, 8-9 (1953). Each use of the wires in a fraudulent scheme constitutes a separate violation. *Garlick*, 240 F.3d at 792.

## C.    RELEVANT CONDUCT

The court is also tasked with determining "all relevant conduct related" to the scheme to defraud. Relevant conduct is a defined term under the U.S.S.G.:

**§1B1.3. <u>Relevant Conduct (Factors that Determine the Guideline Range)</u>**

> (a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
>
> > (1)    (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; * * *
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, <u>all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;</u>

/ / /

**PAGE 17    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

(3) <u>all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions</u>; and

(4) any other information specified in the applicable guideline.

Therefore relevant conduct, which will be used to calculate the appropriate guideline range, includes <u>all</u> conduct defendant engaged in before during and after the counts of conviction and is not circumscribed by the Indictment or anything else.   Indeed, the United States Supreme Court has found that "Section 1B1.3. . . describes in sweeping language the conduct that a sentencing court may consider in determining the applicable guideline range." *Watts*, 519 U.S. at 153.  The commentary to that section states: "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." USSG § 1B1.3, comment, backg'd.  Indeed, the Sentencing Guidelines require the sentencing court to consider "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." Application Note 3 explains that "[a]pplication of this provision does not require the defendant, in fact, to have been convicted of multiple counts." Accordingly, the Guidelines conclude that "[r]elying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses." USSG § 1B1.3, comment, backg'd.  Thus, in calculating relevant conduct, the court can consider uncharged conduct, conduct upon which defendant was acquitted and even conduct which was initially included in an Indictment and later dismissed by the government.  *United States v. Wong*, 2 F.3d 927, 928 (9th Cir. 1993).

**PAGE 18      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

Relevant conduct includes, among other things, the amount of loss[3] for sentencing purposes under U.S.S.G. §2B1.1.  The Sentencing Guidelines primarily measure the harm caused by a defendant's fraud offense by loss. The Sentencing Commission has explained:

> [O]rdinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

U.S.S.G. § 2B1.1, Background cmt. (2001 ed.).   For purposes of § 2B1.1, the determinative amount of financial loss in a fraud crime is the greater of the victims' actual loss or the amount of loss the defendants intended. USSG § 2B1. 1 cmt. 3 (A) (2013) . The Guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* A reasonably foreseeable pecuniary harm is "pecuniary harm that the defendant knew or under the circumstances, reasonably should have known was a potential result of the offense." *Id.*  The defendant's conduct must have been the proximate cause of actual loss. *U.S. v. Hicks*, 217 F.3d 1038, 1048-49 (9th Cir. 2000).  "The Court need not make its loss calculation with absolute precision: rather it need only make a reasonable estimate of the loss based on available information." *U.S. v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  Courts should "take a realistic, economic approach to determine what losses a defendant truly caused or intended to cause." *U.S. v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996).

/ / /

---

[3] The parties have agreed that sentencing enhancements under the U.S.S.G. such as misrepresentation in a bankruptcy proceeding and violations of securities laws, will be determined by evidence submitted at the second sentencing proceeding scheduled for November 2015.

**PAGE 19    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

### D.    EVIDENTIARY STANDARDS

The Rules of Evidence explicitly do not apply to any sentencing proceeding, including this one.  Fed. R. Evid. 1101(d)(3) ("These rules . . . do not apply to  . . . . miscellaneous proceedings such as: . . . sentencing.").  As noted by the United States Supreme Court, "18 U.S.C. § 3661 . . . codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information."  *Watts*, 519 U.S. at 151.  That statute provides:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. §3661.  The Court observed that very different evidentiary standards apply in sentencings as opposed to trials, and found that "[h]ighly relevant-if not essential to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Watts,* 519 U.S. at 151-52.

Unlike the strict evidentiary restrictions applicable at trial, the only evidentiary requirement at sentencing is that the sentence be based on information which has "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. *See United States v. Berry,* 258 F.3d 971, 976 (9th Cir.2001) (hearsay testimony  "be accompanied by some minimal indicia of reliability"); *United States v. Zuleta-Alvarez,* 922 F.2d 33, 36 (1st Cir.1990) *rehearing denied, certiorari denied* 111 S.Ct. 2039, 500 U.S. 927, 114 L.Ed.2d 123.  Accordingly, this court is free to rely upon outside evidence, including hearsay evidence that has never been subject to cross-examination, so long as the information on which a sentence is based has sufficient indicia of reliability to support its probable accuracy.  *United States v. Littlesun,* 444 F.3d 1196, 1199 (9th

Cir.2006) (noting reliability "criterion is plainly satisfied by the judge's personal observation of the defendant's demeanor during his testimony, the wire transfers and their significance, and testimonial inconsistencies noted by the sentencing judge); *Zuleta-Alvarez*, C.A.1 1990, 922 F.2d at 36; *Williams v. New York,* 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)(upholding sentence based on hearsay); *United States v. Marquardt, 949 F.2d 283* (9th Cir. 1991) (Postal inspector could properly testify to his opinion that one of the children in film was under the age of 12 and engaged in sexually explicit conduct, for purposes of two-level increase of defendant's offense level for pornographic material involving "prepubescent" minors, notwithstanding defendant's contention that inspector lacked qualifications or should have had more scientific credentials; there was no evidence that information provided by inspector lacked sufficient indicia of reliability to support its probable accuracy, or that inspector or court should have applied different standard); *United States v. Portalla*, 985 F.2d 621 (1st Cir. 1993)( Hearsay evidence of victim's statements to police relating defendant's assault of victim with gun supported finding that defendant had violated condition of supervised release that he not commit further crimes, in light of sufficient indicia of reliability supporting hearsay evidence, despite victim's denials at revocation proceedings; police gave detailed accounts, victim did not deny receipt of bruise, and victim might have denied prior statements from fear of defendant's retaliation); *United States v. Tardiff*, 969 F.2d 1283 (1st Cir. 1992)( Victim impact statements comprised competent proof at sentencing and were properly treated by court as reliable in determining amount of loss, for sentencing purposes).

/ / /

/ / /

**PAGE 21        GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

III.   **WHAT THE EVIDENCE WILL SHOW**

A.   **SUNWEST ENTITIES—STRUCTURE AND ENTITIES**

At its peak in 2008, Sunwest operated more than 280 senior housing facilities (ALFs) in approximately 34 states, and controlled and managed other investments, including real property both related and unrelated to the assisted living facilities.  Its management estimated that it had over $2,000,000,000 in asset value. Defendant Harder was the founder and majority owner of Sunwest, and until around January 2009, when he resigned, he served as its President and CEO.  The government will introduce the testimony of several key Sunwest employees who observed first hand the defendant's actions.  Virtually every witness who worked at Sunwest will testify that defendant had complete and total control over all aspects of Sunwest and its affiliated companies.

Defendant developed a complex, vertically integrated set of companies which he used to market investments and obtain bank loans, acquire ALFs, manage ALFs, construct new ALFs, furnish and decorate ALFs, solicit tenants for the ALFs, hire employees to work at the ALFs, and insure the employees and facilities.  Defendant exercised complete control over the entire enterprise and had an ownership, if not controlling ownership interest, in each segment of the enterprise, including an interest in each ALF.  Chief among the corporate components of Sunwest Enterprise were:

> a.     **Sunwest Management, Inc. ("SMI")** is an Oregon corporation formed on or about February 27, 1992.  Defendant owned approximately 75% of SMI and was Chief Executive Officer, President and a Director of the company.  The principal business of SMI was the marketing of and managing senior assisted living facilities ("ALFs").
>
> b.     **Canyon Creek Development, Inc. ("CCD")** is an Oregon corporation formed on or about March 28, 2001.  Defendant owned approximately 60% of CCD and was the Vice President and a Director of

PAGE 22   GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
PROCEEDING

the company.  The primary business of CCD was the acquisition of property for Sunwest to manage, and to gather information that would be used in investment documents that were distributed to investors as part of the sales process.

c.      **Canyon Creek Financial, LLC ("CCF")** is an Oregon Limited Liability Company formed on November 4, 2005.  As of December 31, 2008, defendant owned 100% of CCF.  CCF was licensed by the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer, limited to the private placement of securities sponsored by the property developer CCD.

d.      **Senenet, Inc. ("Senenet")** is an Oregon corporation formed on August 14, 2002.  As of December 31, 2008, Defendant owned approximately 80% of Senenet.  Defendant was President and a Director of Senenet.  The primary business of Senenet was the leasing of employees to other affiliated companies, including but not limited to CCD, CCF, and senior living facilities.

e.      **KDA Construction, Inc. ("KDA")** is an Oregon corporation formed on or about March 15, 2000.  As of December 31, 2008, defendant owned 41% of KDA Construction.  The primary business of KDA was to provide construction services to senior living facilities and properties sponsored by CCD and managed by SMI.

The Sunwest Enterprise, taking into account the establishment of several legal

entities for each ALF, consisted of over 700 corporations, partnerships and limited

liability companies.  Here is a chart for the court's reference:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**PAGE 23     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**



### B.    INVESTMENT OPPORTUNITIES AS REPRESENTED BY DEFENDANT

#### 1.    How the Investment Worked

Beginning in 2001 and running through 2008, Sunwest offered to investors an opportunity to invest in ALFs either through the purchase of tenancy in common interests ("TIC") or preferred membership interests.  Starting in 2006, the majority of investors were sold TIC interests; which as described below, were supposed to be a tax free exchange of the investor's previous interest in a property with an interest in a Sunwest ALF.  In fact, between 2006-2008, the majority of the $300 million received from investors came from TIC investors.  Sunwest's business model was to purchase (at a discount) properties that were financially distressed and to increase occupancy and cash flow by stabilizing the facilities and improving sales efforts.  Sunwest financed the initial purchase and created reserve funds to pay for rehabilitation and operating expenses until the property cash flowed.  The TIC investors' funds were used for the down payment and closing costs.  Once a property was profitable and stable, it typically

was refinanced and the TIC investors were repaid their investment plus a guaranteed profit.  Afterwards, the entire ALF would be owned by defendant and other Sunwest insiders.

In and after January 2006, most TIC offerings were structured and sold in a consistent manner. CCD identified a property to be acquired and managed by Sunwest, and sponsored the TIC offering to potential investors. CCD, at defendant's direction, offered ownership in the property to investors through TIC ownership interests.  The TIC investors were interested in deferring tax payments on the sale of property they had once owned, and under Section 1031 of the Tax Code, they were entitled to do so if they were exchanging one property for another.  This required the investor to exchange the proceeds from the ownership of a particular piece of property for ownership in another specific piece of property within a specified period of time.  For this exchange to satisfy IRS requirements, the investor had to buy an ownership interest, as a tenant in common with other owners, in a specific ALF.  As it became more difficult for Sunwest to acquire new properties and refinance existing properties, Sunwest accelerated their program of selling preferred membership interests in certain properties.  The preferred investors purchased a percentage interest in the entity operating a specific ALF.  Preferred membership interest investors received an annual 10% return.

The majority of the Sunwest investments were structured with one entity ("OmniCo") with TIC investors. The TIC investors were sold fractional interests in the property by a "Co-Owner," typically a limited liability company that was majority-owned by defendant and other Sunwest Principals The entity that owned the real property also operated the property by executing a 50-year lease with the Co-Owner and TIC property owners. The remainder of the property was owned by a "Co-Owner," typically a limited

PAGE 25      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
             PROCEEDING

liability company that was majority-owned by defendant and other Sunwest Principals. Funds raised from investors through TIC offerings were to be used as the down payment for the property, while the remainder of the purchase price was to be financed through a mortgage, with the Co-owner as the borrower.

Beginning in late 2006 the investment structure was changed to include separate entities for the real property owners and the entity that operates the property. The property was purchased, the TIC investors and Co-Owner leased the property to another Defendant-owned LLC, called the "Operator" or "Master Tenant." The Master Tenant then subcontracted the property management duties to Sunwest, referred to as the "Property Manager." The Property Manager maintained complete control of the property's operations and finances. The TIC investors from whom the money was raised had no role in operating or managing the property. Each entity was set up as single purpose entity (SPE), a bankruptcy remote entity designed for its singular purpose. The SPE structure was required both by Sunwest's creditors, a standard term in financing for such facilities, and by the IRS so that the TIC investors qualified for the 1031 exchange. The following charts are examples of how the OmniCo and OpCo/PropCo relationships were supposed to work:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**PAGE 26       GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**





/ / /

2.    <u>Specific Material Representations to Investors</u>

CCF was formed as a securities broker for the sole purpose of selling the TIC securities to investors either directly or through arrangements with third-party brokers. CCF used various marketing materials, including Private Placement Memorandums ("PPMs"), Executive Summaries, and Offering Memoranda to market the investment opportunity to potential investors. These marketing materials were, at times, distributed to potential investors through interstate wires, the United States Postal Service, Fed Ex and UPS. Through the PPMs, other materials, and occasional in-person meetings with investors.

a.    *Investors Were Investing in a Specific Property*

The general sales pitch made by defendant and those working for and with him emphasized certain points.  Investors were told that they would be investing in specific ALFs, not the Sunwest Enterprise as a whole.  To that end, Sunwest sent specific Offering Summaries, describing the property, its location and other information that would inform the investors about whether it would be successful, such as proximity to hospitals, etc.  The summaries further described generally the terms of the investment on a very cursory level.  For example, the summary made clear that the operator of the facility would be a SPE, thus reinforcing the representations that the investor was investing in a specific property and not a portfolio of Sunwest's various facilities.  Here is one example of such a summary, for Sunrise Creek, which will be introduced into evidence by the government:

## Investment Highlights

**OPERATING LLC:**

The Operator is Sunrise Creek Assisted Living and Memory Care Community, LLC, a single purpose Oregon Limited Liability Company formed with Jon M. Harder and Darryl E. Fisher (the "Principals"). The sole purpose of the Operator is to acquire, syndicate, develop and operate the Property. The Principals also own a majority of Sunwest Management, Inc., the manager of the Property.

**INVESTOR DEAL STRUCTURE:**

All equity investors will be preferred members of Sunrise Creek Assisted Living and Memory Care Community, LLC, and will receive a preferred annual return of 10% paid monthly. We anticipate that most, if not all, of the monthly return will be a return of capital. The Operator will be granted an option to buy the investor's interest at anytime at the purchase price paid by the investor plus 4% per year. Please consult your tax advisor.

An investor may exercise a put option to Jon Harder if the Operator fails to distribute three months of the preferred return.

A detailed description of the preferred membership interest is set forth in the offering memorandum.

Offering Memorandum dated:
January 10, 2008

| | |
|---|---|
| ADDRESS | 1968 Sunrise Drive<br>Montrose, CO 81401<br>Montrose County |
| PROPERTY TYPE AND DESCRIPTION | Approximately 7.78 acres of improved land. Improvements include a senior housing facility consisting of one main building and 7 duplex cottages. |
| LEGAL DESCRIPTION | See Exhibit A in the Offering Memorandum for a complete legal description. |
| ANTICIPATED CLOSING DATE | Available for Immediate Closing. |
| PREFERRED ANNUAL RETURN | 14%<br>See investor deal structure. |
| TOTAL OFFERING | $3,700,000 |
| MINIMUM CASH INVESTMENT | $50,000<br>Not 1031 exchange eligible. |
| APPROXIMATE LOAN ASSUMPTION | No debt is available for assumption. |
| LENDER | Tier One Bank provided the construction loan which is due in 2015 (personally guaranteed by the Principals). |
| COLLATERAL REQUIRED | All membership interests are subordinate to the existing loan, and the land owners. |

The representation that the investment was limited to a single property and the entities involved were SPEs was significant. Investors will testify that they rejected investing in specific properties offered to them because they did not think the location or other factors would make that particular facility successful. Investors will further testify that because they believed they were investing in a specific property, they often split their investment into several different properties in order to diversify their investment and ensure that if one property failed, another could succeed and their overall risk of loss would be minimized.

/ / /

/ / /

**PAGE 29      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

### b.    Rents were derived from income from the specific property

Defendant emphasized that investors were to be paid by Sunwest a return annually, described as "rent" due on the lease of their facility. Although various facilities offered differing rent payments, the typical payment was 8-10 percent of the investment paid annually (paid on a per month basis).  Although the PPM discloses that a property might fail to generate sufficient income, it made clear that, to the extent "rent" was paid to an investor, it would be funded from the positive cash flow generated by the individual facility in which the investor held a TIC interest.  This principle and representation goes hand-in-hand with the understanding in the documents presented to investors that entities leasing and operating each facility were SPEs.  The PPMs cautioned and emphasized that the payment of returns on the TIC investments was dependent on the financial performance of the specific facility.  Virtually all of the PPMs disseminated by CCF for offerings sponsored by CCD made either identical or substantially similar representations.  These statements represented to investors that the source of the Master Tenant's 8-10 percent rent payment was the cash generated by the facility. While the Master Tenant's *obligation* to pay rent might continue regardless of the financial performance of the property, the PPMs represented that the Master Tenant's *ability* to make the rent payment was inextricably tied to the financial performance of the individual property.

To emphasize this point, the PPMs included financial projections for how Sunwest expected the property to perform once under its management, including monthly expenses and income. [4] In the marketing information provided to investors, defendant, CCD and CCF touted Sunwest's expertise and ability to use economies of

---

[4] Similar, less detailed projections were made in the Offering Summaries presented to investors as well.

scale to lower costs and improve a facility's profitability. Once the facilities improved their occupancy rate, the facility would be refinanced and Sunwest would buy out the investors' interests (returning their original investment) and pay them an additional two percent appreciation of the equity invested for each year the investor had held the TIC interest. These projections were included for the amount of time projected by Sunwest to "stabilize" the property and have sufficient cash to pay-off investors.  Here is a partial example of the projections and the level of detail included to investors:

## Income and Expense Forecast

Seasons at Mission Viejo

| | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SUMMARIZED** | | | | | | | | | | | | |
| Ordinary Income/Expense | | | | | | | | | | | | |
| # Residents | 63 | 65 | 68 | 72 | 77 | 81 | 86 | 92 | 97 | 100 | 103 | 106 |
| Occupancy % | 46% | 48% | 50% | 53% | 57% | 60% | 63% | 67% | 71% | 73% | 75% | 78% |
| Income | | | | | | | | | | | | |
| Total *REVENUE* | 235,662 | 243,609 | 254,478 | 270,372 | 288,885 | 304,779 | 336,906 | 358,334 | 378,076 | 389,480 | 401,515 | 413,860 |
| Total Other Revenue | 1,225 | 2,025 | 2,825 | 3,625 | 4,425 | 3,625 | 4,425 | 5,225 | 4,425 | 2,825 | 2,825 | 2,825 |
| Total Income | 236,887 | 245,634 | 257,303 | 273,997 | 293,310 | 308,404 | 341,331 | 363,559 | 382,501 | 392,305 | 404,340 | 416,685 |
| Gross Profit | | | | | | | | | | | | |
| Expense | | | | | | | | | | | | |
| ADMINISTRATION | 35,962 | 36,512 | 36,646 | 37,037 | 37,105 | 37,305 | 39,098 | 39,887 | 39,990 | 40,388 | 40,388 | 40,422 |
| MANAGEMENT FEE | 11,844 | 12,182 | 12,865 | 13,700 | 14,666 | 15,420 | 17,067 | 18,178 | 19,125 | 19,615 | 20,217 | 20,834 |
| MARKETING | 25,201 | 21,628 | 25,437 | 20,437 | 20,437 | 20,437 | 20,437 | 18,441 | 20,441 | 20,441 | 20,441 | 18,441 |
| ACTIVITIES | 10,792 | 10,792 | 10,792 | 10,792 | 10,792 | 10,792 | 11,224 | 11,224 | 11,224 | 11,224 | 11,224 | 11,224 |
| PERSONAL CARE | 63,648 | 67,642 | 70,216 | 74,180 | 73,567 | 73,627 | 74,209 | 74,630 | 74,708 | 74,755 | 74,801 | 74,848 |
| HOUSEKEEPING | 10,479 | 10,496 | 10,559 | 10,683 | 10,751 | 11,513 | 11,601 | 11,690 | 11,778 | 11,849 | 11,902 | 11,972 |
| DIETARY | 28,060 | 30,884 | 30,903 | 32,608 | 34,302 | 35,504 | 37,788 | 38,911 | 40,005 | 41,622 | 41,528 | 44,392 |
| MAINTENANCE | 20,940 | 21,540 | 22,540 | 22,840 | 29,840 | 25,528 | 26,384 | 26,384 | 27,248 | 27,248 | 27,248 | 27,248 |
| UTILITIES | 13,260 | 13,260 | 13,260 | 13,260 | 14,340 | 14,422 | 14,985 | 16,025 | 16,085 | 16,085 | 15,061 | 15,061 |
| INSURANCE | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,560 | 14,560 | 14,560 | 14,560 | 14,560 | 14,560 |
| Total Expense | 234,187 | 239,037 | 247,257 | 249,537 | 259,800 | 258,548 | 265,356 | 269,930 | 275,164 | 277,786 | 277,370 | 279,003 |
| EBITDAR | 2,700 | 6,597 | 10,046 | 24,460 | 33,510 | 49,856 | 75,975 | 93,630 | 107,336 | 114,519 | 126,971 | 137,682 |
| % of Profit | 1% | 3% | 4% | 9% | 11% | 16% | 22% | 26% | 28% | 29% | 31% | 33% |
| Mortgage Interest | 81000 | 81000 | 81000 | 81000 | 81000 | 81000 | 81000 | 81000 | 81000 | 81000 | 81000 | 81000 |
| TIC Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Prefered Return @ 10% | 61000 | 61000 | 61000 | 61000 | 61000 | 61000 | 61000 | 61000 | 61000 | 61000 | 61000 | 61000 |
| EBITDA | (139,300) | (135,403) | (131,954) | (117,540) | (108,490) | (92,144) | (66,025) | (48,370) | (34,664) | (27,481) | (15,029) | (4,318) |
| Reserve balance initially $1,000,000 | 860,700 | 725,297 | 593,343 | 475,803 | 367,313 | 275,168 | 209,143 | 160,773 | 126,109 | 98,628 | 83,599 | 79,281 |

These projections were very influential to investors who believed that Sunwest had significant experience and the ability to turn poor-performing ALFs around and make a profit.   The PPMs did not include financial statements for Sunwest or other Sunwest-managed properties.  To assuage investor concerns that rent would be paid,

investors will testify that they were told that Sunwest had a history of never missing a rent payment.  This statement led investors and potential investors to believe that Sunwest was a successful business with a history of meeting these projections.

It was represented to investors that the loans securing the property were backed by the personal guarantees of defendant and other Sunwest principals, giving investors the impression that the investments were safe.  It was further represented to investors that defendant was worth $300 million. Investors will testify that when they expressed doubt or concern about the investment at closing, Sunwest employees would whip out a copy of the defendant's financial statement, a statement which defendant created and gave to employees, that stated defendant was worth more than $300 million.  Investors believe this was designed to comfort and induce them to go forward with the investment.

In addition, because many of the ALFs were acquired at a time when the facility itself was not fully occupied, investors were told orally and in writing that reserves would be set aside to be used for improvements on the facility and rent payments until such time as the occupancy rate was sufficiently high to cover all expenses and provide a return in the form of rent to investors.  This was designed to assure investors that they would receive their "rents" while the ALF was brought up to near full occupancy

<div align="center"><em>c.     Sunwest was a financially successful business.</em></div>

In addition to the claims that it never missed a payment and its principals were so financially successful they guaranteed rents, Sunwest touted its financial prowess and success to investors at every turn.  Investors will testify that Sunwest held seminars and dinners for current and potential investors in which defendant attended and addressed those present.  Defendant and others exclaimed unqualifiedly that Sunwest was a

**PAGE 32       GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
                PROCEEDING**

successful company and financially healthy with tremendous potential for continued

growth.  Former Sunwest employees and investors will testify that similar individual,

oral representations were made to investors throughout 2006-2008.

### C.    HOW DEFENDANT EXECUTED THE FRAUD

The defendant's representations to investors were false from beginning to end.

It is important to note that while, the government has alleged that from at least the

beginning of 2006 through mid-2008, defendant devised and executed his scheme to

defraud this is an extremely conservative date since representations to investors have

been false, in essence, since Sunwest began.  The government choose 2006 as the

starting point for the scheme to defraud in the Indictment, a conservative estimate, for

three primary reasons: (1) 2006 was an approximate date when CCF started selling the

TIC investments as a security and defendant received his securities brokerage license;

(2) 2006 was the year defendant directed and oversaw an acquisition binge of new

facilities, averaging the purchase of one new facility per week during that year[5]; (3) the

result of this binge given the already poor financial condition of Sunwest was that it both

increased the number of victims and worsened significantly Sunwest's financial

condition.  For example, the negative cash flow for Sunwest's Senior Housing increased

from \$8,219,985 in 2005 to \$29,297,914 in 2006—an increase of over \$21 million.[6]  The

percentage of overall negative cash flowing properties also increased from 48% in 2005

to 62% in 2006. Here is a chart depicting primary problems beginning in 2006:

---

[5] Sunwest purchased 54 properties in 2006, most of which had negative cash flow.
[6] This Cash flow analysis from Senior Housing is a measure of the performance of senior living facilities only. It does not include any overhead expenses for Sunwest Management, CCD, KDA and other affiliates. It also omits expenses associated with non-senior housing.

PAGE 33    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
                 PROCEEDING



1.   <u>The SPE was a Fiction Because of the Way Sunwest Operated its Business.</u>

The investors in the TICs were told they were purchasing ownership interests in a specific facility that would pay an 8-10 percent annual return either from the reserves or profits from the specific facility. These representations misstated the true nature of the investment, and concealed the risk to investors from Sunwest's precarious financial position. Contrary to representations that individuals were obtaining an interest in a specific property, held in an SPE and in some instances, operated by an SPE, which would provide a steady income stream, defendant ran Sunwest as a single, integrated unitarian enterprise, commingling all investor funds and operational revenue from various facilities into essentially a single fund from which all operating expenses and investor returns were paid.

Defendant and Sunwest failed to disclose to investors that Sunwest managed its cash on an "as available" basis, which meant that as various costs at the facilities became due, whether it was large vendor bills, payroll, debt service or TIC payments for particular properties, Sunwest's finance team simply found cash in whatever facility happened to have cash available at that moment and used that money to satisfy the

PAGE 34      **GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

obligation.  To the extent the money was used for a purpose that was not related to the property from which the funds were taken, that property recorded the cash transfer as a "Note Receivable" on its balance sheet. To the extent a property received funds (or the benefit of funds) from that transfer, that property recorded a "Note payable" on its balance sheet.  In order to facilitate transfers of cash between facilities, Sunwest established a business bank account at Wells Fargo Bank, in defendant's and Mrs. Harder's name. In addition, Sunwest established an overdraft funding account at Wells Fargo.

Significant sums of money moved through these accounts. The majority of the funds were transferred from one Sunwest facility to another, via purported loans to and from defendant. Although the transfers of cash through the defendant business bank account were entered on the balance sheets for the various facilities as notes payable or notes receivable, the loans did not actually carry important terms, and there was no commercial substance behind them. Thus, the loans were not separately documented and did not state a date upon which payment was due. In short, the transfers in the form of supposed loans were simply the means by which Sunwest shifted cash among the facilities.

As a consequence of the above, funds from facilities that generated positive cash flow, and at times, funds from certain new investments, were used to pay the returns to investors of other retirement facilities. Because the homes varied in profitability, on an enterprise-wide basis, successful homes were supporting unsuccessful ones. Here is a chart showing the flow of money out of a cash flow positive facility:[7]

---

[7] The money in and out of Sunrise to "Jon Harder" are funds that were transferred to and from the Wells Fargo accounts in defendant's name. Funds in that account were moved to other accounts to pay for various Sunwest



 These transfers to the Wells Fargo accounts and other facilities were inconsistent with the representations in the PPMs, the operating agreements and Sunwest's covenants with its own lending institutions.  Defendant and Sunwest concealed the fact that a significant number of properties were unsuccessful and understated the risk of investing.  Furthermore, by operating Sunwest as a unitary enterprise, defendant concealed from investors the true financial position of each facility. This business practice violated the secured lenders' loan agreements and the property owning LLCs' operating agreements, and also jeopardized the validity of the TIC investors' 1031 exchanges.  Moreover, had Sunwest operated each property as the independent financial unit described to investors, the true picture of Sunwest's success at "turning around" properties as well as the success of each individual facility would have been visible to investors.  Instead, investors received the false impression that all Sunwest-managed facilities had become successful.

expenses.  This account was used however to pay for defendant's opulent lifestyle.

**PAGE 36    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

2.      Sunwest Did Not Miss a Payment Because it Commingled Funds
        From All Properties.

From approximately 2001 through approximately July 2008, the Sunwest TICs
did not miss a rent payment despite the fact that many Sunwest TICs were losing
money. Consequently, the payment to investors of the rent further conveyed to investors
the false impression that Sunwest was managing their property profitably and
successfully. In fact, since 2001 the vast majority of the TIC invested facilities never
made their projections represented to the investors—a fact not disclosed to investors
until late 2007.

By misrepresenting the true nature of the operations, Sunwest and defendant
concealed the fact that the supposed profitability of each TIC investment was largely
dependent on the success of other properties, the continuing availability of credit for
future refinancing, and defendant's ability to raise new money or borrow from friends.
More significantly, by commingling the operating funds and money raised from
investments and financing, Sunwest hid the fact that, far from consistently turning a
profit, more than half of the properties were losing money, making Sunwest a far riskier
proposition than investors were led to believe. As a consequence, numerous investors
received regular rent payments, purportedly from the proceeds of the facilities in which
they invested, even though the facilities were losing money. Under the terms of the
PPM, those investors should not have received investment returns in the form of rent.
However, those TIC investors were lulled into believing that their investments were
profitable because Sunwest had propped up the failing properties with money from
other sources. Despite the negative cash flow of many retirement facilities and the PPMs
disclosures to the contrary, every Sunwest managed facility continued to pay investors

**PAGE 37      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
        PROCEEDING**

their 10 percent rent and did not cease payments until July 2008. The practice of making investor payments on unsuccessful properties, which would not have been possible if Sunwest did not commingle funds, was misleading to investors. Investors will testify that the fact that they received regular payments on previous Sunwest investments was  material to their decision to reinvest in other Sunwest properties.

        3.        <u>Sunwest Was Not a Financially Sound Company</u>.

        a.        *Sunwest significantly commingled and misused investor funds.*

At defendant's direction and with his knowledge, Sunwest commingled investor funds.  They took money from anywhere they could to pay bills and cover negative bank balances regardless of the source or intended purpose of those funds. As described above, the government will show that Sunwest took money from profitable facilities to pay bills of facilities operating at a loss and took money from the losers if they had any cash in their accounts and used it for other facilities, even though they couldn't afford to do so.

Investors were told by Sunwest employees and other representatives of Sunwest that they were investing in a specific property. The significance of this representation is that investors selected properties for various reasons and viewed SMI as the manager of those properties. Investors believed their investment depended on the success of the property they invested in, regardless of what was happening at other Sunwest facilities. They were not aware that failure of other Sunwest properties to meet financial obligations would affect their investment.  Investors will testify that they choose specific properties to invest in because of its specific location, or other particular identifier. Investors will testify that they choose to invest their money in different facilities to

**PAGE 38**       **GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

"diversify" their investments—little did they know that diversification was not even a possibility because of the commingling.   Indeed, commingling was one of the primary tools that allowed Sunwest to continue to grow in size and attract additional bank financing and investor funds while concealing significant financial problems. For example, the PPM for Paragon Gardens, a preferred membership investment that closed in 2008, told investors that the funds generated would be spent as follows:

| Sources and Uses | | |
|---|---|---|
| Preferred Membership Interest: | | 7,300,000 |
| Uses: | | |
| Trade Payables | 504,200 | |
| Accrued Management Fees | 212,600 | |
| Notes Payable & Other Current Liabilities | 5,047,200 | |
| Debt Service Reserve: | 364,000 | |
| Preferred Distribution Reserve: | 636,000 | |
| CCF Brokerage Fee | 511,000 | |
| Closing Cost and Fees | 25,000 | |
| | 7,300,000 | 7,300,000 |

The money was not spent as promised to investors in the PPM.  Instead, between January and May, 2008, as the money came in, more than $6.1 million went into the defendant Wells Fargo accounts and then to pay expenses not related to the property. This is just one example of many.  The government will introduce a handful of examples to demonstrate that defendant spent investor money inconsistent with his promises to investors.

Eventually in late 2007 and early 2008, supplemental PPMs were issued on some, but not all, offerings finally disclosing in part that Sunwest had violated terms of the operating agreements it signed by commingling money between properties and which further stated that the practice would stop, and that all inter-company payables had been paid off.  In spite of the new supplemental PPMs, commingling continued at

PAGE 39        GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
                        PROCEEDING

Sunwest and under defendant's direction at an accelerated rate. Defendant did not do anything differently as it related to commingling after the supplemental PPMs were issued.  Defendant was completely aware that when the company continued to commingle funds between properties, it was in direct conflict with the language used in the new PPMs.

> **b.** *Over the course of the time alleged, Sunwest experienced significant problems with their cash flow, creditors and vendors.*

As described above, Sunwest's negative cash flow significantly increased from 2005 through 2006, in large part because of the sharp increase in facility acquisitions led by defendant.  That acquisition binge increased even more sharply over 2007. This worsened Sunwest's cash flow because of the manner in which Sunwest operated.  That is, the more facilities Sunwest purchased and the more investor money was obtained, the worse Sunwest's financial situation got.  Here is a chart of the increase in negative cash flow Sunwest experienced over the period alleged in the Indictment:



**PAGE 40    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

This precarious financial position was not disclosed to investors.  Instead investors were told that Sunwest was a financial success.

In addition, to the undisclosed commingling, discussed above, the negative cash flow and the treatment of the Sunwest as a unitary entity and the failure to disclose these significant issues, in the summer of 2007, Sunwest experienced serious financial problems with its primary creditor that ultimately led to the collapse of the entire Sunwest enterprise in the summer and fall of 2008. As more fully described below, Sunwest was declared in default by its largest creditor in 2007 once it began to learn of Sunwest's financial practices, soon after began defaulting on some mortgages and lenders began placing facilities into receivership or foreclosure. Other lenders threatened to foreclose unless Sunwest put into place cash controls, such as lock boxes, to prevent transfers of cash between facilities.  These serious financial problems were not disclosed to potential investors or potential lending institutions.

While facing imminent collapse, Sunwest, CCD and CCF continued raising money from investors until in or around June 2008. In fact, in early 2008 defendants conceived of an additional way to raise money by offering "preferred membership" interests in the Operator/Master Tenant limited liability companies. The money raised from new  investments, between approximately January and June 2008, both TICs and preferred memberships, was used, in part, to fund struggling, pre-existing facilities rather than to finance and operate the property described in the specific PPM. Investors will testify that they were not aware of any of the financial problems Sunwest was experiencing. The investors will testify that defendant and others told them the Sunwest real estate enterprise was financial stable and strong, and had never missed a payment to investors were material factors in their making a decision to invest in Sunwest.

**PAGE 41        GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
                 PROCEEDING**

Tamara Sanner, an independent registered sales representative for CCF, will testify that she was lied to repeatedly by people at Sunwest when she tried to get more information about Sunwest's financial conditions for clients. Sanner will testify that disclosures were inaccurate and defendant and others misrepresented the financial health of the company and the extent of the negative cash flow.  When Sanner sought financial information for investors, employees of Sunwest pushed off her requests.  The evidence will demonstrate that this concealment was representative.

In addition, Sunwest had a significant problem paying the utilities for and vendors that provided services to the facilities.  The government will introduce evidence that the senior facilities, whose residents' average age was 85, routinely received utility shut-off notices because of Sunwest's improper cash management and lack of cash flow. Vendors who delivered food and other goods and services to the facilities at points refused to deliver without payment up front.  Sunwest's performance with its vendors was so poor that by the time turnaround and restructuring consultants came into to help Sunwest, as described below, they had little if any ability to negotiate more favorable payment terms to give Sunwest breathing room. Employees will testify about the daily stressful task of finding sufficient funds, wherever they were available, to pay for Sunwest and the facilities' most immediate and emergent payables.  Investors in new facilities were not advised of Sunwest's difficulties meeting its most basic obligations to the tenants of the existing senior facilities—a risk that could have adversely impacted significantly the investors' investment.

<div style="text-align:center">

c.    *Defendant's financial statements were not accurate*

</div>

The representation to investors that defendant was worth $300 million was not accurate.  Defendant failed to disclose that his purported net worth consisted almost

**PAGE 42        GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING**
                 **PROCEEDING**

entirely of his ownership interest in Sunwest related entities, which defendant valued himself without the assistance of an independent appraiser.  The financial statement also did not include all of the loans defendant took over the course of the scheme to defraud to prop up Sunwest's cash flow and maintain his lavish lifestyle. In short, defendant's financial statement used almost as a prop in a play, to assure investors de3fendant could back their investment, was a complete sham.

> d.    *Defendant disbursed millions of dollars to himself and on his behalf to fund his opulent lifestyle.*

The government intends to introduce evidence that defendant withdrew millions of dollars from Sunwest, treating investor and financial institution funds as his own personal piggybank, in order to maintain his lavish lifestyle.   Defendant's pace of disbursements to himself or for his benefit continued unabated even as the Sunwest enterprise was unraveling.  Evidence of defendant's use of Sunwest funds to pay for his and his family's opulent lifestyle are probative of the defendants' motive and intent to defraud. Courts have routinely admitted such evidence in fraud cases at trial. *See United States v. Boone*, 951 F.2d 1526, 1537 (9th Cir. 1991) (holding that "[the defendant's] use of the funds raised for the venture for his personal benefit is probative of his fraudulent intent."); *United States v. Britton*, 289 F.3d 976, 982 (7th Cir. 2002) (financial benefits concurrent with misdeeds permits inference of fraudulent intent); *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) (inference of intent to defraud from contemporaneous financial benefits and misrepresentations); *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997) (intent may be inferred from the fact that the defendant profited or converted money to his own use); *United States v. Grimes*, 967 F.2d 1468, 1470 72 (10th Cir. 1992) (profit from arson scheme permitted inference

**PAGE 43    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

defendants were involved in scheme). Specifically, courts have admitted salary evidence as proof of the defendant's motive and intent. *See United States v. Johnson,* 297 F.3d 845, 871 (9th Cir. 2002) (observing that "circumstantial evidence established that [the defendants] were willing participants in the scheme. Each worked for the company for a significant amount of time, and each accepted the financial benefits of [the company's] success."); *United States v. Quattrone,* 441 F.3d 153, 187 (2d Cir. 2006) (upholding admission of defendant's substantial salary in 1999 and 2000 as proof of "a motive for him to obstruct the IPO allocation investigations.").

The government will introduce evidence to demonstrate that defendant disbursed millions of dollars to himself and his family (or for his benefit) in order to continue his extravagant lifestyle.  Defendant believed his monthly income was between $1.5 to $2 million and at least more than his personal expenses which ranged from $200,000 to $600,000 a month.  At one point the company maintained three aircraft, including one that was a high performance Bombardier jet that cost approximately $20 million. Defendant used these airplanes for personal use and failed to reimburse the company, despite the significant financial drain of the maintenance and upkeep of these aircraft. defendant organized and paid for trips for large groups including one fishing trip for about 100 people in Alaska, most of which were Sunwest employees. They were flown in on private jets. defendant also made annual trips to the Caymans Island.

Defendant was alleged to have up to six homes, including at least one in the Prong Horn development, an exclusive golf country club gated community, between Bend and Prineville, Oregon. His home in Salem, Oregon was a large house on a private lake and aerial photos showed that he was in the process of building a very large house of several thousand square feet.

**PAGE 44     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
              PROCEEDING**

Defendant had a large staff at his home that incurred significant monthly expenses. For example, he paid private tutors $6,200 per month to home school his daughter. No extravagance was too much—when defendant's daughter studied Ireland, he flew a teacher and the whole family, first class, to Ireland. When defendant's daughter studied turtles, defendant flew them first class in February 2008 to the Galapagos Islands to observe the turtles.[8] When defendant's daughter studied currency, defendant flew them D.C. to get a tour of the Department of Treasury.

The government will introduce testimony that Mrs. Harder would call Sunwest employees and ask for large amounts of money. If she asked for $100,000, the company would always disburse it to her. This was occurred on multiple occasions.

In late 2007 through 2008, despite Sunwest's dire financial situation, defendant and his wife continued to ask for and receive significant disbursements for their own personal use. Indeed, the government will introduce testimony that in 2008 alone, as Sunwest was literally on its last breath, over $6.1 million in payments were made to the Harders or for the benefit of the Harders from the comingled Wells Fargo and the CCD bank accounts.

### D.    UNRAVELING THE FRAUD

Sunwest's house of cards started to teeter in 2007. As more fully described below, in efforts to save Sunwest, protect the residents of the ALFs and the investors,

---

[8] During the February 2008 trip, defendant ran into Sunwest investors Lynn and Jane Henricksen—investors in Clovis, the count which defendant plead guilty. Mr. Henrickson and his wife actually invested in 13 Sunwest properties total, including Clovis, with a total investment of more than $4.1 million. On December 31, 2007, Henricksen invested in Clovis. On that very same day, he invested $200,000 in another property as well—one defendant disputes should be part of relevant conduct. At the trip, Mr. Henricksen asked Harder how Sunwest was doing—Harder failed to disclose any adverse financial troubles with Sunwest. By February 2008, GE had taken significant steps to assert remedies under its agreements. GE was insisting that its own accountant be placed to stop the commingling and intercompany loans and bring them in compliance with their loan covenants. In addition, Suwest was experiencing significant shortfalls of cash.

PAGE 45    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
                PROCEEDING

several outside experts were brought in to examine, correct and eventually take Sunwest out of defendant's hands and put more capable management in. When that didn't work, several civil proceedings took place.  Though the defendant intends to introduce his own financial experts to demonstrate that he did not defraud investors or commingle funds, the court should understand that the government will introduce testimony that every single outsider brought in during Sunwest's demise concluded just as the government has alleged—investors were lied to about the true nature of their investments, investor funds were misused and Sunwest was an incredibly poorly run and seriously financially unhealthy company dating back since at least 2006.

      1.      <u>GE Capital and Alvarez and Marsal</u>.

GE Capital, Healthcare Financial Services (GE) was a major Sunwest creditor whose loan portfolio ultimately grew to $575 million.  In mid-2007, GE discovered the inter-company lending that had been taking place among the Sunwest ALFs.

Richard Arrowsmith, Senior Vice President of GE will testify that as early as June 2007 GE sent notices to Sunwest of default because Sunwest had broken covenants, failed to make timely monthly payments and was in default on several of the GE loans. In the summer of 2007 GE also learned of the commingling of funds between Sunwest facilities, which was explicitly not allowed in the loan documentation and was considered a breach of representation or warranty. It demanded that this practice stop and directed Sunwest to reclassify the inter-company loans as distributions to defendant and the other Sunwest insiders.    In response, Barbara Jones, the head of the Sunwest accounting department, supervised the re-characterization of the inter-company loans to appease GE.  However, this did not stop Sunwest from taking money from GE financed properties. Sunwest continued to transfer funds as before from GE properties

PAGE 46      **GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

to support other Sunwest entities.  The only difference was the transfers were recorded in the records of the GE properties as distributions to Jon Harder instead of loans to another Sunwest entity.  One of the mechanisms used to transfer funds between the affiliated ALFs were the two Wells Fargo Bank accounts held in defendant's name.  The funds withdrawn from an ALF and deposited into one of the Wells Fargo accounts often were recorded in the accounting records of the ALF as a "withdrawal of capital" by defendant to disguise the inter-company transfers from investors and creditors.  In the summer of 2007, Arrowsmith learned that GE would be acquiring several of Sunwest's loans from Merrill Lynch. These loans were riskier than GE's loans to Sunwest and would not have been made by GE. In meetings with the defendant and other principles of Sunwest, they were told that GE did not want the Merrill Lynch loans.

In early February 2008, GE acquired the Merrill Lynch loans and by the end of the month had sent Sunwest notice that several of the loans were in default. GE told Sunwest that if they wanted more time to sell or refinance the Merrill Lynch properties they would have to hire outside consultants to assist them. GE gave Sunwest a list of accpetable consultants and 30 days to choose one of them.  In April of 2008, Sunwest hired turnaround consultants Alvarez & Marsal ("A&M") to provide financial and restructuring advice.  At about the same time, Sunwest also hired Steptoe & Johnson, a law firm specializing in bankruptcy.[9]  While A&M was working on the restructuring plan, Sunwest was attempting to sell 144 ALFs in what was called the Treadstone package. This transaction was to provide the funding needed to complete the reorganization of Sunwest and possibly cure its financial difficulties.  However, the deal collapsed in September 2008.

---

[9] These significant financial problems were not specifically disclosed to investors at the time.

**PAGE 47      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

In the meantime, lenders had begun to foreclose on a number of ALFs and were placing state receivers in control of the facilities.  Some of the lenders enforced lock box provisions, effectively cutting off funds to Sunwest in the form of management fees and inter-company loans. In March to July of 2008, GE and Sunwest attempted to reach a resolution regarding a group of the Merrill Lynch loans acquired by GE and referred to as the "Carolina 7" properties. Sunwest could not sell or refinance the properties and to prevent GE from foreclosing on them the Carolina 7 properties filed chapter 11 bankruptcies in Nashville, Tennessee in August 2008.

Matthew Marcos of A&M will testify for the government.  The first report by A&M, issued in about May 2008, revealed that the three major sources of funds for Sunwest were refinancing of properties, sales of securities, and borrowing of funds from facilities that had cash available. The A&M report also indicated that Sunwest was operating at a loss or "burning" $10 million per month. The report prepared a plan of reorganization for Sunwest. The plan was to dispose of poorly performing properties they had identified and keep the others to form the new Sunwest enterprise. However, Sunwest had a major problem. It was broke and out of cash.

    2. <u>Chief Restructuring Officer Clyde Hamstreet.</u>

As Sunwest faced the foreclosure of numerous ALFs, defendant approached turnaround consultant Clyde A. Hamstreet ("Hamstreet") to assist in restructuring Sunwest.  Defendant and other Sunwest principals signed a CRO Engagement Agreement  dated November 20, 2008 in which they retained Hamstreet as the Chief Restructuring Officer ("CRO") of the Sunwest enterprise.  The CRO Engagement Agreement called for an independent board to be selected in order to provide Hamstreet

with oversight and direction.[10]  The CRO Engagement Agreement provided that defendant and other principals ("HFG") transferred their right to receive any cash or noncash proceeds on account of their interests in the ALFs.  The CRO Engagement Agreement provided that Hamstreet would pay HFG "amounts that the CRO or Independent Board determine is reasonable and necessary for such Equityholder's living expenses, taxes, legal, accounting, and other professional fees and expenses, and such other amounts as may be approved by the independent board."  Under the CRO Engagement Agreement, Hamstreet assumed control of the operations of the Sunwest enterprise.

The solution to Sunwest's dire cash problem, was to sell 45 properties in a transaction that was referred to as the Lone Star Sale. Defendant signed an Agreement of Purchase and Sale dated December 1, 2008(the "Lone Star P&A") on behalf of 44 entities and another principal signed on behalf of one entity to sell the entities' interest in 45 ALFs to LSREF Golden Age Acquisitions, LLC ("Lone Star").  The sale price was $347.3 million dollars.  The sale was scheduled to close within 15 days after Lone Star completed its due diligence.  The due diligence period was set to expire on December 31, 2008. Hamstreet and his firm began to negotiate standstill agreements with creditors to stop the foreclosures and allow time to negotiate new loan terms.  Before this could be achieved, however, creditor LRS Development, which had a judgment of more than $5 million dollars, began to garnish Sunwest and defendant bank accounts.  Other judgments were imminent.  Defendant and other guarantors also were being named as defendants in foreclosure cases in which creditors sought to collect upon their

---

[10]  An independent board never was selected.

**PAGE 49      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

guarantees.   If these creditors obtained priority to the proceeds from the Lone Star sale,

they would jeopardize the global restructuring effort.

       3.    <u>Defendant's Bankruptcy.</u>

On December 1, 2008, defendant filed chapter 11 bankruptcy cases for more than

20 corporate entities in Portland, Oregon (the "SPE Bankruptcy Cases") to stay the

various enforcement actions.   Defendant and his professional advisors determined that

Sunwest did not have the financial resources or the personnel to collect the necessary

information to file chapter 11 cases for the over 200 ALFs.   Instead, defendant filed an

individual chapter 11 case in an attempt to gain breathing room and restructure his

whole enterprise on December 31, 2008 (the "Bankruptcy Case").   On the same day,

defendant signed an Amended and Restated CRO Agreement.[11]   He also signed an

Amendment to the Lone Star P&A that made several changes to the original agreement.

Finally, on December 31, 2008, defendant filed an adversary proceeding in Bankruptcy

Court captioned *Harder v. Wells Fargo Bank et al.*, Adversary Proceeding No.

08-03265-tmb (the "Adversary Proceeding").   The complaint in the Adversary

Proceeding sought an injunction to prohibit lenders from foreclosing on properties

owned by the SPEs.   Defendant sought and obtained the appointment of the Honorable

Michael Hogan ("Hogan"), a United States District Judge sitting in Eugene, Oregon, to

act as a mediator in the case.

The Lone Star sale closed on January 15, 2009.   Ultimately, the United States

Trustee ("UST") learned that defendant's net proceeds from the Lone Star Sale exceeded

---

[11]   Among other things, this agreement provided that Harder would receive an allowance of $25,000 per month which would increase to $54,000 per month once the Lone Star Sale closed.

$40,000,000. The defendant did not request court permission, as required by bankruptcy law, to transfer his interest in the 45 ALFs that were sold. The bankruptcy approval process would have allowed investors, creditors, and interested parties to review the terms of the sale and object to them prior to the Court's approval of the sale. This could have delayed the closing and potentially upset the entire transaction.

On January 27, 2009, the UST filed a motion to appoint a chapter 11 trustee in defendant's bankruptcy case. The motion asserted that defendant was acting in his own best interests rather than in the interests of his creditors in connection with the execution of the CRO agreement and Lone Star transaction.

Meanwhile, on February 13, 2009, the bankruptcy judge, Judge Patricia Brown, denied defendant's request for an injunction against the lenders in the Adversary Proceeding. This was a major impediment to defendant's plans. On February 16, 2009, Judge Hogan conducted a mediation session with at least thirty other attorneys and interested parties to address the denial of the injunction, the UST's motion to appoint a trustee, and future operations. The end result was a Stipulation that specified how the Sunwest enterprise would be operated on a going forward basis.

The bankruptcy judge expressed concerns about the Stipulation when it was read into the record during a hearing on February 18, 2009. On March 1, 2009, defendant filed a settlement motion calling for approval of the Stipulation. The filing of a securities fraud action however, changed the course of the bankruptcy proceedings.

4.    The SEC's Securities Fraud Case Against Defendant and Sunwest Entities.

On March 2, 2009, the SEC filed a securities fraud complaint against defendant and others in United States District Court in Eugene, in a case captioned SEC v. Sunwest

**PAGE 51      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
                PROCEEDING**

<u>Management, Inc. et al</u>, District Court for the District of Oregon Case No. 09-6056-HO. The SEC requested a temporary restraining order ("TRO") against defendant and others. Hogan presided over the emergency hearing on the SEC's motion for a TRO on March 2, 2009.   Hogan denied the SEC's motion for a TRO because he did not believe that the freezing of funds and assets and the appointment of a receiver was a better result than the cooperation already in place, i.e., the structure set forth in the Stipulation. Hogan then presided over a series of mediation sessions in the SEC Case.  He entered an order on March 10, 2009  that allowed the Stipulation that he had brokered and signed to remain intact, including the Management Committee concept and Hamstreet's continued control over the SPEs.  Hogan appointed a special receiver, Michael Grassmueck ("Grassmueck"), with limited powers and authority.

In August 2009, Grassmueck submitted a declaration dated August 25, 2009 in which he stated, in part, that Sunwest commingled funds "without regard to the source or intended or required use of the funds, and without the knowledge or consent of affected investors and creditors." The Grassmueck declaration included the following statements: "...based on the review to date, it appears that the allegations of wrongful conduct described by the SEC are supported by substantial evidence and played a significant role in the losses suffered by the Sunwest Enterprise." He further noted that "the receivership Entities were organized as discrete legal entities, but historically operated as one enterprise, and utilized cash investments and/or cash from operations in a significantly commingled manner without regard to the proper legal rights of purportedly separate entities to such funds. As a result, payments to certain Investors or to benefit certain facilities were made from funds that should have been limited to benefit other Investors or facilities."

**PAGE 52     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

Eventually, the SEC moved for summary judgment. Defendant did not fight summary judgment; instead, he admitted certain facts and agreed to the entry of Findings of Fact and Conclusions of Law. This document will be introduced by the government and is evidence of the defendant's scheme to defraud. Below is a chart summarizing the agreed upon finding of facts and conclusions of law:

| <u>FINDINGS OF FACT AND CONLUSIONS OF LAW IN THE SEC PROCEEDING</u> | <u>CITATION</u> |
|---|---|
| **BACKGROUND** | |
| Sunwest operates approximately two hundred senior housing facilities nationwide. At its peak in 2008, Sunwest had more than 280 facilities in approximately 34 states, and its management estimated that it had over $2,000,000,000 in asset value. | ¶4 |
| Defendant is the founder and majority owner of Sunwest, and until around January 2009 when he resigned, he served as its President and CEO. | ¶4 |
| **TIC INVESTMENTS** | |
| Beginning at least in 2006 through June 2008, Sunwest offered to investors TIC interests to facilitate the purchase of senior housing facilities managed by Sunwest. | ¶5 |
| From 2001 through June 2008, Sunwest raised approximately $430,000,000 from investors. Approximately $300,000,000 of that amount was raised in and after January 2006. | ¶6 |
| In and after January 2006, most TIC offerings were structured and sold in a consistent manner | ¶7 |
| Harder formed CCD on about March 28, 2001. CCD identified a property to be acquired and managed by Sunwest, and sponsored the TIC offering to potential investors. | ¶7 |
| Defendant CCD, with Harder's knowledge and assistance, offered ownership in the property to investors through TIC ownership interests. The remainder of the property was owned by a "Co-Owner," typically a limited liability company that was majority-owned by Harder. | ¶7 |
| Funds raised from investors through TIC offerings were to be used as the down payment for the property, while the remainder of the purchase price was to be financed through a mortgage, with the Co-Owner as the borrower. | ¶7 |
| Once the property was purchased, the TIC investors and Co-Owner leased the property to another Harder-owned LLC, called the "Operator" or "Master Tenant." The Master Tenant then | ¶7 |

**PAGE 53        GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

| | |
|---|---|
| subcontracted the property management duties to Sunwest, referred to as the "Property Manager." The Property Manager maintained complete control of the property's operations and finances. | |
| The TIC investors from whom the money was raised had no role in operating or managing the property. | ¶7 |
| Throughout the relevant period, Harder was the Vice President and Director of CCD and held a sixty percent (60%) controlling interest in CCD. | ¶8 |
| On about November 4, 2005, Harder formed CCF as a securities broker for the sole purpose of selling the TIC securities to investors either directly or through arrangements with third-party brokers. | ¶9 |
| From 2005 through 2008, Harder considered the TIC interest offers and sales to be offers and sales of securities. CCF was registered with the Commission as a securities broker-dealer on June 22, 2006. Harder was the sole member and a broker-dealer salesperson for CCF and holds a one hundred percent (100%) controlling interest in CCF. | ¶9 |
| **REPRESENTATIONS MADE TO INVESTORS** | |
| CCF used various marketing materials, including PPMs, Executive Summaries, and Offering Memoranda to market the investment opportunity to potential investors. | ¶9 |
| Through the PPMs, other materials, and occasional in-person meetings with investors, Harder emphasized certain points to investors including that investors were to be paid by Sunwest a return annually, described as "rent" due on the lease of their facility. Although various facilities offered differing rent payments, the typical payment was 10 percent of the investment paid annually. | ¶10 |
| At times, Harder personally met with potential investors at the investors' request, or at the request of CCF, to discuss matters regarding existing or potential investments . | ¶14 |
| **COMMINGLING WAS RAMPANT** | |
| At times, from 2005 to 2008, Harder identified cash flow positive facilities and cash flow negative facilities to facilitate transfers of money from one facility to another. Harder admitted this practice was central to Sunwest's business model. | ¶11 |
| Sunwest, as the property manager of each TIC-funded facility, had complete control over each facility's finances. | ¶12 |
| Because many of the facilities had low occupancy rates, high costs, or other financial challenges when acquired, one or more facilities' cash needs at times exceeded the cash generated. | ¶12 |
| To deal with this shortfall, Sunwest arranged loans from facilities that had surplus- cash for facilities that needed cash. | ¶12 |
| Harder admitted that cash transfers were made in response to "timing procedures" based on which facilities had cash on hand. | ¶12 |

**PAGE 54      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

| INVESTORS PAYMENTS WERE MADE BY FACILITIES THAT HAD NEGATIVE CASH FLOWS | |
|---|---|
| Harder encouraged the investor or potential investor to purchase a TIC interest in a particular facility and, at times, represented that the potential TIC investment was limited only to the risks and benefits of an investment in only that particular facility. | ¶13 |
| Through the PPMs, other materials, and occasional in-person meetings with investors, Harder emphasized certain points to investors including that investors were to be paid by Sunwest a return annually, described as "rent" due on the lease of their facility. Although various facilities offered differing rent payments, the typical payment was 10 percent of the investment paid annually. | **¶10** |
| **SUNWEST WAS NOT A SUCCESSFUL BUSINESS** | |
| According to Sunwest's financial records, many of the retirement facilities remained cash flow negative for prolonged periods while payments were nonetheless made to TIC investors and other creditors. For the nine-month period ended September 30, 2008, 58 percent of homes had negative cash flow. | ¶13 |
| During some of those in-person meetings, Harder omitted the fact that, in some cases, each facility's financial success depended upon the financial position of Sunwest because the operating capital of the facility in which they were investing might be loaned to other Sunwest facilities, whether the facility was operating at a cash profit or not. | ¶15 |
| Harder did not disclose to some potential investors that, at times, Harder identified cash flow positive facilities and negative cash flow facilities and that he directed money transfers to be made from cash flow positive Sunwest facilities to negative cash flow Sunwest facilities and from negative cash flow Sunwest facilities to cash flow positive Sunwest facilities to ensure the facilities could meet financial obligations to residents, investors and creditors. | ¶15 |
| As a result of the money transfers between facilities, the TIC investments were not always limited to a particular facility, but were, at times intertwined with other facilities also managed by Sunwest. That material fact was necessary to make other statements made by Harder to potential investors not misleading. | ¶16 |
| According to at least one PPM, TIC investors should not have received their rent payments when the facility in which they invested was not economically successful. For example, at least one PPM stated that the "Master Tenant must be economically successful in order to pay your rent." | ¶17 |
| Despite whether a facility faced negative cash flow, TIC investors were paid their rent until approximately July 2008. | ¶17 |
| One of the properties offered to TIC investors was called Victory Hills, in Kansas City, Missouri. | ¶18 |

**PAGE 55      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

| | |
|---|---|
| According to at least one PPM, TIC investors should not have received their rent payments when the facility economically successful. | ¶17 |
| For example, at least one PPM stated that the "Master Tenant must be economically successful in order to pay your rent." | ¶17 |
| Despite whether a facility faced negative cash flow, TIC investors were paid their rent until approximately July 2008. | ¶17 |
| SMI, as the property manager of each TIC-funded facility, had complete control over each facility's finances. | ¶7 |
| Because many of the facilities had low occupancy rates, high costs, or other financial challenges, their cash needs exceeded the cash they generated. | ¶12 |
| **PERSONAL USE OF SUNWEST FUNDS BY HARDER** | |
| Sunwest began operating Victory Hills in May 2007. According to Victory Hills' consolidated income statement for the twelve months ended December 31, 2007, each month Sunwest operated Victory Hills in 2007, the property operated at a net loss. In other words, although the property generated sufficient revenue to meet its operating expenses, each month in 2007, Victory Hills experienced a shortfall that did not leave it enough cash to make its debt service, interest expense, and TIC rent payments. In 2007, Victory Hills lost over $430,000. | ¶18 |
| Similarly, for each month that Sunwest operated Victory Hills through September 2008, Victory Hills failed to generate sufficient revenue to pay its debt service, interest expense and TIC rent payments. For the nine months ended September 30, 2008, Victory Hills lost over $440,000. | ¶19 |
| Despite the fact that Victory Hills lost money each month, rent payments were made to its TIC investors until July 2008. | ¶20 |
| That practice of paying rent when the property was failing was misleading to investors who believed that their investment was tied only to the property in which they had invested. | ¶20 |
| In order to fund Victory Hills TIC rent payments when it was not generating enough cash to make them, Harder caused other Sunwest-managed properties to transfer money to Victory Hills. According to Victory Hills General Ledger Trial Balance for the period ending December 31, 2007, Victory Hills received tens of thousands of dollars in loans from other Sunwest affiliated entities, including a $26,500 infusion from Harder. According to Victory Hills General Ledger Trial Balance for the period ending September 30, 2008, Harder's loans to Victory Hills had increased to $86,000. | ¶21 |
| Even though Victory Hills was not generating enough revenue to meet its financial obligations to its TIC investors, it was also actively lending money to other Sunwest-affiliated properties. For the period ending December 31, 2007, Victory Hills recorded notes receivable of | ¶22 |

| | |
|---|---|
| at least $330,000 owed to it from approximately nineteen other Sunwest properties. By September 30, 2008, Victory Hills was owed over $500,000 from twenty-four different Sunwest properties . | |
| By approximately late 2007, the nationwide credit crisis adversely impacted Sunwest's business model. Sunwest's ability to refinance substantially diminished, and Sunwest experienced acute problems funding the operations of various facilities. As a result, Sunwest began defaulting on some mortgages and lenders began placing facilities into receivership or foreclosure. Other lenders threatened to foreclose on properties unless Sunwest put into place cash controls, such as lock boxes, to prevent transfers of cash between facilities.  By December 2007, Sunwest was in risk of default on loans to its largest creditor, GE. | ¶23 |
| In 2008, CCD sponsored and CCF marketed the initial "Hawthorne Gardens Confidential Offering Memorandum," seeking to raise approximately $5 million to purchase a new facility for Sunwest to manage.  On about May 30, 2008, before the Hawthorne Gardens offering closed, Harder and others met with GE, Sunwest's largest creditor, and were informed that GE intended to foreclose on at least a portion of its $590 million loan portfolio. | ¶24 |
| On about June 9, 2008, the Hawthorne Gardens offering closed, adding approximately $5 million of new investor money into the enterprise. Six months later, on about December 1, 2008, Hawthorne Gardens filed for bankruptcy as part of Sunwest's ultimate collapse. | ¶25 |
| Before the Hawthorne Gardens investment opportunity closed on about June 9,2008, Harder did not tell Hawthorne Gardens potential investors about the meeting with GE and the risk the GE foreclosure posed to the financial position of Sunwest. This omitted material information was necessary to make other statements not misleading. . | ¶25 |
| **CONCLUSIONS OF LAW** | |
| Under the federal securities laws, "investment contracts" such as the TIC agreements sold or sponsored by Harder are securities. 15 U.S.C. 5 77b(l) (defining "security" under the Securities Act); 15 U.S.C. 5 78c(a)(10) (including "investment contract" in Exchange Act definition). | ¶29 |
| Harder's specific misstatements and omissions in relation to the TIC investment agreements occurred in the offer and sale of securities, from which Harder and others received money or property. Harder's specific misstatements and omissions were material to investors. | ¶31 |
| Harder's scienter may be inferred from his conduct in using the assets of the Victory Hills facility to pay the obligations of another facility and using the assets of another facility to pay obligations owed by the Victory Hills facility under circumstances that were misleading to  investors in the Victory Hills facility. The evidence | ¶34 |

**PAGE 57      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

| | |
|---|---|
| strongly suggests that Harder provided false information with respect to both the Victory Hills facility and the Hawthorne Gardens facility and withheld material information to investors in the PPMs and during in-person meetings. | |
| Harder violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. | ¶35 |

      5.    <u>Jon Harder has Admitted Under Oath, in Large Part, the Government's Case.</u>

Because of the significant civil litigation that ensued as Sunwest and defendant's scheme unraveled, defendant was required to testify multiple times under oath. Through his sworn testimony, defendant has, in large part, admitted under oath most of the government's case. These sworn statements, made in part, to obtain a benefit in the civil cases and before this criminal case was initiated, are evidence this court can and should consider in making its determination regarding the defendant's scheme to defraud. Here is a summary of some of defendant's sworn testimony:

| **Admissions by Jon Harder** | **Reference** |
|---|---|
| **Single Purpose Entity (SPE)** | |
| Harder acknowledged that each of the facility owning LLC's or partnerships was created as a separate legal with a distinct life from Sunwest. | *Kraus v. Harder, et al.*, USDC Case No. CV-03-1198-MO (Preliminary Injunction Hearing February 26, 2004), p.108, ll.4-18 |
| Harder stated that any property they bought or built was placed into a single purpose entity (SPE). | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 32-33, ll.16-8 |
| Harder admitted that this entity was in violation of its loan documents when the loan was made. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 192. ll3-20 |
| Harder agreed that the loan agreement prohibited the borrower from lending or loaning money to any person or entity | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 191-192. ll21-2 |
| Harder agreed that another limitation of an SPE is "Borrowers shall not incur, create, assume or | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File |

| | |
|---|---|
| become liable in any manner with respect to any indebtedness, except the debt and the permitted debt." | No. SF-03390-A (February 10, 2009), pp. 193-194, ll 7-1 |
| <div align="center">**Intercompany Loans/Commingling**</div> | |
| Harder admitted that Sunwest has been transferring funds back and forth between entities for many years and it was a "common practice." | *Harder v. Wells Fargo Bank, N.A.*, USBK Case No. 08-37225-tmb11, Adv. Proc. No. 08-03265 (Videotaped, January 20, 2009) pp. 229-230, ll 22-11 |
| Harder testified that if the intercompany borrowing and loans from principals had not taken place facilities would have failed and Sunwest would not be able to claim that they had never missed a TIC payment or lost a property to foreclosure. Admits that each individual property, unless it's in a cross collateralization, was "technically" by itself. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009), pp. 468-469, ll17-21 |
| <div align="center">**Restrictions or Prohibitions on Commingling**</div> | |
| Harder admitted that Sunwest's management agreements did not give Harder the authority to take money from one entity and transfer it to another entity | *Kraus v. Harder, et al.*, USDC Case No. CV-03-1198-MO (Preliminary Injunction Hearing February 26, 2004), pp. 109-110, ll 25-5 |
| Harder admitted he accepted the terms of the loan when he signed the loan agreement. He also admitted that other agreements were similar and created single purpose entity loans | *Harder v. Wells Fargo Bank, N.A.*, USBK Case No. 08-37225-tmb11, Adv. Proc. No. 08-03265, (January 26, 2009), pp. 195-195, ll 3-3 |
| <div align="center">**Commingling not Disclosed to Investors**<br>**Representations made to Investors by Defendant**</div> | |
| Harder admitted that he did not know why the disclosure to investors failed to advise them until October of 2007, that since December of 2001 the majority of the 135 TIC Offerings did not meet their projections in the first two years of operations was not made. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 187-188, ll 19-1 |
| Harder stated that he was aware that a Supplement to the OM for Autumn Glen dated October 2, 2007 contained a disclosure that stated the majority of the 135 TIC offerings by Sunwest since 2001 did not meet their financial projections in the first two years of operations. They did however pay all | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 184-185, ll 9-12 |

**PAGE 59      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

| | |
|---|---|
| mortgage, lease and TIC obligations which were at times funded by the infusion of funds from the entities principal members. | |
| Harder testified that he did not tell the sales people at CCF about the intercompany loans, although he thinks that they knew about it. He did not know how they found out about it. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 230-231 L21-11 |
| Harder admitted that Sunwest never missed a TIC payment until July of 2008.  He also stated that the practice of principals making up loan and TIC payments until July of 2008. | G *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 135-136 L18-3 |
| **Monthly TIC Rent Payments Were Backed by Sunwest's Principals** | |
| Harder stated that when a property was acquired that had negative cash flow money would be set aside in a reserve account to cover the TIC payments during the lease up period.  He also testified that if the reserve account funds were used up that the principals referring to himself and Fisher would make those payments. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 133-134, ll 8-16 |
| **Return on Investment Dependent on Facility Performance** | |
| Harder testified that the disclosure stating that the master tenant must be making money in order to pay the monthly rent payments is a caveat that the entity must be economically successful in order to pay the rent, however you define economic success. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 139-140, ll 9-3 |
| **Cash Flow Management** | |
| Harder stated that borrowing money from outside individuals as well as the intercompany loans and refinancing of properties were integral parts of how the business was meeting its cash flow demands. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009), pp. 360-361; L22-11) |
| Harder testified that money was taken from poor performing or cash flow negative facilities to loan out to other entities. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009), pp, 424-425; L8-6) |
| Harder admitted that without the intercompany loans, refinancing and borrowing from individuals he would have had to sell properties to prevent defaults or failure. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009), pp. 468-469; L11-11 |
| **Diverting Funds from New Acquitions** | |

| | |
|---|---|
| Harder admitted that he used funds from an offering or acquisition to cover cash shortfalls in other facilities and that in certain setting this practice would have been shared with people. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 77-79, ll 24-8 |
| Harder admitted that "excess" funds raised from investors would at times loaned to other facilities. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), p. 83, ll 8-19 |
| Harder admitted that proceeds from an offering or acquisition would be used to help fund shortfalls in a different entity | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 78-79, ll. 22-2 |
| Harder testified that earnest money deposits on property purchases were usually $100-$200,000 and typically made by CCD.  However at times the funds were borrowed from other investors, partners and affiliated entities. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), pp. 88-89, ll. 22-15 |
| **Sunwest was Short on Cash** | |
| Harder stated that Sunwest always had problems with having enough cash to pay its bills. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009), pp. 427-428, ll. 16-2 |
| **Dissemination of Financial Information** | |
| Harder stated that investors were not normally given financial statements on their property.  He admitted that if they had been given financial statements they could have discovered the intercompany loans that might have taken place. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), p. 206, ll. 2-23 |
| **Violation of Loan Covenants and Other Lender Problems** | |
| Harder admitted  that Sunwest was in violation of some loan covenants at the time he signed the loan documents. | *Harder v. Wells Fargo Bank, N.A.*, USBK Case No. 08-37225-tmb11, Adv. Proc. No. 08-03265 (Videotaped, January 20, 2009),B34 pp, 37 and 43; *U.S. SEC In the Matter of:  Sunwest Management, Inc.*, File No. SF-03390-A (February 10, 2009), p. 220, ll. 3-18 |
| **Jon Harder's Personal Financial Statements** | |
| Harder admitted that he prepared the property valuations in his personal financial statements | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File |

| | No. SF-03390-A (February 19, 2009), pp. 374-375, ll. 9-7 |
|---|---|
| **Sunwest was a Single Unitary Enterprise** | |
| Harder admitted that the company was operated somewhat as one company over the course of time. | *In re: Jon M. Harder* BK Case No. 08-37225-tmb11. (February 4, 2009, 341(a) First Meeting of Creditors), pp. 64-65, ll. 17-6 |
| Harder admitted that Sunwest was operated "as one business, all these little businesses as one aggregate business." | *U.S. SEC In the Matter of: Sunwest Management, Inc.,* File No. SF-03390-A (February 10, 2009), p. 180, ll. 5-13 |
| Harder did not believe that investors were informed via Offering Memos disclosures that Sunwest was operated a one unified business. | *U.S. SEC In the Matter of: Sunwest Management, Inc.,* File No. SF-03390-A (February 10, 2009), pp. 180-181, ll. 14-10 |
| **Payments Made to or on Behalf of defendant** | |
| Harder testified that money he borrowed from individuals and friends were used in the Sunwest business and to pay for his personal living expenses and investments. He also stated that he was making $1.5 to $2 million a month in income. | *U.S. SEC In the Matter of: Sunwest Management, Inc.,* File No. SF-03390-A (February 19, 2009), p.350, ll. 4-23 |
| Harder admitted that the portfolio of senior housing had at times negative cash flow and that he still took money out for his personal expenses knowing this fact. | *U.S. SEC In the Matter of: Sunwest Management, Inc.,* File No. SF-03390-A (February 19, 2009), p. 430, ll. 2-15 |
| Harder stated that he understood his income was more than the amount of his personal expenses that ranged from $200,000 to $600,000 a month that were paid from the Harder business account. | *U.S. SEC In the Matter of: Sunwest Management, Inc.,* File No. SF-03390-A (February 24, 2009), pp. 514-515, ll. 21-4 |
| Harder admitted that he received his ownership interest in Sunwest entities without paying any cash for them. | *Harder v. Wells Fargo Bank, N.A.,* USBK Case No. 08-37225-tmb11, Adv. Proc. No. 08-03265 (Videotaped, January 20, 2009), pp. 220-221, ll. 11-11 |
| Harder admitted he paid nothing for his ownership interests in Sunwest entities | *Harder v. Wells Fargo Bank, N.A.,* USBK Case No. 08-37225-tmb11, Adv. Proc. No. 08-03265, (January 26, 2009), p. 176, ll. 10-18 |
| Harder's wife began receiving a salary from Sunwest in the month they filed for bankruptcy. In December of 2008 she began receiving a salary of $60,000 per year. | *Harder v. Wells Fargo Bank, N.A.,* USBK Case No. 08-37225-tmb11, Adv. Proc. No. 08-03265 (Videotaped, January 20, 2009), pp. 20-21, ll. 2-19 |
| Harder admitted he was paid more than $60,000 a | *Harder v. Wells Fargo Bank,* |

| | |
|---|---|
| month before he filed for bankruptcy. | *N.A.*, USBK Case No. 08-37225-tmb11, Adv. Proc. No. 08-03265 (Videotaped, January 20, 2009), p. 51, ll. 1-20 |
| Harder admitted that payments were made to Kristen Harder from Sunwest to pay for Harders' living expenses. The total listed for 2008 was $734,300. He stated that Kristen would call Johnny Dinh when she needed money. Harder stated he did not know where the money came from that was paid to Kristen. | In re: Jon M. Harder Bankruptcy Case No. 08-37225-tmb11. (February 4, 2009, 341(a) First Meeting of Creditors), p. 110, ll. 6-21 |
| Harder admitted that Marianne Schlies paid his Bank of Whitman monthly home mortgage payment of $33,000 from his business account. (JMH Business account #4517) | U.S. Securities and Exchange Commission vs. Sunwest Management, Inc.,et al., Case No. 09-CV-6056-HO (December 4, 2009), p. 42, ll. 5-22 |
| Harder stated that the amount of monthly payments made on his behalf by the Harder business account varied from $312,000 in January 2006, to $547,580 the next month and by April of 2008 was about $640,000 a month. He again stated that he did not know which bank account these payments were made from. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009. (281 pages), p. 345, ll. 2-18 |
| Harder stated that some of the money he personally borrowed from individuals did not go into the Sunwest businesses but to him personally at times. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009. (281 pages),p. 351, ll. 4-8 |
| Harder testified that money he borrowed from individuals and friends were used in the Sunwest business and to pay for his personal living expenses and investments. He also stated that he was making $1.5 to $2 million a month in income. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009. (281 pages), p. 350, ll. 4-23 |
| Harder testified that he justified taking funds from Sunwest to pay his personal expenses because he understood that his income was millions of dollars and since he loaned most of that back to the business he was entitled to take funds for his personal expenses. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A.  (February 19, 2009), p. 405, ll. 4-17 |
| Harder admitted that the portfolio of senior housing had at times negative cash flow and that he still took money out for his personal expenses knowing this fact. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009), p. 430, ll. 2-15 |
| Harder stated that by all reasonable standards he had a very "big lifestyle" spending $100,000 or $150,000 a month. He also said that most of the money he borrowed from individuals went back | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009. (281 pages), p. 347, ll. 9-22 |

| | |
|---|---|
| into the business but some of it may have gone to fund his "big lifestyle." | |
| Harder testified that he understood that Kristen was receiving $100,000 to $150,000 a month from the Harder business account to pay their personal expenses | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009),p. 387, ll. 11-24 |
| Harder stated that no one did anything to make sure the money transferred to Kristen was money that Harder was entitled to take from Sunwest. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A.  Deposition of Harder (February 19, 2009), p. 391, ll. 14-24 |
| Harder admitted that payments to Kristen were based on what her needs were at the time to cover her bills. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009,p. 402 L2-6 |
| Harder testified that Dinh never told Kristen she could not have money from Sunwest. He may have told her she would have to wait a few days to get it but not that she could have it. | *U.S. SEC In the Matter of: Sunwest Management, Inc.*, File No. SF-03390-A (February 19, 2009, pp. 426-427, ll. 17-15 |
| Harder testified that in April of 2007 they engaged CBRE a large senior housing broker to sell 135 of Sunwest's better properties.  Harder admitted that the reason for trying to sell properties in April of 2007 was to raise cash and that Sunwest was having financial issues at that time. | U.S. SEC In the Matter of: Sunwest Management, Inc., File No. SF-03390-A (February 10, 2009), pp.162-163, ll. 6-8 |

### E.    DEFENSES

The government anticipates the defendant will assert principally two reasons why his scheme to defraud does not exceed the counts of conviction, none of which are persuasive: (1) despite the systematic and pervasive false representations in the marketing materials and by defendant's agents to investors both before and during their investments, the TIC victims in particular got everything they were promised under the strict, literal terms of the agreements they signed with Sunwest and cannot now complain about the gross way defendant managed Sunwest; (2) after defendant stole all of the victims' money and as he was about to lose everything, he cooperated with Hamstreet and in the Bankruptcy and SEC proceedings to mitigate the losses to the

victims.  In determining the scope of the fraud and relevant conduct, the court should reject these arguments.

       1.      <u>The TIC and Preferred Member Investors were Told Lies and Material Information was Concealed, Regardless of How the ALFs were Supposed to be Operated.</u>

The government anticipates that the defendant will argue some variation of the following: the structure of the investment and the strict, technical language in the agreements, all of which by defendant's own admissions prohibited the very practices of commingling and inter-company loans that Sunwest was engaged in, did not give the TIC investors the right to object to the practices of the operator and the manager and therefore, they received what they were promised under the agreements—a fractional interest in an LLC that owns the facility—and the inter-company loans are essentially none of their business.  This argument misapprehends very basic principles of wire and mail fraud many times over.

The defendant, and by others at his direction, lied to investors orally and in writing about the true nature of their investment, the operations of Sunwest and the financial success of the company.  The reason he did so was to get investors to give him money.  This information was capable of influencing the investor, and in fact did so. The fact that investors may not have had the ability or right under the legal agreements they signed to object to or control the commingling, the transfers between the facilities or to the source of their rent payments is completely irrelevant under a wire and mail fraud theory.  Indeed, "[t]he fraudulent nature of the 'scheme or artifice to defraud' is measured by a non-technical standard." *Bohonus*, 628 F.2d at 1171. Statements are false and a scheme to defraud established, a scheme sufficient where "the statements * * * may not have been literally false, [but] taken as a whole they were fraudulently

**PAGE 65**      **GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

misleading and deceptive." *Lustiger*, 386 F.2d at 136. The only requirement of a false statement is that it be material. In this case, the representations to investors, both orally and in writing, were lies and included information that a reasonable prudent investor would be influenced by. Indeed, seven separate investors will testify at the sentencing hearing that the representations made a difference to them in determining whether they should invest money into Sunwest.

        2.      <u>Defendant Harder's Purported Assistance and Cooperation in the Recovery of Assets for TIC and Preferred Member Investors is Not Relevant to this First Sentencing Proceeding.</u>

The government anticipates that the defendant will introduce significant evidence and argument that the court's finding regarding the defendant's scheme to defraud and relevant conduct should be circumscribed because of defendant's purported cooperation with the restructuring officer, Hamstreet, the SEC, its receiver and in the bankruptcy proceeding. The government expects the defendant to introduce a disproportionate amount of evidence in this first sentencing proceeding about defendant's actions after the true nature and scope of his fraud was revealed to the world. Defendant's actions, however helpful, and there is some dispute about this, serve no purpose in this first sentencing proceeding to determine scope of fraud and relevant conduct. The government believes defendant's conduct in this regard is an appropriate consideration for the court in evaluating the 3553(a) factors, however, defendant's conduct after he plundered all of the investors' and financial institutions' money by lying and concealing material facts, are not relevant in evaluating the scope of his fraud or the loss under that fraud.

/ / /

/ / /

**PAGE 66     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

> a. *Defendant's actions after the fraud was committed are not relevant in determining the scope of defendant's fraud.*

As outlined in more detail below, the defendant's crimes of wire and mail fraud were complete as soon as he, or others, used the mail and or the interstate wires in furtherance of his scheme. *United States v. Blitz,* 151 F.3d 1002, 1011 (9th Cir. 1998). Thus, his after-the-crime "assistance" in the SEC and Bankruptcy Proceedings is not an appropriate consideration for this court in analyzing whether the defendant's scheme to defraud exceed the counts of conviction.

> b. *Any recovery investors received as a result of the Bankruptcy Proceedings or the SEC Proceedings or the Receiver does not reduce loss.*

In determining relevant conduct, the defendant should not receive a credit against actual loss for money the Receiver has returned to Sunwest's investors. A fraud defendant is entitled to credit for refunds paid prior to the discovery of the offense. *United States* v. *Garro,* 517 F.3d 1163, 1167 (9th Cir. 2008). *See also United States v. Bright,* 353 F.3d 1114, 1118 (9th Cir. 2004). Repayments after detection of a crime, however, are not deducted from the loss because they show only an effort to reduce accountability. *Garro,* 517 F.3d at 1168. *See also Bright,* 353 F.3d at 1118.

In *U.S. v. Wolfe*, 71 F.3d 611 (6th Cir. 1995), the Sixth Circuit concluded the amount of financial loss attributable to a defendant who operated a Ponzi scheme should not be reduced by property a bankruptcy trustee recovered. The Sixth Circuit stated that "[the defendant] cannot reduce the magnitude of his own crime by relying on the actions of the bankruptcy trustee . . . ." *Id.* at 618. The court's holding was largely the application of "the basic notion that the agency of another cannot be used to reduce the amount of loss." *Id.*, *citing U.S. v. Rothberg*, 954 F.2d 217 (4th Cir. 1992); *U.S. v.*

*McAlpine*, 32 F.3d 484 (10th Cir. 1994); *U.S. v. Harris*, 38 F.3d 95 (2d Cir. 1994).

In another fraud case, the Sixth Circuit held that:

Recovery of fraudulently obtained money or property by the coercive actions of the state, whether these actions occur years after or immediately after the fraud is discovered, cannot be used to reduce the amount of loss. Whatever mechanism the government uses to assist recovery after a fraud is discovered, the scope of the defendant's fraud remains unaltered. Such governmental action is unrelated to the defrauder's conduct and may never occur, whereas the scope of the fraud is limited from the outset in cases where the defrauder himself first acts to constrain the magnitude of the money or goods that he can fraudulently obtain.

*U.S. v. Lucas*, 99 F.3d 1290, 1299 (6th Cir. 1996).

More recently in this District, Judge Anna Brown rejected any reductions from loss under §2B1.1 because of recoveries after the fraud was completed. *United States v. Neuman*, 3:11-CR-0247-BR, (Doc. No. 454). Specifically, Judge Brown found the defendants' attempt to bootstrap recoveries made in the bankruptcy proceeding to reduce loss "to be after-the-fact, attempted rationalizations that do not address the standards applicable to determining a loss amount under § 2B1.1 whereas the PSR loss calculation of $13.7 million tracks both definitions of loss set forth above." *Id.* at p. 11.

## IV.  <u>LEGAL ISSUES TO BE RESOLVED</u>

The government believes the defendant will attempt to introduce significant evidence, through expert and lay testimony that is simply not relevant to whether defendant intended to defraud investors, made material misrepresentations or any other issue regarding the defendant's scheme to defraud or determining relevant conduct. As outlined below, some of this evidence should be disregarded in its entirety by the court and some may be considered by the court in determining the appropriate sentence to impose on defendant when evaluating the factors listed in 18 U.S.C. § 3553(a).

**PAGE 68      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

### A.   KEY CONCEPTS REGARDING WIRE AND MAIL FRAUD IN EVALUATING DEFENDANT'S EVIDENCE.

As described above, the purpose of the hearing is to determine whether the defendant's scheme to defraud is broader than the counts of conviction.  The government's theory is that the scheme to defraud was broader and generally outlined in the Indictment.  In evaluating the quality of the evidence the defendant attempts to introduce to rebut that, there are some key wire and mail fraud principles to keep in mind.

### 1.   The Fraud is Complete as Soon as the Mail or Interstate Wire is Used.

The mail and wire frauds have a unique characteristic—a violation is complete when the mail or wire has been used.  *Blitz,* 151 F.3d  at 1011. For each, the mere existence of the scheme plus the use of the mail, or an interstate wire, to further the scheme will suffice.  *See Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1481 (9th Cir.1997), *cert. denied,* 522 U.S. 996, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997); *Hubbard,* 96 F.3d at 1227–28; *Lothian,* 976 F.2d at 1262.

Therefore, each completed call and or mailing is a separate, completed fraud offense.  *See United States v. Nash,* 115 F.3d 1431, 1441 (9th Cir.1997), *cert. denied,* 522 U.S. 1117, 118 S.Ct. 1054, 140 L.Ed. 117 (1998); *United States v. Niven,* 952 F.2d 289, 293 (9th Cir.1991); *Nelson v. United States,* 178 F.2d 458, 458–59 (9th Cir.1949); *see also United States v. St. Gelais,* 952 F.2d 90, 96–97 (5th Cir.1992); *United States v. Fermin Castillo,* 829 F.2d 1194, 1199–1200 (1st Cir.1987). Once the mail or interstate wire is used, the offense and the intended loss is complete at that point. United States v. *Yusufu,* 63 F.3d 503, 514 (7th Cir. 1995). Thus, it is irrelevant to the determination of the scope of the fraud the defendant's actions after he completed his fraud.

**PAGE 69     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

2.    <u>The Scheme Does Not Need to be Successful</u>.

It is not necessary for the defendant to gain anything or for the scheme to succeed at all. *United States v. Racliff*, 488 F.3d 639, 645 (5th Cir. 2007); *United States v. Schumer*, 458 F.3d 1148, 1153 (10th Cir. 2006); *United States v. Taros*, 310 F.3d 999, 1006 (7th Cir. 2002); *United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997); *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir.1994); *United States v. Frey*, 42 F.3d 795, 800 (3d Cir. 1994); *United States v. Williams*, 728 F.2d 1402, 1405 (11th Cir. 1984); *United States v. Curtis*, 537 F.2d 1091, 1095 (10th Cir. 1976); *United States v. Pollack*, 534 F.2d 964, 978 (D.C. Cir. 1976); *Pritchard v. United States*, 386 F.2d 760, 765-66 (8th Cir. 1967).  The victim need not have suffered a loss, because the crime consists merely of devising the scheme and executing or attempting to execute it. *United States v. Treadwell,* 593 F.3d 990 (9th Cir.2010); *United States v. Copple*, 24 F.3d 535, 544 (3d Cir. 1994).  If money or property is received as a result of the scheme, it would be fraud proceeds. *See United States v. Savage,* 67 F.3d 1435, 1442–43 (9th Cir.1995), *cert. denied,* 516 U.S. 1136, 116 S.Ct. 964, 133 L.Ed.2d 885 (1996).  Again, in determining whether the defendant defrauded the TIC or preferred investors and over what time period, the actions of defendant and the recovery by the investors after the fraud was committed, is completely irrelevant.

**B.    JON HARDER'S DESIRE OR ABILITY TO REPAY INVESTORS OR FIANNCIAL INSTITUTIONS IS NOT RELEVANT.**

The government believes that defendant will offer what is essentially evidence and argument of defendant's intent, desire or ability to repay investors even though he took their money through material misrepresentations and omissions and/or used a scheme to defraud.  The government anticipates that such evidence will be stylized in

**PAGE 70    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

many forms, including as purported evidence rebutting the element of intent to defraud, but the crux is essentially the same. For example, the government expects the defendant to offer evidence and argument that defendant did not intend to defraud investors because he believed that investor money was safe despite the misrepresentations and failures to disclose to investors and financial institutions what was actually happening with their money and Sunwest's true financial situation, among other things. The government anticipates that defendant will offer evidence and argument that other reasons contributed to the precipitous decline of Sunwest and at all times defendant believed he could pay investors back because the properties owned by Sunwest and the business had value and could be easily sold. Such evidence is not at all relevant to the scope of defendant's fraud and likely would have been excluded from the jury had this matter gone to trial. Intent or ability to repay a victim is not a defense to fraud. *See United States v. Namvar,* 2012 WL 5866049, *1 (9th Cir. Nov. 20, 2012) (unpublished) ("The district court properly excluded evidence of [defendant's] intent to repay the victims and good faith effort to fund the exchanges because such an intent is not a defense to fraud."); *United States v. Bowman*, 81 Fed.Appx. 104, 106 (9th Cir. 2003) (unpublished) ("The district court did not abuse its discretion by excluding evidence of [defendant's] attempts to find a replacement guarantor because his intent to repay fraudulently obtained funds is not a defense to mail fraud.); *see also United States v. Olson,* 925 F.2d 1170, 1175-76 (9th Cir. 1991) ("What matters ... is that [defendant] fraudulently obtained the use of others' money. Whether he intended that the effects of his fraud to be permanent or temporary has no legal relevance.").

It is well-established that a good faith belief that money will be restored or paid back to a victim is generally not a defense to fraud charges. *United States v. Treadwell*,

**PAGE 71    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

593 F.3d 990, 996-97 (9th Cir. 2010); *United States v. Shipsey*, 363 F.3d 962, 967-68 (9th Cir. 2004); *United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir. 1993); *see also United States v. McCormick*, 72 F.3d 1404, 1409 (9th Cir. 1995) (no defense to providing a false statement to a bank); *United States v. Alcantar*, 832 F.2d 1175, 1179 (9th Cir. 1987) (no defense to embezzlement and conversion of bank funds); *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) (no defense to mail fraud). Here, the fraud was complete when defendant lied to investors in order to obtain and utilize the investor's money and used the mail and interstate wires in furtherance of their scheme to obtain investor money. *Kann v. United States*, 323 U.S. 88, 95 (1944) (scheme complete when defendants received money intended to be obtained by their fraud); *cf. United States v. Coin,* 753 F.2d 1510, 1511 (9th Cir. 1985) (holding that testimony regarding defendant's repayment of stolen monies was irrelevant because, "such crimes are complete when the misapplication or embezzlement occurs").

Intent to defraud does not require the government to prove an intent to cause a pecuniary loss. *Treadwell*, 593 F.3d at 999 (upholding convictions and noting jury found that defendants "through misrepresentation, intentionally deprived their victims of the opportunity to decide for themselves, on the basis of true and accurate information, whether or not to invest" which is "all that an 'intent to defraud' under 18 U.S.C. § 1343 requires"); *United States v. Shaw*, No. 13-50136 Slip Op., p. 15 (9th Cir. March 27, 2015)(intent to defraud requirement in bank fraud statute, modeled on wire and mail fraud statutes, does not require government to prove that defendant intended bank to suffer financial loss). Simply put, "one can intend to 'deprive' a victim of property within the meaning of the statute without intending to cause pecuniary loss."

*Id.* at 996; *see also United States v. Oren*, 893 F.2d 1057, 1062 (9th Cir. 1990) (holding

PAGE 72    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
             PROCEEDING

that even if the defendant believed that the property was worth what the victim of the fraud paid for it, the fact that the seller made a false representation to inflate the purchase price constituted "intent to defraud" under § 1343).  The defendant may have hoped that he would have been able to sell or mortgage his business to successfully repay the investors or the financial institutions, but that has no relevance to the ultimate questions before the court must decide—did the defendant knowingly devise or intend to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises beyond the counts of conviction.

Even if defendant believed that the victim's money would be returned to it at some point, it could not negate the fraud.  *Treadwell*, 593 F.3d at 996 ("One can intentionally 'deprive' another of property while at the same time intending to restore it a later date.").  The harm triggering criminal liability occurred when defendant, by making investors believe Sunwest's promises offered verbally and in the various documents, intentionally deprived them of the opportunity to decide whether it wanted to assume the risk of the actual investment made or allow their money to be used for other uses.  *See Treadwell*, 593 F.3d at 997 (finding proof of loss irrelevant and holding harm was depriving victims of opportunity to weigh true benefits and risks of transaction, regardless whether they suffered permanent loss); *United States v. Hamilton*, 499 F.3d 734, 736 (7th Cir. 2007) ("If you embezzle from your employer you are not excused just because you had an honest intention of replacing the money, maybe with interest . . . You imposed a risk of loss on the employer—deliberately, fraudulently, and without a shadow of excuse or justification—and that is harm enough to trigger criminal liability").

**PAGE 73        GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING**

### C.    UNUSUAL OR UNPREDICTABLE MARKET CONDITIONS ARE NOT A DEFENSE TO DEFENDANT'S CRIMES.

The defendant has provided the government the expert report of Patrick Emerson who will testify about the precipitous economic crisis that occurred during the relevant time period and its effects on the credit market and the assisted living facility industry, i.e. decreased demand and increased costs.  It is unclear for what purpose this evidence is being offered, but counsel has proffered a 35-page plus report detailing the cause of the economic crisis and how it affected financial institutions and the economy generally and Sunwest specifically.  This evidence is not relevant nor should it be considered by this court for any purpose—a wide body of case law supports this.

### 1.    The Financial Crisis and its Consequences Are Not Relevant Whether Defendant Intended to Defraud Investors.

This evidence is simply not relevant to the issue of whether the defendant's scheme to defraud exceeded the counts of convictions since the crime was completed at the time defendant use the mail and wires to execute his scheme to defraud.  The impediments to defendant's ability to obtain credit and other disasterous financial effects caused by the financial crisis simply do not assist in determining whether defendant devised a scheme to defraud investors or sought to obtain money from investors through materially false statements.  Thus, even if there was a legitimate reason that supported the inability of the defendant to continue to operate in the manner it was before July 2008 versus an "illegitimate" motive for why it was unable to continue, there is no basis for offering such evidence because it has no bearing on whether a fraud had been committed.  *United States v. Daniel*, 329 F.3d 480, 488 (6th Cir. 2003) ("[The defendant] contends that the intent must be to injure or harm the victim . . . But neither law nor policy supports this approach, which would have the jury

PAGE 74    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING PROCEEDING

look beyond his bad conduct to his overall motives. It is sufficient that the defendant by material misrepresentation intends the victim to accept a substantial risk that otherwise would not be taken.").  Such evidence is similar to "intent to repay evidence" and should likewise be excluded for the reasons outlined above.  Accordingly, such evidence should not be considered by this court in determining the scope of defendant's fraud.

### 2.    The Financial Crisis Does not Affect Relevant Conduct.

The financial crisis and its role in the demise of Sunwest is similarly irrelevant with respect to determining relevant conduct of the defendant's fraud, including loss under the sentencing guidelines.  Again, the purpose for which defendant is offering this evidence is unclear, and the defendant should clarify this, however, courts across the country, including the United States Supreme Court, have refused to consider such evidence in determining relevant conduct.  *U.S. v. Robers* 134 S.Ct. 1854, 1859, 188 L.Ed.2d 885 (2014)(rejecting market conditions as breaking causal chain of loss to victims and noting "[f]luctuations in property values are common.  Their existence (though not direction or amount) is foreseeable.  And losses in part incurred through a decline in the value of collateral sold are directly related to an offender's having obtained collateralized property through fraud.  That is not to say that an offender is responsible for everything that reduces the amount of money a victim receives for collateral.  Market fluctuations are normally unlike, say, an unexpected natural disaster that destroys collateral or a victim's donation of collateral or its sale to a friend for a nominal sum—any of which. . . could break the causal chain"); *United States v. Bernadel*, 490 Fed. Appx. 221, 228 (9th Cir. 2012)(in mortgage fraud case, a reduction in loss because of real estate market decline, was not supported by the guidelines); *United States v. Carpenter*, ___F.3d___, 2015 WL 1412584, *18 (1st Cir. March 30,

**PAGE 75      GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING**
**PROCEEDING**

2015)(rejecting defendant's argument loss should be reduced because the extent of the victims' losses were caused by decline in stock market and noting that "defendant is the reason that the investors' money was exposed (and greatly so) to market risk in the first place. If he had promised to buy fire insurance for his clients but failed to do so, he could hardly cite the fire as a cause for mitigation when their homes burned down."); *United States v. Crowe*, 735 F.3d 1229, 1238 (10th Cir. 2013)(citing with approval Restatement (Second) of Torts §442A that "[w]here the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause."); *United States v. Turk*, 626 F.3d 743 (2nd Cir. 2010)(noting both that "arguments about the extrinsic forces that cause the value of the collateral to decline are simply irrelevant . . . [the defendant] may not invoke them to insulate her from responsibility for the loss she *caused*, namely, the loss of the unpaid loan principal" and "that to accept the argument that market conditions should affect loss "would . . . encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk."); *United States v. Mallory*, 709 F. Supp.2d 455 (E.D.Va. 2010) *aff'd* 461 Fed.Appx. 352 (4th Cir. 2012); *United States v. McCloud*, 837 F. Supp. 2d 778, 787 (N.D. Ill. 2011) (explaining that under Section 2B1.1, "'reasonably foreseeable pecuniary harm resulting from the fraud'" refers to the full amount remaining due on the fraudulently obtained loan, as an unqualified borrower's default is clearly a reasonably foreseeable possibility in a mortgage fraud scheme and that the phrase 'reasonably foreseeable pecuniary harm' has nothing to do with whether or not a defendant could have anticipated a drop in property values"). These principals are applicable here—while the breadth and scope of the

**PAGE 76     GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
          PROCEEDING**

financial crisis was not predicted, the fact of such variations in the credit market, the real estate market and the TIC market are predictable to economists of all backgrounds. It was foreseeable that the defendant's investors could lose all of the money they invested once defendant misrepresented the true nature of the investment, i.e. that investors were not investing in a single property but rather, the Sunwest enterprise as a whole and that money was diverted from reserves and other properties as well as commingled in direct contravention to representations made to the investors is entirely foreseeable. The loss to investors was not caused by market conditions—it was caused by defendant's greed and resulting fraud.

## V.    **CONCLUSION**

Defendant Jon Harder plead guilty to Mail Fraud and Money Laundering—he stands before this court convicted for these crimes. The court is now tasked with obtaining appropriate information to sentence him. The clear and convincing evidence will show that defendant Harder devised and executed a much broader scheme to defraud than the one in which he plead guilty.

Respectfully submitted this 15th day of April, 2015.

By:
S. AMANDA MARSHALL
UNITED STATES ATTORNEY

*/s/ Allan M. Garten*
ALLAN M. GARTEN
Assistant United States Attorney

*/s/ Michelle Holman Kerin*
MICHELLE HOLMAN KERIN
Assistant United States Attorney

**PAGE 77    GOVT'S SENTENCING MEMO FOR DEF.'S FIRST SENTENCING
          PROCEEDING**