# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:12-cr-485-SI |
| v. | **AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW AT PHASE I OF DEFENDANT'S SENTENCING PROCEEDING** |
| **JON MICHAEL HARDER**, | |
| Defendant. | |

Billy J. Williams, Acting United States Attorney, Allan M. Garten and Michelle Holman Kerin, Assistant United States Attorneys, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Christopher J. Schatz, Assistant Federal Public Defender, 101 S.W. Main Street, Suite 1700, Portland, OR 97204; Robert B. Hamilton, Attorney at Law, 1001 S.W. Fifth Avenue, Suite 1100, Portland, OR 97204; Emily E. Elison, CASTLEBERRY & ELISON, P.C., 500 Yamhill Plaza Building, 815 S.W. Second Avenue, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

On July 20, 2015, the Court issued its Findings of Fact and Conclusions of Law at Phase I of Defendant's Sentencing Proceeding. Dkt. 169. Defendant filed objections on July 27, 2015 (Dkt. 170), the Government responded on August 27, 2015 (Dkt. 178), and Defendant filed his reply on August 31, 2015 (Dkt. 179). On October 28, 2015, Defendant filed a Supplemental Statement Re Defendant's Objections to Findings of Fact and Conclusions of Law at Phase I of Defendant's Sentencing Hearing. Dkt. 187. The Court has reviewed the parties' submissions and

PAGE 1 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

has concluded that some of Defendant's points are well taken, although they are insufficient to change the result previously reached by the Court. Nevertheless, it is important that the Court's findings and conclusions are accurate. Hence, the Court amends its previously issued findings and conclusions as follows.

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On January 8, 2015, Defendant, Jon Michael Harder ("Harder" or "Defendant"), pleaded guilty to two counts of a 56-count amended indictment, alleging mail fraud, wire fraud, and unlawful monetary transactions in connection with the operation of Sunwest Management, Inc. ("SMI") and its affiliated businesses (collectively, "Sunwest" or the "Sunwest Enterprise"). Dkt. 107. The Court accepted Defendant's plea. *Id*. As set forth in the plea agreement, the parties agreed that Defendant's sentencing shall occur over two separate proceedings. Dkt. 109, ¶ 4. In the first proceeding, the Court must determine: (1) whether Defendant's scheme to defraud exceeded the two counts of conviction (*i.e.*, the two counts to which Defendant pleaded guilty); and (2) all "relevant conduct" related to Defendant's scheme to defraud. *Id*. After the Court makes these "Phase I" determinations, the parties, the United States Probation Office, and ultimately the Court will be in a better position correctly to determine the applicable advisory sentencing guideline range under the United States Sentencing Guidelines. In the second proceeding (Phase II), the Court will determine and impose an appropriate sentence, considering the applicable advisory sentencing guidelines and all other sentencing factors set forth in 18 U.S.C. § 3553(a). *Id*. At each of these two proceedings, appropriate evidence shall be received.

The hearing in Phase I began on May 12, 2015. Both sides together submitted more than 400 pages of memoranda before the hearing began. Counsel for the Government called 14

witnesses, and offered more than 200 exhibits.[1] Dkt. 151. Defense counsel called seven

witnesses, including Defendant, and offered more than 400 exhibits. *Id.* On May 28, 2015, the

parties presented closing argument lasting approximately five hours. These Findings of Fact and

Conclusions of Law are based on the testimony and exhibits received and constitute the Court's

Phase I determination of Defendant's scheme to defraud and relevant conduct. For the reasons

stated below, the Court finds that the scope of Defendant's scheme to defraud exceeds the two

counts of conviction and that the relevant conduct includes all Sunwest senior housing facility

and senior housing development investments sold by Defendant, directly or indirectly by persons

acting under his control, supervision, or direction, to investors from January 1, 2006, through

July 7, 2008, regardless of the specific form of those investments.

## BACKGROUND

### A. Amended Indictment

The Amended Indictment (Dkt. 74) charges as follows: "Beginning not later than 2006

and continuing until mid-2008," Defendant "defrauded more than 1,000 investors out of

approximately $130 million." Am. Indict., ¶ 1. Defendant, both directly and through other

persons and entities under his employ, supervision, or control, solicited investments across the

United States in various Sunwest-affiliated businesses. *Id.* at ¶ 2. These businesses were all

controlled by Defendant and operated "for the purpose of acquiring, managing, and constructing

senior housing facilities, known as assisted living facilities ('ALFs')." *Id.* As part of Defendant's

alleged scheme and artifice to defraud, investors were enticed with materially false promises,

fraudulent representations, omissions, and misleading half-truths, including, among others:

---

[1] In these Findings of Fact and Conclusions of Law, the Court generally refers to the
Phase I hearing testimony of a witness as "Hrg. [witness's first initial and last name]" and
generally refers to an exhibit received at the Phase I hearing as "Ex. [number]."

PAGE 3 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

(l) that investor funds would be invested in a specific ALF or individual senior housing facility, rather than in the Sunwest Enterprise as a whole; (2) that any return on an investor's investment, which would be paid to the investor in the form of "rent" from the specific facility into which the investor decided to invest, would be based solely on the financial performance of that individual facility and be independent of the success or failure of other Sunwest properties; (3) that Sunwest was a financially strong and successful company; (4) that Sunwest had a history of never missing a "rent" payment to an investor; and (5) that reserve accounts would cover expenses for a specific facility, including "rent" payments, until that facility became profitable. *Id*. at ¶¶ 3, 11, 12, 16, 25, and 26. In truth and fact, however, according to the Amended Indictment: (1) an investor's money in a particular ALF, or senior housing facility, was commingled with investments from all investors in all ALFs as well as with bank loans for these ALFs; and (2) at least as far back as 2006, Sunwest was losing millions of dollars each year. *Id*. at ¶ 3. Through Sunwest, Defendant raised more than $300 million from more than 1,000 investors in Oregon and throughout the United States. *Id*. at ¶ 4. As Sunwest began to collapse and as its losses mounted, Defendant "went on an acquisition binge to fund his business empire and to mask losses and the commingling of funds." *Id*. During the period 2006-2008, Defendant acquired more than 100 facilities, buying them at the rate of approximately one per week. Sunwest, at its height, had acquired approximately three hundred senior housing facilities (or ALFs), serving more than 15,000 residents, whose average age was 85. *Id*.

Counts 1-25 of the Amended Indictment charge mail fraud in violation of 18 U.S.C. § 1341, Counts 26-36 charge wire fraud in violation of 18 U.S.C. §1343, and Counts 37-56 charge the crime of engaging in monetary transactions in property derived from specific unlawful activity in violation of 18 U.S.C. § 1957. *Id*. at pp. 12-21. Defendant pleaded guilty to

Counts 13 and 51. In Count 13, the Amended Indictment charges that, for the purpose of executing and attempting to execute the scheme and artifice to defraud as alleged, Defendant knowingly caused to be delivered by the United States Postal Service or a commercial interstate carrier on December 21, 2007, matter sent from Sherwood, Oregon to Portland, Oregon, consisting of "L.H. and J.H. investment documents for Clovis Senior Living." *Id*. at pp. 12-14. In Count 51, the Amended Indictment charges that on January 30, 2008, Defendant withdrew funds derived from his scheme and artifice to defraud in order to pay for Defendant's beach home. *Id*. at pp. 18-20.

**B.  Plea Agreement: Defendant's Factual Statement**

In the written plea agreement, Defendant admitted that Sunwest "solicited and received investor funds through two different types of investment offering structures, the tenancy in common ('TIC') investment and the preferred membership interest ('PMI') investment." Dkt. 109, at ¶ 5(A)(2) (Defendant's Factual Statement). Defendant further admitted that with respect to the PMI investments, Defendant, through written private placement memoranda ("PPMs"), "represented to investors that their funds would be used for a specific property, and for specified purposes." *Id*. Defendant adds that between December 2007 and February 2008, Defendant and others under his control "offered PMI investments in two separate LLCs [limited liability companies] that were developing assisted living facilities located in Clovis and Hobbs, New Mexico." *Id*. These two facilities are referred to as "Clovis Assisted Living, LLC" and "Hobbs Assisted Living, LLC," respectively. The PMI investment documents for these two facilities represented to investors that their funds would be used to complete construction of these facilities, respectively. *Id*.

As Defendant further admitted, these representations were knowingly fraudulent. According to Defendant's factual statement in the plea agreement:

PAGE 5 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Concurrently with the issuance of the Clovis and Hobbs PPMs, Defendant Harder decided to use investor funds raised through the Clovis and Hobbs offerings to meet certain Sunwest business expenses and as well certain of his own personal financial obligations. Defendant Harder knew that this use of investor funds was not contemplated by the Clovis and Hobbs PMI investors. Neither defendant nor his agents or employees informed the Clovis and Hobbs PMI investors of his intent to use their investment funds in a manner different from what the PPMs had advised, and in a manner that increased the risk of potential investment loss associated with the Clovis and Hobbs investments.

As the first Clovis and Hobbs investor funds were received in late December of 2007 they were diverted at defendant's direction and used to meet payroll and other Sunwest-related financial obligations. The Clovis and Hobbs PMI investors were not notified of this misuse of their funds. Defendant continued to solicit investors for the Clovis and Hobbs projects throughout January and February of 2008. As PMI investor funds were received, they were diverted by defendant to address Sunwest-incurred financial obligations, cash shortfalls of Sunwest affiliates, and his personal financial obligations. The misstatements made and facts omitted as part of this scheme were material to the investment decisions made by the Clovis and Hobbs PMI investors. For Clovis, the PMI investment offering raised a total of $3,225,000. For Hobbs, the PMI investment offering raised a total of $2,000,000. Although construction continued at Clovis and Hobbs, neither facility was fully completed by Sunwest.

*Id*.

Thus, according to Defendant, the scheme to defraud and related scope of "relevant conduct" for purposes of determining the applicable advisory sentencing guidelines is limited to the PMI investments for the Clovis and Hobbs facilities sold to investors between December 2007 and February 2008. These two facilities raised a total of $5.225 million from investors in what Defendant admits was a scheme and artifice to defraud.[2]

---

[2] During the evidentiary hearing held in Phase I, testimony was received regarding another PMI investment, known as the "West Salem Senior Living" facility (also known as "Cottonwood"), which involved a senior living facility planned to be built by Sunwest in West Salem, Oregon. The misrepresentations made by Defendant and others acting under his control to investors concerning the West Salem Senior Living facility are materially identical to the

PAGE 6 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## C.  Plea Agreement: Government's Allegations Regarding Scope of Fraud

In the written plea agreement, the Government provided a summary of what it intends to prove at the Phase I sentencing proceeding regarding the scope of Defendant's scheme to defraud. According to the plea agreement, the Government did this fully to apprise Defendant of the Government's position at sentencing "to ensure his entry of guilty plea is voluntary and knowing." Dkt. 109, at ¶ 5(B) (The Government's Allegations Regarding Scope of Fraud). As stated in the Government's summary:

> Beginning in 2001 and running through 2008, Sunwest offered to investors an opportunity to invest in ALFs either through the purchase of TIC or PMIs. Starting in 2006, the majority of investors were sold TIC interests; which were supposed to be a tax free exchange of the investor's previous interest in a property with an interest in a Sunwest ALF. The TIC offerings were sold in a consistent manner. Investors would buy an ownership interest in a specific ALF through a tenancy in common ownership interest, which was a way for the investor to engage in a tax free exchange of an ownership interest in one property into an ownership interest in a specific ALF. The ALF would be co-owned by a separate limited liability company that would be owned by defendant. The money invested by the TIC owners would be used as a down payment for the property purchase, with the remainder of the purchase price to be financed by a bank loan or mortgage obtained by defendant's limited liability company (the Co-Owner). Once purchased through the TIC investments and bank loans, the ALF would be leased to and managed by other companies in the Sunwest Enterprise that were owned in whole or in part by defendant and in most instances completely controlled by him.
>
> * * *
>
> The investment programs were marketed through the distribution of various marketing materials, including PPMs, Executive and

misrepresentations concerning the Clovis and Hobbs facilities already admitted to by Defendant. (Counts 7, 14, 15, and 24 in the Amendment Indictment relate to the West Salem Senior Living facility.) During the Phase I hearing, Defendant, through counsel, did not dispute this conclusion. Thus, at the minimum, the scope of Defendant's scheme to defraud and all related relevant conduct must be viewed as also including Defendant's West Salem Senior Living facility PMI investments, and not merely Clovis and Hobbs.

Offering Summaries, and Offering Memoranda, and through defendant's personal sales efforts. Defendant, engaged in a scheme and artifice to defraud and to obtain money and property through materially false and fraudulent pretenses, representations, and promises concerning the investment programs. Among the materially false and fraudulent representations were:

Investor Funds Would Be Invested In A Specific Assisted Living Facility. It was represented both orally and in writing that investor funds would be used for expenses and costs associated with a specific property. Although the investment documents changed over time, they all included specific language concerning ALF investments being single purpose entities whose sole purpose was to acquire, further develop and operate a specific property. This same single purpose representation was made orally at investment meetings. In truth and fact, defendant ran Sunwest as a single, integrated unitary enterprise, commingling investor funds from the numerous ALFs into commingled bank accounts which would then be used for operational purposes of all ALFs, among other things.

Investments Were Independent of the Success or Failure of Other Sunwest Properties. It was represented both orally and in writing that investments in a particular ALF were not impacted by the success or failure of other ALFs under management and control of Sunwest. In truth and fact, since all funds were commingled and since the Sunwest Enterprise was run as a single, integrated unitary business, money from successful facilities was diverted to unsuccessful ALFs, and each ALF became dependent on the success of the enterprise as a whole.

Sunwest Was A Successful Business. Investors were induced to invest in part on the materially false representation, made orally and in writing, that Sunwest was a financially successful business. In truth and fact, by 2006, Sunwest was losing millions of dollars each year. Facilities were only partially filled and often in disrepair. ALF vendor payments were delayed. Construction reserves from bank loans were diverted to pay operational expenses. Sunwest stayed afloat through its commingling of funds. Sunwest relied on the new cash infusion from investors and bank loans and refinancing as it acquired facilities at the rate of one a week in order to prop up its failed business practices. In addition, Sunwest relied on bank reserves from loans it obtained through misleading and often fraudulent representations and material omissions, and by relying on escalating personal loans obtained by defendant to fill cash needs.

> Sunwest Never Missed a Payment to Investors. One of the critically important marketing pitches employed by defendant and those working for and with him was that Sunwest never missed a "rent" payment to an investor. In truth and fact, those rent payments often did not come from the success of the facility in which the investor invested. Instead, it came from the commingled funds, diversion of loan reserves, fraudulently obtained bank loans and personal loans taken by defendant.

> Reserve Accounts Would Cover Expenses Until Profitable. Many of the ALFs were acquired at a time when the facility itself was not fully occupied. To assure investors that they would receive their "rents" while the ALF was brought up to near full occupancy, investors were told orally and in writing that reserves would be set aside to be used for rent payments until such time as the occupancy rate was sufficiently high to cover all expenses and provide a return in the form of rent to investors. In truth and fact, the reserves were often used for purposes wholly unrelated to the particular facility for which the reserve was established.

*Id*.

Thus, according to the Government, Defendant's scheme to defraud and relevant conduct goes well beyond merely the PMI investments in Clovis and Hobbs (and even West Salem[3]). Defendant's scheme to defraud and relevant conduct also includes, the Government contends, all of the tenancy in common, or TIC, investments, at least beginning in early 2006. The Government asserts that at least by early 2006, Sunwest was being operated as a "unitary" enterprise with rampant commingling of funds, extensive inter-facility borrowing and lending, and substantial, sustained, and widespread enterprise-level losses. Based on these facts, the Government concludes, since at least 2006 material misrepresentations and omissions (including misleading half-truths) were made by Defendant, and others acting under his control, to Sunwest investors, including those who made TIC investments, and not merely to those who made only PMI investments.

---

[3] *See* n.2, *supra*.

PAGE 9 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In response, Defendant's position is that the Government cannot meet its burden of showing material misrepresentations or omissions regarding TIC investments because: (1) the specific funds invested by investors in TIC facilities (as distinct from investments in PMI properties) were, for the most part, used as represented, namely to close a purchase transaction in which the investors bought a tenancy in common (TIC) interest in a specific piece of real property; and (2) no other material misrepresentations or omissions were made by Defendant or by those acting under his control. This is the essence of the parties' disagreement and the focus of the Court's determination at Phase I based on the extensive testimonial and documentary evidence received.

## LEGAL STANDARDS

### A.  Relevant Conduct: Common Scheme or Plan

In determining an appropriate sentence, a district judge is directed under the law to impose a sentence that is sufficient, but not greater than necessary, to comply with the several purposes of sentencing established by Congress, after considering "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). In evaluating the nature and circumstances of the offense, the United States Sentencing Guidelines ("USSG") directs that the calculation of the applicable offense level consider all "relevant conduct." USSG §1B1.3. The USSG defines "relevant conduct," in part, as follows:

> Relevant Conduct (Factors that Determine the Guideline Range)
>
> (a)      Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)    * * *

*that occurred during the commission of the offense of conviction*, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)    solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above *that were part of the same course of conduct or common scheme or plan as the offense of conviction*;

(3)    all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

USSG §1B1.3(a) (emphasis added). Thus, under subsection (a)(1), the Court must determine all acts and omissions "that occurred during the commission of the offense of conviction." In addition, with regard to subsection (a)(2), §3D1.2 directs:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

* * *

(d)    When the offense level is determined largely on the basis of the total amount of harm or loss, * * *.

Offenses covered by the following guidelines are to be grouped under this subsection: * * * §2B1.1 [Fraud and Deceit] * * *.

Thus, under subsection (a)(2), the Court must determine all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction."[4]

_____

[4] Defendant argues that because Defendant only pleaded guilty to Counts 13 and 51, the "offense of conviction" is limited to the Clovis and Hobbs PMI investments. Defendant further

The Commentary provided by the United States Sentencing Commission for this subsection states: "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." USSG §1B1.3, Commentary, Background. Moreover, the Sentencing Commission's Application Note 9 to this section defines "common scheme or plan" and "same course of conduct" as follows:

> (A)    Common scheme or plan. For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. * * *

> (B)    Same course of conduct. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. * * *

USSG §1B1.3, Commentary, Application Note 9.

Thus, the focus of the Court in Phase I is to determine: (1) whether Defendant, and other persons or entities acting under his control, made material misrepresentations or omissions, as alleged in the Amended Indictment, to the investors in Sunwest in connection with their TIC investments; and, if so, (2) whether such offenses are "substantially connected" to the material misrepresentations or omissions made to the Sunwest investors in the Clovis and Hobbs PMI investments (*i.e.*, the offenses of conviction) "by at least one common factor, such as common

---

argues that the Government has not met its burden of showing that any other investments, especially any TIC investments, occurred "during the commission of the offense of conviction," USSG §1B1.3(a)(1), or "were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG §1B1.3(a)(2). The Government responds that, among other things, Counts 13 and 51 (the offenses of conviction) are part of a common scheme or artifice to defraud the investors in Sunwest that began at least by 2006 and included both TIC and PMI investments. *See generally* Am. Indict., ¶¶ 3, 11, 12, 16, 25, and 26.

victims, common accomplices, common purpose, or similar modus operandi." If the Government meets its burden of proving both of these propositions, then the offenses committed in connection with the Sunwest TIC investments are part of a "common scheme or plan" with the offenses committed in connection with the Sunwest PMI investments related to the Clovis and Hobbs facilities. Further, if the Government has not met its burden of showing that the TIC and PMI Clovis and Hobbs investments are part of a "common scheme or plan," the Court must then determine whether these sets of offenses "may nonetheless qualify as part of the same course of conduct" because they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single . . . ongoing series of offenses."

## B.  Fraud: Material Misrepresentations, Half-Truths, and Omissions; Intent

The elements of both mail fraud and wire fraud require the Government to prove that a defendant knowingly devised a scheme or plan to defraud or to obtain money or property by making false promises or statements, that the defendant knew that the promises or statements were false or fraudulent, that the promises or statements were material, that the defendant acted with the intent to defraud, and that the defendant used or caused to be used either the mails or the wires to carry out an essential part of the scheme. *See generally* 18 U.S.C. §§ 1341, 1343; Ninth Cir. Crim. Jury Instr. 8.121 (mail fraud) and 8.124 (wire fraud).

In addition, the defendant need not perform every act of the scheme himself to be held responsible. *United States v. Stapelton*, 293 F.3d 1111, 1116-1117 (9th Cir. 2002). Further, the Government does not have to prove every alleged misrepresentation in an indictment, so long as it proves at least one material misrepresentation. *United States v. Cloud*, 872 F.2d 846, 851 (9th Cir. 1989); *United States v. Wellington*, 754 F.2d 1457, 1462 (9th Cir. 1985). "A false promise, statement or representation is material if it is made to induce action or reliance by another or has

a natural tendency to influence or is . . . capable of influencing another's decision." *United States v. LeVeque*, 283 F.3d 1098, 1103-04 (9th Cir. 2002) (citation omitted) (quotation marks omitted).

Omissions of material fact and half-truths may be used to establish a scheme to defraud. *United States v. Woods*, 335 F.3d 993, 997-98, 1000 (9th Cir. 2003); *see also United States v. Montgomery*, 384 F.3d 1050, 1063-64 (9th Cir. 2004) (holding that a statement is false if it is half true or conceals facts or information necessary to make the statement as a whole not misleading). "Moreover, deceitful statements of half-truths or the concealment of material facts is actual fraud violative of the mail fraud statute. . . . [T]he deception need not be premised upon verbalized words alone. The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance." *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967) (citations omitted).

Finally, "[w]hile an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all." *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) (citation omitted).  "The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes 'harm' by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property." *United States v. Treadwell*, 593 F.3d 990, 997, 999 (9th Cir. 2010) (upholding convictions and noting that the jury found that defendants "through misrepresentation, intentionally deprived their victims of the opportunity to decide for themselves, on the basis of true and accurate information, whether or not to invest," which is "all that an 'intent to defraud' under 18 U.S.C. § 1343 requires").

**C.  Government's Burden of Proof: Clear and Convincing**

"District courts generally use the preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud. The higher 'clear and convincing' standard may apply, however, when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction." *United States v. Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015) (citations and quotation marks omitted). The Government acknowledges that the Court should apply the "clear and convincing" standard in this case.

Understanding that the Court will apply the "clear and convincing" standard,[5] Defendant urges the Court to employ a more rigorous version of that standard than is currently reflected in the Ninth Circuit Model Civil Jury Instructions. In relevant part, that instruction reads:

> When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must be persuaded by the evidence that the claim or defense is highly probable. This is a higher standard of proof than proof by a preponderance of the evidence.

Ninth Circuit Civ. Jury Instr. 1.4 (2007).

Although the official comment to that instruction cites to the U.S. Supreme Court's decision in *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984), for the definition of "clear and convincing" evidence, Defendant argues that the model civil jury instruction incompletely reflects the Supreme Court's direction. In *Colorado*, the Supreme Court observed:

> Last Term, the Court made clear that Colorado's proof would be judged by a clear-and-convincing-evidence standard. In contrast to the ordinary civil case, which typically is judged by a

---

[5] Defendant argues, without citing to any specific legal authority, that due process requires that the Court use the standard of "beyond a reasonable doubt." The Court declines to do so, but notes that Defendant's argument has been preserved for appellate purposes. *See* Plea Agreement, Dkt. 109, at ¶ 12.

> "preponderance of the evidence" standard, we thought a diversion
> of interstate water should be allowed only if Colorado could place
> in the ultimate factfinder *an abiding conviction that the truth of its*
> *factual contentions are "highly probable."*

467 U.S. at 316 (emphasis added) (citation omitted). Defendant also invites the Court to review

the Ninth Circuit's decision in *Sophanthavong v. Palmateer*, 378 F.3d 859 (9th Cir. 2004). In

that case, the Ninth Circuit, citing *Colorado*, noted:

> Clear and convincing evidence requires greater proof than
> preponderance of the evidence. To meet this higher standard, a
> party must present sufficient evidence to produce "in the ultimate
> factfinder an abiding conviction that the truth of its factual
> contentions are [sic] highly probable."

*Sophanthavong*, 378 F.3d at 866 (citation omitted). The Court accepts Defendant's argument.

Accordingly, to meet the higher "clear and convincing" standard in this case, the Government

must present sufficient evidence to produce in the Court, as the ultimate factfinder in this

sentencing proceeding, an "abiding conviction" that the truth of the Government's factual

contentions is "highly probable."

## D.  Rules of Evidence

The Federal Rules of Evidence do not apply in a sentencing proceeding. Fed. R.

Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . sentencing").

As noted by the United States Supreme Court, "18 U.S.C. § 3661 . . . codifies the longstanding

principle that sentencing courts have broad discretion to consider various kinds of information."

*United States v. Watts*, 519 U.S. 148, 151 (1997). That statute provides:

> No limitation shall be placed on the information concerning the
> background, character, and conduct of a person convicted of an
> offense which a court of the United States may receive and
> consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661. Unlike the strict evidentiary restrictions applicable at trial, the only

evidentiary requirement at sentencing is that the sentence be based on information that has

"sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3. *See United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001) (holding that for sentencing purposes, hearsay testimony need only "be accompanied by some minimal indicia of reliability") (quotation marks omitted). Thus, during this Phase I sentencing determination, the Court freely considers all relevant evidence that has sufficient indicia of reliability.

### FINDINGS OF FACT

The Court finds the following facts by clear and convincing evidence:

**A.  Overview and Sunwest's Early History**

In 1991, Jon Michael Harder and Brad Colson[6] formed Sunwest Management, Inc. in Salem, Oregon to own and operate senior housing communities. In 1999, Mr. Colson sold his ownership interest in Sunwest. Harder became President, and Darryl Fisher became chief operating officer, after which Harder owned a controlling interest of approximately 75 percent of Sunwest Management, Inc. In 2000, Sunwest operated approximately 20 senior housing properties. As of July 1, 2007, Sunwest operated approximately 294 senior housing properties, containing approximately 24,293 apartments, or units, located throughout 37 states. This resulted in Sunwest being one of the nation's largest operators of senior housing facilities. As described more fully below, each senior housing facility managed by Sunwest was a legally distinct entity with varying ownership interests held by various co-owners consisting of individual investors and Sunwest-affiliated entities or persons.

---

[6] Brad Colson is the son of William Colson and the grandson of Hugh Colson. In 1971, William and Hugh Colson co-founded Holiday Retirement Corp. ("Holiday") in Salem, Oregon. Holiday owned and managed numerous senior housing communities. In 2007, William Colson sold Holiday for approximately $6.6 billion. Hrg. M. D. Rothschild. The Holiday transaction in 2007 appears to have affected Defendant Harder's perception of the value of Sunwest's senior housing portfolio.

PAGE 17 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Harder also owned controlling interests in various Sunwest-affiliated entities. Harder owned a 60 percent controlling interest in Canyon Creek Development, Inc. ("CCD"), formed in March 2001. CCD coordinated the acquisition and development of senior housing communities on behalf of Sunwest. Harder owned 100 percent of Canyon Creek Financial, Inc. ("CCF"), formed in November 2005. CCF was registered in June 2006 with the U.S. Securities and Exchange Commission ("SEC") as a securities broker-dealer, licensed to sell securities, and Harder was its registered broker-dealer salesperson. The primary function of CCF was to sell to investors TIC (tenancy in common) ownership interests in Sunwest-managed senior housing properties, either directly or through arrangements with third-party brokers.[7]

In addition to CCD and CCF, Harder owned controlling interests in other Sunwest affiliates that assisted in administering Sunwest's senior housing portfolio. These affiliates included: Senenet, which provided "employee leasing" for all Sunwest-affiliated entities; Encore Indemnity, which provided insurance only for Sunwest-affiliated entities; and KDA Construction, which provided construction services either for Sunwest-affiliated or Harder-affiliated development projects.[8] Finally, Harder also owned controlling interests in approximately 55 commercial real estate projects, consisting of bare land to be developed, existing apartments, and other commercial properties, that were not involved in Sunwest's senior housing facilities (the "non-senior housing portfolio").[9]

---

[7] Ex. 838; Ex. 170, ¶ ¶7-9; Hrg. M. Deines; Hrg. T. Wettlaufer; Hrg. T. Dozois.

[8] Ex. 2B.

[9] Ex. 2B; Ex. 1, ¶ 4.

**B.** *Kraus* **Lawsuit**

From 2000 until sometime in 2002, Jeffrey D. Kraus was Sunwest's chief financial officer. Kraus left Sunwest's employment in 2002. In 2003, Sunwest operated more than 100 senior housing facilities. Kraus was an investor in, or co-owner of, 18 senior housing facilities that either were being managed by Sunwest or previously had been managed by Sunwest. Kraus was also a minority shareholder in Sunwest Management, Inc. In 2003, Kraus and the eighteen facilities in which he was a co-owner sued Harder, Sunwest, and several individuals affiliated with Sunwest. The lawsuit was filed in federal district court in Oregon. Kraus and the other plaintiffs alleged thirteen claims for relief, including direct and derivative claims asserting breach of fiduciary duty, conversion, fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The plaintiffs sought preliminary and permanent injunctive relief and the appointment of a receiver.

On March 31, 2004, after an evidentiary hearing, U.S. District Judge Michael W. Mosman denied the plaintiffs' motion for preliminary injunction. The court denied the motion on the grounds that the plaintiffs had not shown a significant threat of irreparable harm, based on evidence that "none of the entities at issue are on the brink of financial ruin." *Kraus v. Harder*, 2004 WL 716576, at *10 (D. Or. March 31, 2004). In his written opinion, Judge Mosman also concluded that the plaintiffs had shown serious questions regarding the merits of their claims. Judge Mosman's conclusions on this issue are of particular relevance to the present criminal sentencing proceeding against Harder. Judge Mosman wrote:

> The court further concludes that plaintiffs have submitted sufficient evidence to raise serious questions about defendants' performance of their fiduciary duties. *The court is most troubled by defendants' transferring homes' money without so much as informing the owners.* Plaintiffs' expert documented over $2 million in unauthorized transfers among the homes. *In essence the evidence showed that Sunwest treated the money in the transfer*

PAGE 19 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

> *account as its own despite its officers knowing the money belonged*
> *to the retirement homes. Indeed the evidence showed that*
> *Sunwest's officers deliberately sought to conceal the transfers*
> *whenever it believed an investor such as Kraus might object.*

*Kraus*, 2004 WL 716576, at *6 (emphasis added) (footnote omitted).[10] The parties to the *Kraus*

lawsuit settled their dispute later that year.[11]

After the parties settled the *Kraus* lawsuit, Sunwest's then-CFO, Curtis Brody, spoke

with Harder about whether Sunwest should discontinue its practice of commingling funds of

separate facilities or making intercompany loans or transfers. Brody told Harder that Sunwest's

outside legal counsel had advised that if this practice were to continue, then Sunwest would need

to ensure that organizational documents and management agreements allowed for such

intercompany borrowing. Brody described Harder's response as follows: "Well, he [Harder]

basically said that he – either the lenders or partners – I believe the lenders weren't going to go

fot that."[12] Finally, as discussed below in the context of Defendant's intent to defraud, Judge

Mosman, in explaining his ruling orally from the bench when denying the plaintiffs' motion for

preliminary injunction, stated:

> I place very little credence on the explanations of Mr. Harder. His
> testimony I found evasive and not readily believeable . . . .[13]

## C.  Continuous Commingling, Inter-Facility Lending, and the "Daily Hunt for Cash"

As mentioned earlier, Sunwest operated approximately 20 senior housing properties in

2000, and by July 1, 2007, Sunwest operated almost 300 such facilities. It was a regular practice

---

[10] Ex. 172.

[11] Hrg. C. Brody; Hrg. T. Dozois.

[12] Hrg. C. Brody.

[13] Ex. 171, at Tr. 286:4-6.

within Sunwest for one senior housing facility to loan money to another senior housing facility, and these transactions were generally referred to as intercompany (or inter-facility) loans (or transfers). According to Sunwest's chief financial officer Curtis Brody, Sunwest's practice of inter-facility lending began in the late 1990s.[14] In 2003, the same year that Jeffrey Kraus filed his lawsuit complaining about Sunwest's intercompany lending, Brody tendered his resignation to Harder based on Brody having discomfort, or "heartburn," over Sunwest's regularly making undisclosed intercompany loans. Brody, however, decided to remain with Sunwest after Harder said that he would "cut back" on that practice. But, according to Brody, "nothing changed."[15] Harder typically used a Sunwest bank account maintained at Wells Fargo Bank labeled "JMH Account" to facilitate the numerous and frequent intercompany loans; Harder also used the JMH Account for his own withdrawals, which he used to finance both the numerous non-senior housing properties that Harder personally owned as well as Harder's other personal expenses and borrowing, much of which encumbered Sunwest's senior housing assets.[16]

Beginning by at least late 2005, Sunwest's portfolio of senior housing properties was operating with a collective negative cash flow, *i.e.*, collectively, the properties' expenses exceeded Sunwest's available cash. Although some of Sunwest's senior housing properties, by themselves, were cash flow positive, many were not. This is shown on several exhibits that, on an annual basis, show whether a specific facility was operating with a debt-service coverage ratio

---

[14] Hrg. C. Brody. Also as mentioned earlier, after Mr. Colson sold his ownership interest in Sunwest in 1999, Defendant Harder became President and owned a controlling interest of approximately 75 percent of Sunwest Management, Inc.

[15] Hrg. C. Brody.

[16] Hrg. C. Brody; Hrg. M. Marcos; Hrg. A. Painter.

("DSCR") greater or less than 1.0.[17] When a facility's DSCR is greater than 1.0, it has sufficient cash flow, or available cash, to meet its expense obligations as they become due. When a facility's DSCR is less than 1.0, however, it lacks sufficient cash flow timely to service its obligations.[18]

At year-end 2005, the collective portfolio of Sunwest's senior housing properties was facing more than $8 million in negative cash flow for the year.[19] By year-end 2006, Sunwest's senior housing portfolio was facing, collectively, more than $29 million in negative cash flow for the year.[20] By year-end 2007, the senior housing portfolio was facing more than $64 million in negative cash flow for the year.[21] And by June 30, 2008, the collective portfolio was facing more than $20 million in negative cash flow just for the first six months.[22] Moreover, these negative cash flow figures reflect only Sunwest's senior housing facilities.[23]

In addition to Sunwest's senior housing portfolio, Harder and Sunwest also owned numerous other non-senior housing properties. The purchase, development, and operating costs of these properties often were funded with money borrowed from financial institutions as well as

---

[17] Ex. 24 (2005); Ex. 25 (2006); Ex. 26 (2007); Ex. 27 (six mos. ending June 30, 2008).

[18] Hrg. C. Brody; Hrg. C. Hamstreet; Hrg. R. Arrowsmith; Hrg. M. Marcos.

[19] Ex. 24.

[20] Ex. 25.

[21] Ex. 26.

[22] Ex. 27.

[23] Hrg. M. Deines; Hrg. A. Painter.

PAGE 22 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

with cash flow from Sunwest's senior housing facilities.[24] When money was taken from Sunwest's senior housing operations to assist in paying the expenses of Harder's non-senior housing acquisitions and operations, this would primarily benefit Harder because he was the sole or majority owner of most of the non-senior housing properties.[25] Taking money out of Sunwest's senior housing properties would also work to the financial detriment of these senior housing facilities.[26] Sunwest and Harder's non-senior housing properties were, collectively, about $500 million in debt.[27] When the non-senior housing portfolio's cash needs and expenses are added into the equation, Sunwest ran a negative cash flow (or "cash burn" rate) of approximately $5 to $6 million per month historically and approximately $10 million per month in the several months preceding Sunwest's ultimate collapse in mid-2008.[28]

     As of May 2008, more than half of Sunwest's senior housing properties were operating at a cash loss, or with negative cash flow.[29] As stated by advisors Alvarez and Marsal, citing the National Investment Center, the industry benchmarks for occupancy rates for senior housing facilities are between 88 to 90 percent, but the average occupancy rate in May 2008 for Sunwest's senior housing portfolio was only 74 percent.[30] At the same time, Sunwest had more

---

     [24] Hrg. C. Hamstreet; Hrg. R. Arrowsmith; Hrg. M. Marcos; Hrg. M. Deines. A list of Sunwest's extensive holding of non-senior housing properties as of June 12, 2008, is set forth in Ex. 140.

     [25] Hrg. M. Deines.

     [26] Hrg. M. Deines.

     [27] Hrg. M. Deines.

     [28] Ex. 5; Hrg. M. Deines; Hrg. M. Marcos.

     [29] Ex 5.

     [30] Ex. 5, at p. 5.

PAGE 23 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

than 160 facilities with occupancy averaging above 85 percent.[31] Thus, a substantial number of Sunwest's senior housing properties had an occupancy rate of well under 74 percent. According to one witness, Sunwest "underinvested" in its senior housing properties, and the poor condition of those properties led to poor occupancy rates.[32] All of this contributed to Sunwest's constant and substantial negative cash flow and urgent need for cash, which Sunwest's chief financial officer Brody described as the "daily hunt for cash."[33] Also according to Brody, a facility's reserves were one source of cash; if a reserve was accessible, it was used by being lent or transferred to another facility where the need for cash was more immediate.[34] According to Sunwest's chief restructuring officer Clyde Hamstreet, "the forensic accountant has not found any senior housing entity unaffected by inter-company transfers."[35] Sunwest's Brody also testified that intercompany lending was a "standard practice" at Sunwest, except for those few properties that were placed on a "Do Not Touch" list.[36]

    In addition, as Brody explained, on a "functional basis," there was no difference between the TIC (tenancy in common) properties and PMI (preferred membership interest) properties when it came to Sunwest's routine practice of commingling funds and engaging in intercompany

---

[31] Ex. 5, at p. 5.

[32] Hrg. M. Marcos.

[33] Hrg. C. Brody.

[34] Hrg. C. Brody.

[35] Ex. 3C.

[36] When lenders would learn, on occasion, about Sunwest's practice of commingling of funds or making intercompany transfers and expressed concern, Sunwest would place those specific properties on a "Do Not Touch" list; for properties not on that list, however, the frequent commingling of funds and intercompany transfers continued as a standard practice. Hrg. C. Brody.

transfers.[37] Brody also stated that the TIC "rent reserves" were generally available to Sunwest

and were used for intercompany transfers.[38]

These conclusions are fully consistent with the Findings of Fact made by U.S. District

Judge Michael R. Hogan in a related civil lawsuit brought by the SEC:

> 11.    At times, from 2005 to 2008, Harder identified cash flow
> positive facilities and cash flow negative facilities to facilitate
> transfers of money from one facility to another. Harder admitted
> this practice was central to Sunwest's business model. (Liftik
> Decl., Ex. 1 at 244:11-248:8).
>
> 12.    Sunwest, as the property manager of each TIC-funded
> facility, had complete control over each facility's finances. Liftik
> DecL, Ex. 3 at 27). Because many of the facilities had low
> occupancy rates, high costs, or other financial challenges when
> acquired, one or more facilities' cash needs at times exceeded the
> cash generated. (Liftik Decl., Ex. 1 at 428: 14-24). To deal with
> this shortfall, Sunwest arranged loans from facilities that had
> surplus cash for facilities that needed cash. (*Id*. at 285:17-288:6;
> Ex. 32 at 24:13-19). Harder admitted that cash transfers were made
> in response to "timing procedures" based on which facilities had
> cash on hand. (Liftik Decl., Ex. 1 at 172:15-23).
>
> 13.    According to Sunwest's financial records, many of the
> retirement facilities remained cash flow negative for prolonged
> periods while payments were nonetheless made to TIC investors
> and other creditors. For the nine-month period ended
> September 30, 2008, 58 percent of homes had negative cash flow.
> (Fortunato Decl. at ¶ 4).

Findings of Fact and Conclusions of Law in Support of Securities and Exchange Commission's

Motion for Summary Judgment on Liability, *Securities and Exchange Commission v. Sunwest*

*Management, Inc.*, Case No. 09-cv-6056-HO (Dkt. 997), ¶¶ 11-13.[39]

---

[37] Hrg. C. Brody.

[38] Hrg. C. Brody.

[39] Ex. 170. In his summary judgment ruling in this civil case brought against Sunwest,
Harder, and others, Judge Hogan found that there was "no dispute of material fact" as to the facts
that he found, including those quoted above. *See also* Ex. 123, at 3 (Judge Hogan's Findings of

These conclusions are also fully consistent with the findings of Sunwest's chief restructuring officer Clyde Hamstreet. In his declaration submitted in the SEC's civil lawsuit, Hamstreet stated that Sunwest

> generally conducted its business as if it were a single corporate entity, with centralized management, personnel administration, marketing services, and cash management. SMI managed nearly all of the affiliated senior living facilities, and Senenet was the employer of nearly all of the personnel who worked at the affiliated entities. *The Company routinely aggregated and commingled funds in centralized SMI and Senenet accounts. Funds were typically taken from wherever they could be found within the Company and used wherever they were needed.*

Declaration of Clyde A. Hamstreet in Support of Distribution Plan of Receiver and Chief Restructuring Officer for Sunwest Enterprise, Dkt. 543, ¶ 8 (emphasis added).[40]

In addition to exacerbating cash flow problems for those senior housing facilities from which money was taken, or "borrowed," Sunwest's routine and regular practice of commingling funds, or conducting intercompany transfers, also caused Sunwest's senior housing facilities (or their operating companies) to be in violation of a number of loan covenants with key lenders. For example, in a loan agreement with General Electric Capital Corporation dated January 31, 2006, the borrower (typically, a co-owner of a Sunwest-managed senior housing facility, which is a Sunwest affiliate) agreed to the following negative covenants:

> 6.2    No Additional Indebtedness, No Borrower nor any TIC Entity shall, without Lender's prior written consent, incur additional indebtedness, except for trade payables in the ordinary course of business. No Borrower nor any TIC Entity shall, without

---

Fact and Conclusions of Law) ("The Sunwest Enterprise, however, was managed as a unitary enterprise that generally did not respect the separateness of the Receivership Entities [the senior housing facilities] nor the restricted purposes of invested funds that were intended to be limited to use for specific facilities.").

[40] Ex. 1. Mr. Hamstreet also testified at the Phase I Hearing consistent with his declaration. Hrg. C. Hamstreet.

PAGE 26 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Lender's prior written consent, lend any money to any person or entity.

6.3    No Commingling Funds. No Borrower shall commingle the funds related to its Property with funds from any other property or venture.[41]

Sunwest's practice of regularly commingling funds and making intercompany transfers, however, was not generally known, even among Sunwest's own employees and outside legal counsel. John Thurber worked from 2005-2008 for Canyon Creek Financial ("CCF"), the Sunwest broker-dealer responsible for selling investments in the various Sunwest senior housing properties. Thurber testified that he did not know about the commingling of funds; he added that, had he known of the commingling, he would not have marketed the Sunwest investments at all.[42]

Further, Matt Marcos is a senior director in the Healthcare Investigatory Group of the consulting firm Alvarez and Marsal, an entity brought in to work with Sunwest in May 2008 as a restructuring advisor. Shortly thereafter, Marcos attended a meeting in New York on May 30, 2008. Also attending this meeting were representatives of GE Capital (a key lender to Sunwest), and several of Sunwest's executives (including Harder). One of GE Capital's representatives who attended this meeting was Richard Arrowsmith.[43] According to Arrowsmith, a representative from Alvarez and Marsal said at this meeting that Sunwest had been taking GE Capital's money and paying others, notwithstanding the loan covenants that prohibited any commingling of funds.[44] Arrowsmith then said that the Sunwest people had better "get criminal

---

[41] *See, e.g.* Ex. 7, at p. 23, §§ 6.2, 6.3.

[42] Hrg. J. Thurber.

[43] Hrg. R. Arrowsmith.

[44] Hrg, R. Arrowsmith.

defense lawyers because you are stealing my money."[45] At some point after being retained, Matt Marcos of Alvarez and Marsal spoke with Sunwest's primary outside legal counsel, Tim Dozois, from the law firm of Davis Wright Tremaine LLP. Marcos testified that when he mentioned the issue of Sunwest's pervasive commingling of funds, "He [Dozois] seemed panic [*sic*]. He went pale. I think he wasn't aware of it or wasn't aware that others were aware of it."[46]

Also, attorney Thomas Wettlaufer, a senior vice president and associate general counsel working inside CCF, the broker-dealer for Sunwest, confirmed that Sunwest did not regularly disclose to investors that funds would be available to and used by other projects.[47] Indeed, Wettlaufer described an incident that occurred in January 2008 with another one of Sunwest's outside legal counsel, Mr. Gib Masters from the law firm of K&L Gates LLP. In a letter dated January 18, 2008, Masters wrote to Wettlaufer about the "Risk Factors" section in a senior housing project's Private Placement Memorandum ("PPM"). Masters stated:

> In thinking about the two stalled projects and the CCD's [Sunwest's development company, Canyon Creek Development] current cash crunch, I also thought about the co-mingling factor in the PPMs. That risk factor contemplates that reserves (including reserves for payments to investors, development expenses and contingencies), will be commingled with other CCD funds. *It does not, however, contemplate that these reserved funds will be employed for other purposes or loaned to other affiliates.* * * *

---

[45] Hrg. R. Arrowsmith.

[46] Hrg. M. Marcos. Marcos's testimony, based on his observations and perceptions of Dozois, is permissible opinion testimony by a lay witness under Fed. R. Evid. 701. During the testimony of Mr. Dozois at the Phase I Hearing, however, Dozois said that he believed that investors knew of the existence of intercompany loans. Hrg. T. Dozois. Although some investors, perhaps, might have known about this, many did not; further, for those investors who were unaware of this practice, they stated that if they would have known about that practice they never would have invested in a Sunwest senior housing property. Hrg. L. Van Dyke; Hrg. J. Gorman (FBI Special Agent summarizing the FBI's interviews with investors). *See also* Exs. 127 and 128.

[47] Hrg. T. Wettlaufer.

PAGE 28 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

> In our meeting yesterday, *you confirmed that reserves funded with the proceeds from equity sales to investors related to the development projects have been loaned to affiliates*. We all agreed that additional safeguards and internal controls are needed at CCD to prevent this from occurring again.[48]

Wettlaufer responded to Masters in a letter dated January 30, 2008. Among other things, Wettlaufer stated:

> Our intent with this letter is to acknowledge the concerns raised and to lay out our plan to immediately cease any activities which might not be considered adequately disclosed to or approved by investors, to restore funds to individual projects, and to properly disclose to current and future investors the process by which certain CCD affiliates have historically loaned funds to other CCD affiliates.
>
> As a preliminary matter, we want to reiterate that past loans among CCD affiliates were the result of *soft cash management controls rather than malicious or intentional wrongdoing*. In short, the CCD accounting department was simply managing their cash requirements.[49]

Masters had only recently learned that funds had been loaned from one project to another, and he advised Sunwest that this practice needed to stop. In response, Sunwest promised Masters: "We will no longer commingle cash management funds in a single cash management system."[50] Contrary to Wettlaufer's written representations to Masters, however, the commingling continued.[51] Moreover, also contrary to Wettlaufer's written representations to Masters that "past

---

[48] Ex. 67, p. 2 (emphasis added).

[49] Ex. 68, at 1 (emphasis added).

[50] Hrg. T. Wettlaufer; Ex. 68; Ex. 170, ¶ 11.

[51] Hrg. T. Wettlaufer; Hrg. C. Brody.

loans among CCD affiliates were the result of soft cash management controls," Harder himself admitted that "this practice was central to Sunwest's business model."[52]

## D. Material Misrepresentations and Omissions in Marketing TIC Investments

Section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031 ("Section 1031"), sets forth the tax recognition rules for gains or losses that result from the "like-kind" exchange of certain types of real property. A tax deferral of gains is available for owners of real property who exchange one property for another of like-kind, provided that certain additional requirements are satisfied. One set of requirements provides that the taxpayer identify the replacement property within 45 days after the first sale and then close on the purchase of the replacement like-kind property within 180 days of that first sale. Another requirement is that the ownership interest being exchanged is not in a business entity, such as a partnership. In 2002, the Internal Revenue Service issued Revenue Procedure 2002-22, which provided guidelines for structuring exchange transactions involving TIC (tenancy in common) ownership interests in real property to make them more likely to qualify for tax-deferred treatment under Section 1031.[53]

From 2001 through June 2008, Sunwest offered to investors TIC interests to facilitate the purchase of senior housing facilities managed by Sunwest.[54] From 2001 through June 2008, Sunwest raised approximately $430 million from investors, and approximately $300 million of that amount was raised from January 2006 through June 2008.[55] In 2005, Sunwest changed its

---

[52] Ex. 170, ¶ 11; Hrg. J. Harder.

[53] Hrg. T. Dozois; Hrg. John Thurber; Hrg. J. F. Elsaesser.

[54] Ex. 170, ¶ 5.

[55] Ex. 170, ¶ 6; Ex. 1, ¶ 9 ("Between 2005 and mid-2008, [Sunwest] raised $440 million in cash through 1,800 TIC investments, $45 million through 280 preferred LLC memberships, and $85 million from 250 non-institutional loans.").

model for structuring its TIC (tenancy in common) investments in order to take advantage of the developing rules and the increasing public interest in using TIC investments for Section 1031 exchanges.[56] Sunwest also realized that by selling to multiple TIC investors, or syndicating, Sunwest needed a securities license, which led to the formation of CCF.[57]

As explained by Sunwest's lead outside counsel, Mr. Dozois, each TIC investor in a Sunwest senior housing facility invested in a single purpose limited liability company ("LLC"). Sunwest's objective in making those sales was to obtain interim, or mezzanine, financing from TIC investors, before Harder or Sunwest could re-finance the properties and become the 100 percent owner. TIC investors were promised annual payments called "rents" (typically eight to ten percent per year), as well as some additional upside benefit or appreciation (typically two percent per year) when their interests or investments were eventually sold or cashed out.[58] Thus, TIC investments in senior housing facilities were intended to be of relatively short-term duration, and a number of Sunwest's TIC investors would "roll over" one TIC investment into another "like-kind" exchange, also with Sunwest, which qualified for tax deferred treatment of gains under Section 1031. As explained by defense witness J. Ford Elsaesser, in order to maintain their ability to defer taxes, people developed "a 1031 addiction. They needed to keep trading."[59] Also, because of the 45-day and 180-day timing requirements needed to qualify for tax-deferred treatment under Section 1031, investors seeking such treatment often would not have much time to engage in their own due diligence on such roll-over investments.

---

[56] Hrg. T. Dozois; Hrg. J. Thurber.

[57] Hrg. T. Dozois.

[58] Hrg. T. Dozois.

[59] Hrg. J. F. Elsaesser.

In addition to selling TIC interests to persons interested in investing in *existing* (or already developed) senior housing facilities, Sunwest also sold two other types of investments, both of which involved purchasing undeveloped land (referred to, on occasion, as "bare land" or "dirt" deals), with the intention of later developing, or building, senior housing facilities on that land. Sunwest sold tenancy in common (TIC) investments as well as preferred membership interest (PMI) investments in such development projects."[60] In a PMI deal, as well as in a TIC "dirt" or development deal, the investor invests directly in the limited liability company that both purchases the land and intends to develop it; thus, PMI investments and TIC "dirt" deal investments do not qualify for tax-deferred treatment under Section 1031, and they were not marketed as such.[61]

In and after January 2006, most TIC offerings were structured and sold in a consistent manner. CCD identified a property to be acquired and managed by Sunwest, and sponsored the TIC offering to potential investors. CCD, with Harder's full knowledge and assistance, offered ownership in the property to investors through TIC ownership interests. The remainder of the property was owned by a "Co-Owner," typically a limited liability company that was majority-owned by Harder. Funds raised from investors through TIC offerings were to be used as the down payment for the property, while the remainder of the purchase price was to be financed through a mortgage, with the Sunwest-affiliated Co-Owner as the borrower. After the property was purchased, the TIC investors received from the escrow agent deeds for their undivided fractional interests, and the TIC investors and Co-Owner would then lease the purchased property to another Harder-owned LLC, called the "Operator" or the "Master Tenant." The

---

[60] Hrg. T. Dozois.

[61] Hrg. J. Thurber; Hrg. T. Dozois.

Master Tenant then subcontracted the property management duties to SMI, referred to as the "Property Manager." The Property Manager maintained complete control over the property's operations and finances. The TIC investors, from whom the initial money was raised, had no role in operating or managing the property.[62]

The TIC securities were sold to investors by Canyon Creek Financial, Inc. ("CCF"), wholly-owned by Harder. CCF used various marketing materials, including private placement memoranda ("PPMs"), executive summaries, and other offering memoranda to market the investment opportunities to potential investors. These marketing materials were, at times, distributed to potential investors through the United States Postal Service.[63] In order to qualify for Section 1031 tax deferral, a like-kind exchange had to be for a "stand-alone" property.[64] Sunwest structured each senior housing facility as a single-purpose LLC. As explained by CCF's John Thurber, the stand-alone nature of investments was communicated to investors both in writing and orally, including at times with Harder present.

Thurber described the standard "sales pitch" to investors as follows: Sunwest is a successful business, each investment is in a stand-alone senior housing facility, investors would receive "rent" payments each year equivalent to between eight and ten percent (depending on the deal) of their total investment, reserves would be established to pay the expenses of a facility (including rent payments to investors) until such time as the facility was able to pay its own expenses based on its own revenues, and Sunwest had never missed a rent payment to any

---

[62] Ex. 170, ¶ 7; *see also* Hrg. T. Dozois.

[63] Ex. 170, ¶ 9.

[64] Hrg. J. Thurber.

PAGE 33 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

investor in any senior housing facility.[65] As Thurber further explained, commingling funds among several facilities or running the Sunwest portfolio of senior living facilities as a "unitary operation" would have been inconsistent with these representations that were made to the TIC investors during Thurber's tenure at CCF, which spanned from 2005 to 2008.[66] According to Thurber, this would be the case regardless of whether an investment was for a TIC senior housing facility, for a TIC land (or "dirt") deal, or for a PMI investment.[67]

Thurber's description of the standard sales pitch to investors is consistent with the results of FBI interviews of Sunwest investors. As explained by FBI Special Agent Jerry Gorman, the FBI interviewed 118 investors, 71 of whom had invested in multiple Sunwest properties. These included both TIC and PMI investors. Eighty-two investors recalled being told that Sunwest was a successful company, and no investor recalled being told otherwise. Thirty-six investors commented that Sunwest's history of making regular monthly payments on their earlier Sunwest investments was a factor in their decision to invest additional money in Sunwest. Forty-one out of 118 investors recall personally meeting Harder, and 18 recall receiving personal assurances directly from Harder about the safety of their investments. Eighty-nine investors told the FBI that they were not informed before making their investments about any financial difficulties that Sunwest was having, and 11 investors who specially asked about potential problems at Sunwest were assured that everything was fine.[68]

---

[65] Hrg. J. Thurber.

[66] Hrg. J. Thurber.

[67] Hrg. J. Thurber. As mentioned earlier, Thurber added that if he had known of the commingling of funds among facilities, he would not have marketed any of the Sunwest facilities to investors.

[68] Hrg. J. Gorman; Ex. 127.

PAGE 34 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In addition, 92.5 percent of the investors (74 out of 80 respondents) stated that they would not have invested had they known that the money either from their investment or generated by the property they invested in might be transferred and commingled with other Sunwest funds; 95.3 percent (61 out of 64) stated that they would not have invested had they known that it was common for Harder to borrow funds from facilities and loan that money to other affiliates to pay payroll, operating expenses, or other obligations, 95.6 percent (64 out of 67) stated that they would not have invested had they known that Harder and Sunwest transferred or loaned reserves from particular projects to other projects or affiliates, and 98.8 percent (83 out of 84) stated that they would not have invested if they had known the overall financial condition of Sunwest at the time of their investment.[69] Thurber's description of the standard sales pitch also is consistent with the testimony of the investor witnesses at the Phase I hearing, including both financially sophisticated investors and those investors with less understanding of financial matters.[70]

## E.  The Collapse of Sunwest

From 2004 through mid-2008, the quantity and dollar values of senior housing facilities and other properties purchased by Sunwest (and, correspondingly, the number of investments

---

[69] Hrg. J. Gorman; Ex. 127.

[70] *See, e.g.*, Hrg. L. Van Dyke (investor, Stanford Law School-trained real estate lawyer, who testified: "Everybody in my business knows inter-project transfers is wrong and people go to jail for that."); Hrg. R. Hansen (investor, retired certified public accountant, who personally met with Harder and others and was assured that each Sunwest investment property was an individual, stand-alone operation, which was important to his investment decision); Hrg. J. Baxter (former certified public accountant and former real estate broker, who invested in numerous Sunwest properties after having been assured that each was a stand-alone, single-purpose entity with three-years' worth of reserves in case occupancy rates fell, who would not have invested had she been told that reserves were being loaned to other facilities or that there were underperforming properties). *See also* Hrg. C. Hamstreet (testifying that he had spoken with many Sunwest investors and that Sunwest's extensive practice of inter-facility lending was inconsistent with the representations that Sunwest made to investors).

and the dollar values that investors made in these new Sunwest properties) grew dramatically. According to a report prepared by Sunwest's chief restructuring officer Clyde Hamstreet in June 2009, Sunwest acquired approximately $40 million in new investments in 2005, up from about $5 million in 2004. Then, in 2006, Sunwest made new investments for that year totaling about $120 million, and in 2007, Sunwest made new investments totaling just under $160 million. In the first six months of 2008, Sunwest made new investments of about $70 million.[71]

According to chief financial officer Brody, as Sunwest's acquisitions of facilities increased, Sunwest's liquidity crisis grew worse.[72] In addition, Brody testified that Sunwest's commingling and inter-facility transfers of money "got worse" from 2004 through mid-2008.[73] According to Brody, the only sources of cash that Sunwest had were from (1) refinancing existing properties; (2) obtaining external loans (from banks or other lending institutions); (3) internal borrowing (namely, inter-company lending and transfers); and closing new projects with new money coming in from investors.[74] As seen in the number and dollar value of Sunwest's overdraft activity at Wells Fargo Bank, Sunwest's problems spiked in 2007.[75]

Brody's analysis is corroborated by the testimony of Matt Marcos, the adviser from the consulting firm of Alvarez and Marsal. As explained by Marcos, more than half of the facilities were operating at a loss, and Sunwest could not sustain itself without bringing in both new

---

[71] Ex. 3B.

[72] Hrg. C. Brody.

[73] Hrg. C. Brody; *see also* Hrg. M. Marcos; Ex. 5.

[74] Hrg. C. Brody.

[75] Ex. 42.

investors and new lending.[76] To acquire a new senior housing facility, a lender typically would lend approximately 70 percent and TIC investors would provide the remaining 30 percent.[77] Thus, to bring in the lender's money, Sunwest would first have to bring in money from the TIC investors. According to Brody, reserves were often a source of immediate cash, and TIC rent reserves were generally available to Sunwest.[78] Moreover, on TIC land (or "dirt") development deals, because there would not be any lender financing, all of the reserves were generally available to Sunwest.[79] These "short-term fixes," however, often only "postponed expenses from one period to the next, [and] they have increased the future cash burn of the enterprise."[80]

This is consistent with what Brody described as Sunwest's "daily hunt for cash."[81] In addition, as Sunwest added more properties, its occupancy rates declined.[82] As occupancy rates declined, less revenue came into a facility. As less revenue came into a facility, it became more difficult to pay vendors on a timely basis. On one occasion in January 2007, the Otis Elevator Company turned off an elevator at a senior housing facility, although it was promptly turned back on when Otis was told that elderly residents were living in that facility.[83] In addition, some vendors, including food service providers, were not being paid in a timely manner, sometimes

---

[76] Hrg. M. Marcos.

[77] Hrg. C. Hamstreet.

[78] Hrg. C. Brody.

[79] Hrg. C. Brody; Hrg. M. Deines; Hrg. T. Dozois.

[80] Ex. 892, § 2 (memorandum from M. Marcos).

[81] Hrg. C. Brody. *See* discussion at p. 23, *supra*.

[82] Hrg. C. Brody.

[83] Hrg. C. Brody; Ex. 932.

being pushed off for months.[84] According to chief restructuring officer Hamstreet, after he was retained in the latter half of 2008, he observed that Sunwest's "lack of liquidity was in the middle of the worst crisis [he had] ever seen in a business of comparable size" and that "[r]elationships with vendors, including critical suppliers of water, electricity, and food, were strained due to a history of late payment," with checks bouncing "frequently."[85]

By June 2007, an audit performed by one of Sunwest's principal lenders, GE Capital, revealed a number of problems. In an email from GE Capital to Sunwest's chief financial officer Brody, dated June 28, 2007, GE provided a summary of "last week's audit." Listed as item number one under the heading "Significant Findings" is the following:

> 1.    NEW DEBT ESTABLISHED BY/MONEY TRANSFERRED OUT OF GE ENTITIES. Attachments #3 - #7 highlight concerns that GE facilities are taking on debt debt or transferring money out to non-GE facilities. Establishing notes payable and notes receivable with non-GE facilities, with owners, or with other unrelated entities appears to be prohibited by the GE loan covenants. . . . The Company [Sunwest] appears to treat all 250+ of their entities as one group with over 800 transfers just between entities (regardless of if they are GE entities or non GE entities) per month. These 800 transfers per month do not include other transfers to the others of the Company (a large number of monetary transfers to and from Jon Harder were noted).
>
> The sheer number of daily transfers is a Company method of controlling cash flow – taking money on a daily basis from entities or owners that have accumulated cash and transferring these monies to entities that need cash. It is essentially a full commingling of funds and appears to be in violation of loan covenant 6.3 which states: "No borrower shall commingle the funds related to its property with funds from any other property or venture."[86]

---

[84] Hrg. J. Cone; Hrg. J. Schumacher.

[85] Ex. 1, ¶ 16; Hrg. C. Hamstreet; *see also* Ex. 42 (Wells Fargo overdraft history). Also, Marcos testified that he saw "duct tape" on the carpet at one facility. Hrg. M. Marcos.

[86] Ex. 8, p. 2. *See also* Hrg. R. Arrowsmith.

This appears to have led to the creation of the "Do Not Touch" list of properties used (and known) by Brody and Harder.[87] Eventually, GE Capital and Sunwest entered into a forbearance agreement with a multi-million dollar fee paid by Sunwest, further adversely affecting its cash flow.[88] Even that agreement, however, did not prevent all of the loans held by GE Capital from being declared to be in default by June 20, 2008. [89]

Also in June 2008, Sunwest completed its last investment deal.[90] In an offering memorandum dated February 12, 2008, Sunwest, through CCD, offered TIC investments in a senior housing facility in Portland, Oregon known as "Hawthorne Gardens."[91] The investors' funds were received, but there were no disclosures made to investors about Sunwest's longstanding practice of commingling funds or intercompany transfers, about Sunwest's history of consistent negative cash flow going at least as far back at 2006 (losing about $5-6 million per month in 2006 and 2007 and about $10 million per month in 2008), or about the fact that numerous Sunwest facilities were in violation of their loan covenants.[92] On July 8, 2008, less than one month later, Sunwest sent a letter to all investors in all of its senior housing facilities

---

[87] Hrg. C. Brody.

[88] Hrg. R. Arrowsmith; Hrg. J. Harder.

[89] Hrg. R. Arrowsmith.

[90] Hrg. J. Thurber.

[91] Ex. 22; Hrg. J. Thurber.

[92] Also in late spring of 2008, Sunwest completed another TIC investment deal for a senior housing facility in Nashville, Tennessee. *See* Ex. 790. Again, none of these material disclosures were provided to investors.

PAGE 39 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

and development properties that there would be no "rent" payments made in July and that "[t]his is also likely to be true in August."[93]

There was, however, still cash available in some of the Sunwest facilities. In late 2007, a PMI development deal known as West Salem Senior Living, LLC (also known as "Cottonwood") was completed.[94] Because this was a development (or bare land, or "dirt") deal, there was no lender, and the investors' money thus was immediately available to CCD. The governing Operating Agreement was signed by Harder and others from Sunwest and by the investors in West Salem Senior Living, LLC. Among other things, the Operating Agreement provided that West Salem Senior Living, LLC "will not incur any debt" and "will not make any loan or advances to *any Person* (including any of its Affiliates)."[95]

One of the investors in West Salem Living, LLC (or Cottonwood) was Dr. Lloyd Hiebert, who testified during the Phase I Hearing. Dr. Hiebert is a medical doctor who retired and sold his surgery center building in late 2007. He explained to a Sunwest-affiliated salesman that he could not afford to lose any of his money because it was needed both for his retirement and for his children's college expenses. Dr. Hiebert added that he needed to re-invest the proceeds from the sale of his medical building "quickly to avoid losing tax deferral benefits" under Section 1031. Dr. Hiebert met with John David Thurber of CCF, among others. Dr. Hiebert was presented with an investment opportunity in West Salem Living Living, LLC (a "development" deal also known

---

[93] Ex. 48.

[94] Ex. 71.

[95] Ex. 71, §§ 5.5 and 5.6 (emphasis added). "Affiliate" is defined in the Operating Agreement as meaning, among other things, "any Person directly or indirectly controlling" the Company, and "control" means "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Company, whether through ownership of voting interest, by contract or otherwise." Ex. 71, § 1.3. This includes Harder as an "Affiliate."

as "Cottonwood"), as well as with another investment opportunity in Georgia. The Georgia investment was a TIC senior housing facility deal, where the facility was already in existence. Dr. Hiebert was told that each investment would stand or fall depending on the success of each particular investment, although he was also told that Sunwest was a financially successful company and that Jon Harder was personally worth more than $900 million, which, Dr. Hiebert was told, was "more than enough" to handle any "emergency."[96] On approximately December 5, 2007, Dr. Hiebert and his wife signed the documents for each of these two investments, including the Operating Agreement for West Salem Senior Living, LLC.[97] This is the same document signed by Harder, which prohibits at sections 5.5 and 5.6 any lending or borrowing by that entity to any person.[98]

At some point after the Hieberts invested in West Salem Senior Living, LLC, Sunwest, issued in 2008 a Supplement No. 1 to the private placement memorandum for West Salem Senior Living, LLC, in response to concerns raised by Sunwest's outside attorney Gib Masters, discussed previously.[99] In this supplement, Sunwest disclosed that as of January 2008, loans had been made in other development projects but that: "This practice has ceased and each entity, including the Operator, will maintain segregated accounts and observe strict internal controls."[100] Even this statement, however, proved not to be true. In August 2008, Sunwest took one million dollars out of West Salem Senior Living, LLC (Cottonwood) to pay the overdue

---

[96] Hrg. L. Hiebert.

[97] Hrg. L. Hiebert; Ex. 111 (signature page of Dr. and Mrs. Hiebert on the Operating Agreement of West Salem Senior Living, LLC.)

[98] Ex. 71.

[99] Hrg. T. Wettlaufer; Exs. 67 and 68.

[100] Ex. 23, at p. 2, § 3.1.

PAGE 41 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

payroll taxes owed by Sunwest-affiliate Senenet in connection with other facilities, operations, and projects.[101] The commingling and unauthorized loans continued, even after Sunwest represented in writing to investors that the practice had ceased.[102] Cottonwood was never built.

By mid-2008, secured lenders were uncooperative with Sunwest. Many refused to negotiate further forbearance agreements or further modified loan terms. In the summer of 2008, Sunwest filed Chapter 11 bankruptcy actions for ten senior housing facilities and 21 more were filed in December 2008. Numerous lawsuits were filed against Harder, Sunwest, and others. By the end of January 2009, nine foreclosures had taken place, 75 more were pending, and receivers controlled 30 facilities, with 15 more being added in February.[103] In March 2009, the SEC filed a lawsuit against Harder, Sunwest, and others.[104] In that lawsuit, Judge Hogan appointed a restructuring officer and a receiver for Sunwest.[105] For purposes of this Phase I sentencing proceeding, this is the end of the Sunwest story.[106]

---

[101] Ex. 54.

[102] Although West Salem Senior Living, LLC, located in Salem, Oregon, was a PMI deal, and not a TIC investment, it was not part of the Clovis and Hobbs PMI deals in New Mexico. Moreover, at least until the Phase I Hearing began, Harder maintained that the sole scope of his scheme to defraud was the investments in the Clovis and Hobbs facilities in New Mexico, Dkt. 109 (Plea Agreement Letter), at ¶ 5(A)(2), even though the Hieberts' investment in West Salem Senior Living, LLC, was expressly alleged as one of the counts for which Harder was indicted. Dkt. 74 (Amended Indictment), Count 14, at p. 14.

[103] Ex. 1, ¶¶ 18-20.

[104] Ex. 1, ¶ 28.

[105] Hrg. C. Hamstreet; Hrg. R. Arrowsmith; Hrg. M. Marcos.

[106] The final resolution and winding-up of the affairs of Sunwest is not relevant at Phase I of the sentencing proceeding.

**F.  Intent to Defraud (*Mens Rea*)**

During the Phase I Hearing, Harder and others explained Harder's business model for running Sunwest. It begins with two assumptions: first, real estate has value and will continue to appreciate; second, based on an aging population, there will be a continuing, even growing, need for senior housing living facilities. Based on these two assumptions, Harder's plan was: (1) use a combination of debt from institutional lenders and equity from investors); (2) to buy underperforming (also known as "distressed" or "turnaround") senior housing properties; (3) improve those properties with additional investment to the point where their occupancy rates improve and their revenues increase; and (4) either sell the properties at a profit or refinance them and buy out the interests of the investors whose money was used initially as the down payment for the original purchase and operating loans.[107] This is a legitimate business model, and there is nothing inherently improper, let alone fraudulent, about it, provided that all material facts and risks are disclosed and there are no materially misleading statements or half-truths. Like most business models, however, it also is not without risk.

One of the ways in which Harder attempted to deal with this risk was through his pervasive practice of commingling funds and intercompany (or inter-facility) transfers and lending. Indeed, as Judge Hogan found, from 2005 to 2008, Harder identified cash flow positive facilities and cash flow negative facilities to facilitate transfers of money from one facility to another. As found by Judge Hogan, "Harder admitted this practice was central to Sunwest's business model."[108] If a single entity owns multiple facilities, there is nothing improper, let alone fraudulent, with that entity borrowing "excess cash" from one of its facilities and then lending it

---

[107] Hrg. J. Harder; Hrg. T. Dozois; Hrg. M D. Rothschild; Hrg. J. Cone.

[108] Ex. 170, ¶ 11. *See also* Hrg. C. Brody; Hrg. T. Dozois.

to another of its facilities, provided that such a practice is not inconsistent with any representations made to the owners of that entity or to any of its creditors (including lenders, who may have covenants in relevant loan documents that prohibit such a practice). That is the lesson that one would have thought Harder had learned from the *Kraus* litigation in 2004.[109]

During the Phase I Hearing, Harder testified that he told many investors that Sunwest lent money from one facility to another.[110] The Court finds that Harder may have told some, but not that he told many. Harder's testimony on this point simply is too inconsistent with the testimony of most of the investors who testified and with almost all of the investors who were interviewed by the FBI. It is also inconsistent with the testimony of Matt Marcos, who testified that after he mentioned the pervasive commingling to Sunwest's outside attorney Tim Dozois: "He [Dozois] seemed panic [*sic*]. He went pale. I think he wasn't aware of it or wasn't aware that others were aware of it."[111] It is also inconsistent with the testimony of CCF's David Thurber, who said that had he known of the commingling, he would not have marketed Sunwest's TIC investments at all and that the commingling and the practice of treating the facilities as a "unitary enterprise" would be inconsistent with the representations made to the TIC investors during Thurber's tenure at CCF from 2005-2008. The Court also is mindful of the conclusion reached by Judge Mosman concering the testimony of Harder during the 2004 evidentiary hearing in the *Kraus* lawsuit: "His testimony I found evasive and not readily believeable."[112] Based on Harder's testimony in Phase I of this sentencing hearing, this Court agrees with Judge Mosman. To the extent that Harder's

---

[109] Ex. 172; Hearing C. Brody.

[110] Hrg. J. Harder.

[111] Hrg. M. Marcos.

[112] Ex. 171, at Tr. 286:4-6.

testimony is that  "lots of investors" were aware of Sunwest's practice of pervasive commingling and intercompany lending and transfers that testimony is not supported by the evidence and is not credible.

Harder also testified that he always believed "in the value we had in our portfolio."[113] The Court accepts this testimony. Indeed, at various times in 2007, Harder was having discussions with potential brokers or purchasers about selling some or all of Sunwest's senior housing facilities. During some of these discussions in 2007, possible prices and values ranging from $125,000 per unit (or apartment) to up to $160,000 per unit were mentioned.[114] It appears that, if Sunwest could have (and would have) sold its senior housing facilities at prices in this range, all of the lenders and all of investors likely would have been paid all of what they were expecting to receive. Harder, however, wanted at least $170,000 per unit, and thus he did not follow up on these discussions.[115] As explained by witnesses Michael Deines and Michael David Rothschild, Holiday sold its portfolio of senior housing facilities in 2007 for $6.6 billion, which is about $189,000 per unit.[116] This valuation appears to have affected Harder's perception of the value of Sunwest's senior housing portfolio, although Holiday's occupancy rate was above 90 percent, which was much higher than Sunwest's average occupancy rate.[117] Sunwest also had about $400-500 million dollars invested in non-senior housing facilities, mostly through debt.[118]

---

[113] Hrg. J. Harder.

[114] Hrg. J. Harder; Hrg. M.D. Rothschild; Hrg. M. Deines.

[115] Hrg. M. Deines.

[116] Hrg. M. Deines; Hrg. M.D. Rothschild.

[117] Hrg. M. Deines.

[118] Hrg. M. Deines.

PAGE 45 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

As discussed previously, this primarily benefitted Harder and not his investors. Moreover, Harder's non-senior housing portfolio required almost $3.5 million per month in carrying costs.[119] As also discussed previously, Harder often used intercompany transfers and loans from Sunwest's senior housing properties to meet his growing and constant expenses, including the expenses for acquiring and operating his non-senior housing portfolio and for his personal lifestyle.

Whatever the reason why Sunwest did not pursue any possibilities it may have had to sell some or all of its senior housing facilities in 2007 (when Holiday sold its facilities), by the end of 2007, the window for such a sale was rapidly closing. In addition to the fact that Sunwest's loans held by GE Capital were out of compliance with their loan covenants, the economic situation in the nation (and the world) was rapidly worsening. Although several witnesses discussed this, Defendant's Hearing Ex. 504 does so extensively.  It is entitled, "Analysis of the Impact of the Financial Crisis of 2007-2009 of the Sunwest Businesses: Proposed testimony of Patrick Munro Emerson, Ph.D."[120] Although Dr. Emerson did not testify, the parties stipulated that the Court could receive and review his report. The Court has done so. The primary lesson from this report is that before mid-2007, "loose credit was abundant in both residential real estate and commercial real estate." At the same time, the rise of the tenancy in common (TIC) investment vehicle "helped to channel proceeds from profitable real estate sales into investments in senior and assisted living facilities." Thus, according to Dr. Emerson, "it was economically reasonable to view continued investment in this market sector as financially viable." As Dr. Emerson concludes: "In short, the collapse of Sunwest Management Company in the midst of the most

---

[119] Ex. 140.

[120] Ex. 504.

PAGE 46 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

severe economic crisis in the United States since the Great Depression was neither easily anticipated nor unique."[121]

The Court accepts this testimony. In the context of this criminal prosecution, however, it is beside the point. The reasons why and when Sunwest ultimately failed as a business is not legally relevant. All that is legally relevant is whether Harder knowingly and intentionally mislead investors about how Sunwest and its various affiliates were operated in order to deny those investors the opportunity to weigh the true benefits and risks of their investment transactions. As the Ninth Circuit has explained:

> The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes "harm" by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property.

*Treadwell*, 593 F.3d at 997.

During the Phase I Hearing, Harder testified as follows:

> Q.    Did you intend to cheat and deceive investors out of their money?
>
> A.    No. I always believed in the value we had in our portfolio.[122]

If, by this answer, Harder is saying only that he never intended permanently to deprive the investors of their money and that, at all relevant times, he believed that his investors would be fully repaid and made whole, the Court accepts that testimony. Relevant Ninth Circuit case law, however, instructs, "a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all." *Benny*, 786 F.2d at 1417 (citation omitted). If, however, Harder is implying by

---

[121] Ex. 504, at 35-36.

[122] Hrg. J. Harder.

his answer that, at all material times, he always had a good-faith belief in the truth, completeness, and non-misleading nature of his representations, the Court finds otherwise.

Harder acted knowingly and with the purpose and intent to deceive Sunwest's investors and deprive them of the opportunity to weigh not only the benefits but also the risks of the investment transactions they were undertaking. Among Harder's material misrepresentations, misleading half-truths, and omissions are the following:

1.     An investor's money would be invested in a specific senior housing facility or single-purpose entity, which is false or misleading without disclosing the existence of pervasive commingling of funds within the Sunwest enterprise and the pervasive practice of intercompany transfers.

2.     The success of an investor's investment was independent of the success or failure of other properties, which is false or misleading without disclosing the existence of pervasive commingling of funds within the Sunwest enterprise and the pervasive practice of intercompany transfers.

3.     Rent payments would be made only if a property was successful (or if Harder voluntarily agreed to use his own money to make them) and that Sunwest had *never missed a rent payment*, which is false or misleading without disclosing that on a number of occasions rent payments for one facility could not have been made but for that facility borrowing money from another facility.

4.     That a senior housing facility would maintain reserves sufficient to cover at least three years' worth of "rent" payments and operating expenses, which is false or misleading without disclosing the significant risk that such reserves might not be available when needed due to Sunwest's pervasive practice of commingling and intercompany transfers.

PAGE 48 – AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

5.      Sunwest was a "successful business," which is false or misleading without disclosing the facts that: (a) since at least early 2006 Sunwest was facing enterprise-wide monthly negative cash flows of approximately $5-6 million; (b) many senior housing facilities were by themselves cash flow negative and depended on intercompany transfers to stay in operation; (c) Harder's significant non-senior housing portfolio was a substantial cash drain on Sunwest and encumbered many of Sunwest's senior housing facilities; and (d) Sunwest and its facilities were not in compliance with loan covenants on a number of its senior housing properties.

6.      An investor's TIC investment qualified for tax deferred treatment under Section 1031 of the Internal Revenue Code, which is false or misleading without disclosing that because of the way in which Sunwest managed its numerous facilities as one company or business (*i.e.* as a "unitary enterprise") with respect to the commingling of funds and Sunwest's pervasive use of intercompany transfers, the Internal Revenue Service either would disallow Section 1031 tax-deferred treatment or there was at least a substantial risk of that occurring.

Had these material misrepresentations or misleading half-truths not been made, or had these material omissions been timely and fully disclosed, the investors would have had the opportunity themselves to weigh the benefits of their contemplated investments alongside the relevant risks. Had that happened, there would have been no fraud perpetrated on the investors, and it is also likely that many of the investors would not have invested.[123] Without these disclosures, however, there was pervasive fraud committed on the Sunwest investors, including the TIC facility investors, the TIC development ("bare land" or "dirt deal") investors, and the PMI development investors (beyond merely Clovis and Hobbs). Because Harder knew that these

---

[123] Indeed, many investors testified to that effect at the hearing.

material misrepresentations, misleading half-truths, and omissions were occurring and were indeed part of the Sunwest standard "sales pitch," because Harder controlled all material aspects of Sunwest's operations, including CCD and CCF, and because Harder had the intent and purpose of deceiving the investors by keeping material information from them in order to obtain their investments, Harder had the requisite *mens rea* (or criminal intent or state of mind) to be held responsible for this pervasive fraud.

In summary, the Sunwest Enterprise is not a classic Ponzi scheme, at least if a "Ponzi scheme" requires that there be no actual operation or revenue-producing activity other than the continual raising of new funds. According to BLACK'S LAW DICTIONARY (9th ed. 2009), at p. 1278, the second definition of "Ponzi scheme" states: "Money from the new investors is used *directly* to repay or pay interest to earlier investors, usu. [usually] without any operation or revenue-producing activity other than the continual raising of new funds." (emphasis added); *see also In re Bonham*, 229 F.3d 750, 759 n.1 (9th Cir. 2000) ("Generically, a Ponzi scheme is a *phony investment plan* in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors.") (emphasis added).[124]

---

[124] Different courts have applied different definitions of "Ponzi scheme." *See In re Taneja*, 2012 WL 3073175 (Bankr. E.D. Va. July 30, 2012) (discussing varying definitions of "Ponzi scheme"); *In re Rose*, 425 B.R. 145, 152 (Bankr. M.D. Pa. 2010) ("One of the struggles in this case has been to find a clear definition of the term 'Ponzi scheme.'"). The meaning of the term is further clouded by its modern colloquial usage to describe financial arrangements that are allegedly unsustainable or unlawful. *See* Alex Tabarrok, "Is Social Security a Ponzi Scheme?," *Marginal Revolution*, September 10, 2011 (noting that at least three Nobel Prize winners have publicly compared Social Security to a Ponzi scheme); Paul Krugman, "The Ponzi Thing," *N.Y. Times*, September 14, 2011 (article by Nobel Prize winner, noting that Social Security "is nothing at all like a classic Ponzi scheme"). The primary disagreement among legal definitions of the term appears to involve whether, in a true Ponzi scheme, the underlying business venture was inherently fraudulent or merely unsustainable. *See In re Taneja*, 2012 WL 3073175, at *5-8. For present purposes, however, it is sufficient to note that "[a]ll Ponzi schemes are frauds. Not all frauds are Ponzi schemes." *Id*. at *7.

In the case of Sunwest, money from new investors was generally used as the down payment for a real estate purchase transaction, while the balance of the purchase price and additional funds for "reserves" would come from an institutional lender.[125] As described above, however, many reserves, and also revenues from operations, often were used by Sunwest to pay expenses at other facilities, including making "rent" payments to investors at other facilities.[126] This was done through intercompany transfers or lending. In addition, on occasion, post-closing or late-arriving investment money also would be available to Sunwest for these expenses.[127] Thus, it would not be precisely correct to say that Sunwest "involved no revenue-producing activity other than the continual raising of new funds" or that Sunwest was a "phony investment plan." Sunwest was a risky, but not strictly-speaking phony, investment plan; nevertheless, the reason why Harder is facing criminal liability (to which he has already pleaded guilty) is because he, and those acting under his direction and control, intentionally and knowingly misled Sunwest's investors about the true nature and extent of the risks of their Sunwest investments.

## CONCLUSIONS OF LAW

Based on the foregoing Findings of Fact, the Court concludes as follows:

1.      Beginning at least by 2006 and continuing until approximately mid-2008, Harder, through Sunwest and its various affiliates, over which Harder exercised control, intentionally and knowingly engaged in a scheme to defraud numerous investors in Sunwest-affiliated senior housing facilities and senior housing facility development opportunities.

---

[125] Hrg. T. Dozois.

[126] Hrg. C. Brody; Hrg. A. Painter.

[127] Hrg. C. Brody; Hrg. T. Dozois.

2.      The Sunwest investments included with the scope of Defendant's fraud are not dependent on the precise form of the investment and consist of all of the following: (a) tenancy in common (TIC) investments in existing Sunwest senior housing facilities; (b) tenancy in common (TIC) investments in development (or "dirt" or "bare land") deals for the purpose of later developing Sunwest senior housing facilities; and (c) preferred membership interest (PMI) investments in either existing or developing Sunwest senior housing facilities.[128]

3.      The Clovis and Hobbs PMI transactions in New Mexico, which Harder describes as the offenses of conviction, are only a small subset of Harder's overall scheme to defraud investors.

4.       Harder's sale of TIC senior housing facility investments, sale of TIC senior housing development investments ("dirt" or "bare land" TIC deals), and sale of PMI investments (in addition to Clovis and Hobbs) are all part of the same "course of conduct" and "common scheme or plan" as the offenses of conviction, based on the fact that they all share the same modus operandi and the same purpose and are all sufficiently connected or related to each other as to warrant the conclusion that they are part of a single ongoing series of offenses. Specifically, they all entail obtaining investors' funds in Sunwest-affilated senior housing facilities or development projects through the same material misrepresentations, misleading half-truths, and

---

[128] The precise form of the investment might be relevant to whether a hypothetical investor would likely prevail in a civil lawsuit against Sunwest or Harder for breach of contract. The specific TIC senior housing investment LLC documents to which each individual investor is a party arguably are not expressly breached solely by virtue of the pervasive commingling of funds and intercompany transfers. On the other hand, an investor might prevail in an express breach of contract action for the reasons described during the testimony of L. Van Dyke. *See* Hrg. L. Van Dyke. That question, however, has nothing to do with whether Harder and those working for him committed fraud against the investors based on the material misrepresentations, misleading half-truths, and omissions described in the Court's Findings of Fact.

omissions, all with the intention and knowing effect of depriving the victims of that fraud of the opportunity to weigh the true benefits and risks of their investment transactions.

## CONCLUSION

The Court finds that the scope of Defendant's scheme to defraud exceeds the two counts of conviction and that the relevant conduct includes all Sunwest senior housing facility and senior housing development investments sold by Defendant, directly or indirectly by persons acting under his control, supervision, or direction, to investors from January 1, 2006, through July 7, 2008, regardless of the specific form of those investments, whether TIC or PMI. The U.S. Probation Office for the District of Oregon shall prepare a presentence report consistent with these Findings of Fact and Conclusions of Law. As part of that report, the Probation Office shall calculate the offense level under the USSG in two alternative versions. The first version shall be based on the existing 2014 Guidelines, and the second version shall be based on the assumption that the currently proposed Amendments to the Sentencing Guidelines (preliminarily issued on April 9, 2015) will become effective as of November 1, 2015. *See* USSG § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). Pursuant to the parties' plea agreement, Dkt. 109, ¶ 4, Phase II of Defendant's sentencing proceeding will begin on November 16, 2015. Dkt. 107.

**IT IS SO ORDERED**.

DATED this 4th day of November, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge