NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**CLAIRE M. FAY, DCB # 358218**
Assistant United States Attorney
Claire.Fay@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:12-cr-00485-SI** |
| **v.** | **GOVERNMENT'S MOTION TO QUASH DEFENDANT'S RULE 17(c) SUBPOENAS** |
| **JON MICHAEL HARDER,** | |
| **Defendant.** | |

## INTRODUCTION

The United States hereby files this motion pursuant to Rule 17(c)(2), to quash six

subpoenas *duces tecum* that defendant seeks to serve on three individuals and three business

entities. Many of the requests set forth in the subpoenas are overbroad, lack relevancy, and

would be burdensome for the subpoenaed individuals or business entities to comply with.

Consequently, the government requests that the Court quash each of the subpoenas sought by

defendant.

**Government's Motion to Quash or in the Alternative,**
**Modify Defendant's Rule 17(c) Subpoenas**                                   **Page 1**

## STATUS OF THE CASE

On January 8, 2015, defendant Jon Michael Harder plead guilty to one count of wire fraud and one count of money laundering (ECF No. 107). After conducting a lengthy hearing on the scope of the fraud, and an additional sentencing hearing on November 17, 2015, the Court sentenced defendant to 180 months in prison on the mail fraud conviction, and 120 months in prison on the money laundering charge, to be served concurrently, followed by a three-year term of supervised release. (ECF No. 210). In its Sentencing Memorandum and Order, the Court found that Harder defrauded more than 1200 victims of over $120 million. (ECF No. 207, p.2 ¶ 2). The Court also deferred ruling on restitution "for up to 90 days, as permitted by federal law." *Id*. at 14. Two weeks later, the Court issued an Amended Judgment, again recognizing that restitution would "be determined within 90 days." The Amended Judgment also specified that monthly payments of not less than $1000 towards restitution would be part of the Special Conditions of Harder's supervised release. (ECF No. 219, p. 3, ¶ 7). The Ninth Circuit affirmed this Court's judgment on December 7, 2017. *United States v. Harder*, 705 F. App'x 643 (9th Cir. 2017).

On January 13, 2021, President Donald J. Trump commuted Harder's sentence to time-served, leaving all other aspects of the judgment intact (ECF No. 267-2). Specifically, the Executive Grant of Clemency left "intact and in effect the three-year term of supervised release with all its condition, and all other components of the sentence." (ECF No. 267-2 at p. 1).

After the Executive Grant of Clemency was made, the government and the U.S. Probation Office realized that restitution had never been ordered (ECF No. 267-3 at p. 1). On April 16, 2021, the government moved for an order directing Harder to pay more than $79

**Government's Motion to Quash Defendant's Rule 17(c)**                **Page 2**
**Subpoenas**

million in restitution.  (ECF No. 267).  Defendant filed his objection to the government's

restitution motion on June 18, 2021.  (ECF No. 271).  On August 2, 2021, the Court granted the

government's Motion for Second Amended Judgment Ordering Restitution.  (ECF No. 277).

Since that time, the government has been diligently working with the defense to resolve

restitution issues they have raised[1].  According to the Court's directive, the parties have provided

regular status reports on the progress of the case since January 2022 (ECF Nos. 287, 290, 292,

295, 297, 299, 302, 304, 306).

On March 8, 2023, at the parties' request, the Court set a two-day restitution hearing for

October 12, 2023 (ECF No. 310).  During this telephone conference, the defense mentioned that

it planned on filing Rule 17(c) subpoenas for records.  At the time, the government indicated that

it didn't object.

On April 3, 2023, the Court set a briefing schedule as follows:  simultaneous Opening

Briefs due on July 24, 2023; simultaneous Response Briefs due on August 14, 2023; remaining

submission (expert notices, witness lists, exhibits and exhibit lists) due August 21, 2023 (ECF

No. 313).

On June 5, 2023, three months after his counsel mentioned the Rule 17(c) subpoenas to

the Court, defendant finally filed his motion along with copies of the proposed subpoenas (ECF

No. 314).  The proposed subpoena attachments rely heavily on exhibits that the defense did not

file because they contain PII.  The government has provided the Court with a copy of these

---

[1] Defense counsel came on to the case in approximately September 2021.  Current government counsel was first assigned to this case in March 2022.  Neither government counsel nor defense counsel were attorneys of record on the case at the time of defendant's guilty plea, sentencing, appeal, or the restitution motion.

**Government's Motion to Quash Defendant's Rule 17(c)**                                   **Page 3**
**Subpoenas**

exhibits to the defendant's motion (Exhibit A -- Defendant's Exhibits to Motion for Unopposed Rule 17(c) Subpoenas).

## STATEMENT OF FACTS

As the Court is aware, in March 2009, the Securities and Exchange Commission filed a case to enjoin Harder, his associates, and Sunwest from issuing securities (*Securities and Exchange Commission v. Sunwest Management, Inc., et. al*., 6:09-cv-06056-HO).   Defendant's business entity, Sunwest, collapsed in bankruptcy shortly thereafter (*In Re: Stayton SW Assisted Living, L.L.C.*, Case No. 6:09-cv-06082-HO).   On March 10, 2009, the Honorable Michael R. Hogan appointed Michael Grassmueck as Receiver and Clyde Hamstreet as Chief restructuring Officer (CRO) (*Securities and Exchange Commission v. Sunwest Management., Inc., et. al*., 6:09-cv-06056-HO, ECF No. 64).   Years of litigation involving hundreds of accounting and legal professionals followed.   The bankruptcy case resolved in September 2014 (*In Re: Stayton SW Assisted Living, L.L.C.*, Case No. 6:09-cv-06082-HO, ECF No. 2185) and the SEC case resolved in January 2019 (*Securities and Exchange Commission v. Sunwest Management., Inc., et. al*., 6:09-cv-06056-HO, ECF No. 2666).

The criminal case against defendant began on September 18, 2012, with the filing of an Indictment charging 25 counts of Mail Fraud, 11 counts of Wire Fraud, 20 counts of Money Laundering, and two Forfeiture Allegations ECF No. 1).   After the grant of Executive Clemency by President Trump, defendant began supervision by the U.S. Probation Office on January 20, 2021, (ECF Nos. 267-2; 267-3).   At the time, AUSA Scott E. Bradford was government counsel, and Robert Hamilton from the Federal Public Defender's Office represented defendant Harder.

In April 2021, AUSA Bradford provided the government's restitution spreadsheet to Mr. Hamilton (Exhibit 1).

The government's restitution spreadsheet was compiled by Internal Revenue Service Special Agent Abe Smith in April 2021[2].  SA Smith based his figures on a final version of a spreadsheet that first Receiver Michael Grassmueck and second Receiver, Maggie Lyons of Resolve Financial Group, Couer D'Alene, Idaho had used to manage all distributions made to claimant from the receivership in the Sunwest bankruptcy case (*In re: Stayton SW Assisted Living, LLC, et. al.*, Case No. 09-cv-06082-HO (Bankruptcy Case)).  Lyons had been appointed by Judge Hogan as the second Receiver to oversee the distributions made to a variety of claimants in the Harder and Sunwest bankruptcies (ECF No. 267-1).  Lyons told SA Smith that she had received some of the information on the spreadsheet from first Receiver Grassmueck and his associate, Geoff Winkler, and that as transactions occurred, she added information to the spreadsheet.  The starting point for each investor on the spreadsheet was the MIMO amount[3].  Lyons' spreadsheet was the latest and most accurate record of the amount of funds disbursed and still owed to the Sunwest investors.  Lyons' spreadsheet did not contain information to identify the facility associated with each victim's claim and the dates of investment.  Consequently, SA

---

[2] We have not attached SA Smith's original restitution spreadsheet here, because over the course of time, there have been several iterations of the document.  These modifications are the result of discussions with Mr. Winkler and the defense, as well as additional research the government has conducted regarding certain claims.  The latest version of the restitution spreadsheet is represented in the Defendant's Exhibit A to his motion for Rule 17(c) subpoenas. The government anticipates some additional, but minor adjustments to the spreadsheet.

[3] MIMO is the acronym for Money-In/Money-Out and is the prototypical method of calculating Allowed Claims of investors in securities fraud receivership cases.  Cash or any other material tangible value given or transferred to any of the parties for purposes of investment in the Sunwest Enterprises in connection therewith ("Money-In") is reduced by all payments of principal, interest, rent, fees, or other payments, distributions, or transfers of funds, securities, or other property or any other material tangible value paid, distributed, or transferred to for any reason after January 1, 2006, arising from or related to the Investors' investment in the Sunwest Enterprise ("Money -Out").  The difference of the Money-In less the Money-Out is the MIMO Allowed Claim.  *Securities and Exchange Commission v. Sunwest Management., Inc., et. al*., 6:09-cv-06056-HO, (ECF No. 875 at p. 14).

Smith contacted Geoff Winkler[4], who assisted Michael Grassmueck during the Sunwest receivership, to obtain facility names and dates of investment associated with each claim on Lyons' spreadsheet.  This information was necessary to comply with this Court's order that restitution be limited to Sunwest victims who invested in senior housing projects between January 1, 2006 and July 7, 2008 (ECF 267-1).  Mr. Winkler was able to provide SA Smith with information about the facility names and the amounts of investments made by the victims.  After receiving the facility names and dates of investment, SA Smith was able to sort the data to ensure that the restitution claims were limited to: (1) TIC (Tenants in Common) and Preferred investors; (2) senior housing properties or land intended for senior housing development; (3) investments made between January 1, 2006 and July 7, 2008; and (4) victims who were still owed money.  SA Smith removed from the chart, non-senior living properties; investments made outside the date range required by the Court; and claimants who may have recovered more than their original investment by virtue of electing a rollover of their interest in stock, rather than requesting either a cash payout or a 50/50 split between cash payout and rollover into stock (ECF No. 267-1)[5].  At the time, the government calculated restitution of more than $66 million to the TIC investors and more than $12 million to the Preferred investors.

On August 8, 2021, the Court granted the Government's Motion for Second Amended Judgment Ordering Restitution (ECF No. 277).

On September 9, 2021, attorney Kevin Sali entered his notice of appearance, replacing Mr. Hamilton as counsel of records for defendant Harder (ECF No. 279).  Attorney Kerry Lawson Pedigo also began representing defendant Harder at this time, although Mr. Pedigo only

---

[4] Mr. Grassmueck retired in approximately 2017-2018.
[5] Some revisions to the chart have been made based on discussions with defense counsel.

entered his notice of appearance in the case on March 13, 2023 (ECF Nos. 311-312).    AUSA Bradford provided the government's restitution calculations to Mr. Sali and Mr. Pedigo in early October 2021 (Exhibit 2).  On February 25, 2022, and February 28, 2022, Mr. Pedigo sent AUSA Bradford a copy of the government's spreadsheet with potential revisions made by the defense, and explanations for those revisions (Exhibit 3).  In general, these adjustments related to defense assertions that: (1) there was an error in how three distribution payments made by the Receiver to investors were accounted for when the spreadsheet shows some investors only receiving either one round or two rounds of payment;  (2) money from the sale of Sunwest properties (Holdco Properties) to Blackstone (BRE/SW Portfolio, LLC) should have been applied against individual MIMO claims[6]; (3) the profit from the sale of Sunwest properties (Holdco Properties) to Blackstone should have been large enough to pay of all TIC investors who did not cash out their claims early; (4) there were non-senior living properties on the spreadsheet; (5) the spreadsheet erroneously contained investors' claims for an adult living facility called Portland Senior Living, because these victims received the property back as part of the bankruptcy case (Defense claims that "anecdotally" this occurred with other properties on the spreadsheet); (6) there were claims the defense team could not verify with documentation of the investment; and (7) the spreadsheet contained duplicate claims.   In an email to AUSA Bradford on March 4, 2022, Mr. Pedigo raised another issue, asserting that the "Great Recession of 2008"

---

[6] The assets and liabilities of certain Sunwest entities were consolidated in an Order (Distribution Plan Approval) entered by Judge Hogan on October 2, 2009, in *Securities and Exchange Commission v. Sunwest Management, Inc. et. al.*, Case No. 6:09-cv-06056-HO (ECF No. 875) and also ordered by the Court (Substantive Consolidation Order) on December 22, 2009, in *In re Stayton SW Assisted Living, L.L.C.,* Case No. 6:09-cv-06082-HO (ECF No. 733).

**Government's Motion to Quash Defendant's Rule 17(c)**                                          **Page 7**
**Subpoenas**

resulted in losses incurred by Sunwest investors.   He maintained that the MVRA requires an adjustment for these losses because defendant Harder did not cause them (Exhibit 3).

In March 2022, AUSA Bradford left the U.S. Attorney's Office, and the undersigned entered a notice of appearance in the case (ECF No. 289).   Between March 2022 and June 2023, current government counsel and SA Smith have communicated with defense counsel and their financial analyst dozens of times about their objections to the government's restitution spreadsheet.  The government has worked diligently to answer the defense's questions about certain line items on the spreadsheet, and to provide documents that would be responsive to their questions.

Geoff Winkler joined SA Smith and government counsel for an in-person meeting with the defense counsel and their financial analyst at the U.S. Attorney's Office on July 22, 2022[7]. At the outset of the meeting, the undersigned advised the defense that Mr. Winkler had a large data base of information related to the receivership, and rather than the government providing a massive amount of information to the defense, a more time-efficient procedure would be for the defense to consider making specific requests for certain documents that were the focus of their concerns.  Defense counsel agreed to this procedure[8].  At this meeting, the defense also indicated that it intended to issue subpoenas to both Receivers and to William Bryan, a member of the Management Committee in the Sunwest bankruptcy case (*In re: Stayton SW Assisted Living, LLC, et. al.*, Case No. 09-cv-06082-HO, ECF No. 2450), and the Chairman of the TIC

---

[7] The government has retained Mr. Winkler's services as an expert witness in this case.
[8] The government provided additional discovery to the defense on June 7, 2022, June 16, 2022, August 1, 2022, October 26, 2022, November 1, 2022, November 3, 2022, May 2, 2023, and June 13, 2023.  Some of the materials provided had been given as part of Rule 16 discovery years ago, but as a courtesy to the defense, the government made these materials available again as part of an effort to keep the case moving forward.

**Government's Motion to Quash Defendant's Rule 17(c)**                                              **Page 8**
**Subpoenas**

Committee established in the Jon Harder Bankruptcy case, Case No. 08-37225 (*see Securities and Exchange Commission v. Jon M. Harder, et. al.*, Case No. 6:09-cv-06056-AA, ECF No. 19, Declaration of William Bryan in Response to Relief Sought by SEC).

In October 2022, the defense requested that the government contact Mr. Bryan and request certain records.  Mr. Bryan provided documents in response to the defense's questions, and the government subsequently provided the records to the defense on November 1, 2022 (Exhibits 4, 5).

The defense also requested that the government contact the Receivers to determine if they had any records responsive to the proposed subpoena duces tecum.  On September 23, 2022, the defense emailed its proposed Attachment to Subpoena on Receivers (Exhibit 6) along with a set of six lengthy exhibits (Exhibit 7).  In October 2022, the government contacted David Zaro, former attorney for the Receivers, and provided him with a proposed subpoena attachment drafted by the defense.  Mr. Zaro indicated that after speaking with Michael Grassmueck, he learned that Grassmueck no longer had any records of the Sunwest receivership.  This information was provided to the defense in early November 2022 (Exhibit 8).  On November 17, 2022, the undersigned informed the defense that Ms. Lyons did not have any records of the receivership that were responsive to the defense's proposed subpoena (Exhibit 9).  Consequently, Mr. Pedigo informed the government that the defense was not expecting the government to further pursue contact with either of the Sunwest Receivers about the availability of additional receivership records.  Mr. Pedigo stated that the defense "may issue a subpoena to either Receiver to attend the restitution hearing," but his correspondence made no further mention of issuing subpoenas duces tecum to the Receivers. (Exhibit 10).

**Government's Motion to Quash Defendant's Rule 17(c)**                    **Page 9**
**Subpoenas**

The defense believes there are remaining issues with the government's restitution spreadsheet.  The defense's continuing objections include the following:  (1) that certain claims included funds in excess of the MIMO amount; (2) that the defense was unable to find a trade blotter or other documents reflecting the original amount of certain  investments; (3)  that several claims appeared to be duplicates; (4) that several claims were missing a First Distribution Payment and did not have a Recovery or Recovery Preferred; (5) that  several claims appeared to be ones where the TICs took back the property; and (6) that several claims appeared as though the investor received a third-party payment that was not accounted for in the MIMO calculations (Exhibit 11).

Regarding items (5) and (6), for many months, the defense has questioned the disposition of 47[9] of the senior living facilities listed on the government's spreadsheet.  They maintain that the properties could have been returned to the TICs, and thus, under the MVRA, the claims of these investors must be eliminated from the restitution figures.  The defense makes this claim despite the government providing it with another spreadsheet compiled by Geoff Winkler, showing the disposition of Sunwest properties.  The defense claims that the government must produce the closing statements for the sale of these 45 properties to definitively determine how these properties were disposed of, whether TICs took possession of them, or whether TICs received any money from the property sales.  On May 19, 2023, the defense changed course and informed the government that it believed the government had to produce closing statements for all 124 properties on the government's spreadsheets, along with the closing statements for the 147 properties sold to Blackstone (Exhibit 12).

_____

[9] There are actually 45 properties, since the list contains two duplicates.

**Government's Motion to Quash Defendant's Rule 17(c)** **Page 10**
**Subpoenas**

Over the course of the past 26 months, the government has diligently worked to address the objections the defense has raised to the government's restitution figures.  We have had in-depth, multi-hour meetings with the defense team in person and on conference calls to discuss their concerns, answer their questions, provide records.  Many of these meetings were preceded by SA Smith and I meeting with Geoff Winkler for several hours to discuss defense requests. We have contacted the Receivers and Mr. Bryan on behalf of the defense to obtain records.  The government has adjusted the figures in its restitution spreadsheet to address some of the defense issues and anticipate further minor adjustments prior to the restitution hearing.  This has all been done to narrow the restitution issues for the Court and to move the case towards resolution.

On June 5, 2023, the defense filed a request for issuance of six subpoenas duces tecum to Michael Grassmueck, Revolve Financial Group (Maggie Lyons), Geoff Winkler, Clyde A. Hamstreet and Associates LLC, William Bryan, and Alvarez and Marsal Disputes and Investigations LLC (ECF No. 314).  Each subpoena attachment references multiple exhibits that the defense did not file with the Court.  The government is providing a courtesy copy of these subpoena attachment exhibits to the Court as Exhibit A – Exhibits to Defense Rule 17(c) Subpoenas.  The subpoena attachments look very different from the proposed subpoena attachment to the receiver that the defense sent the government in September 2022.  The breadth of these subpoenas indicates that the defense is working to expand the issues by auditing every financial decision made by the Receivers and ultimately Judge Hogan.

/ / /

/ / /

/ / /

**Government's Motion to Quash Defendant's Rule 17(c)**                    **Page 11**
**Subpoenas**

### THE RECEIVERSHIP CLAIMS PROCESS

It is important to discuss the claims process in the receivership case, since the government's restitution figures are based on the work done by Mr. Grassmueck, Ms. Lyons and their teams.

On June 15, 2023, SA Smith and the undersigned spoke with Geoff Winkler about the receivership claims process. Mr. Winkler stated that the claims process and the form that would be used by investors to submit claims took more than 12 months to develop. Defendant Harder and his legal team, the Receiver, the CRO and others, were involved in this process. Once the process was finalized, it was submitted to Judge Hogan for approval. After the claims process was approved, the Receiver sent out claim forms and received back more than 12,000 claimant forms. As part of the claims process, the Receiver, Clyde Hamstreet the CRO, and the Sunwest accounting department worked together to determine the amounts due for each claim, using a MIMO, or Money-In/Money-Out calculation. At the beginning of this process, the Receiver began auditing Sunwest's accounting records for accuracy and completeness. However, Judge Hogan soon determined that the exercise was unnecessary, claiming that the Sunwest records were accurate and could be relied on by the parties.

Each claim submitted to the Receiver underwent a minimum of two reviews to ensure accuracy. Michael Grassmueck and his team hired 15 claims analysts to review all the claims submitted. In many instances, Winkler conducted a third level of review for those claims above a certain dollar amount, or as part of a general random audit of the lower-level reviews. Grassmueck elevated more difficult claims to a small team of experts that included Winkler and

a few additional associates at the Receiver's office for a more in-depth review.  In total, the claims process took approximately 18 months to complete.

After reviewing each claim, the Receiver worked with Clyde Hamstreet's office to ensure that the claimant's election of claim type was accurately accounted for (e.g., choice of cash distribution only, stock ownership, or a combination of the two).  When this task was completed, Winnkler and the Receiver sent out letters to each claimant notifying them of their final allowed claim amount.  In situations where the Receiver and the claimant could not come to an agreement, the claim went to mediation with Judge Hogan and Judge Velure.  This process took place over a three-day period, and the Judges considered each contested claim one at a time.

A property disposition committee made up of Grassmueck, Winkler, Hamstreet, Bill Bryan, consulting firm Alvarez and Marsal, Shirley Dunn (who worked with Hamstreet and was appointed CFO of Sunwest during the bankruptcy), and other large-dollar investors appointed to represent the other investors, was formed.  Together, the members of the committee determined whether each property would be sold to Blackstone (Holdco properties), set aside for sale to a third-party (Trustco properties), or given back to the lender or the TICs (Divestco properties).  This committee was created with the approval and oversight of Judge Hogan.

If a TIC or a TIC group ever received a return of real property, such return was approved by the disposition committee and Judge Hogan.  In a few instances, Judge Hogan directed the Receiver to make distributions to some of the TICs who received a return of their property.  This was done because the properties were in unexpectedly poor physical and financial condition.

Defendant Harder and his legal team were heavily involved in this entire process.  They attended meetings and hearings and were given the opportunity to review all work done by the

Receivers and the CRO.  The whole Receivership process, disposition of Sunwest property and assets, and payments made to defrauded investors was conducted by a legion of legal and financial professionals and very closely monitored by Judge Hogan.[10]

## LEGAL STANDARD

Federal Rule of Criminal Procedure 17(c) "governs the issuance of subpoenas duces tecum in federal criminal cases."  *United States v. Nixon*, 418 U.S. 683, 697-98 (1974).  "Rule 17(c) is not intended to provide a means of discovery in criminal cases; rather, its purpose is to expedite trial by 'providing a time and place before trial for the inspection of subpoenaed materials."  *United States v. Heine*, No. 3:15-cr-00238-SI-2, 2016 WL 1270907, at *1 (D. Or. Mar. 31, 2016) (quoting *Nixon*, 418 U.S. at 698-99); *see also United States v. MacKey,* 647 F.2d 898, 901 (9th Cir. 1981) (citation omitted) (instructing that "a Rule 17(c) subpoena is not intended to serve as a discovery tool, or to allow a blind fishing expedition seeking unknown evidence").

The party issuing a subpoena under Rule 17(c) bears the burden of "clear[ing] three hurdles: (1) relevancy; (2) admissibility; [and] (3) specificity."  *Nixon*, 418 U.S. at 700; *United States v. Reed*, 726 F.2d 570, 577 (9th Cir. 1984); *see also United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002).  Moreover, "[e]ven upon a showing of relevance, admissibility, and specificity, a court must consider whether the material is 'otherwise procurable,' whether the proponent can 'properly prepare for trial without such production,' and whether 'the failure to obtain such inspection may tend unreasonably to delay the trial.'"  *Nixon*, 418 U.S. at 699; *see also United States v. Eden*, 659 F.2d 1376, 1381 (9th Cir. 1981) ("in order to justify a subpoena

---

[10] *Securities and Exchange Commission v. Jon M. Harder, et. al.*, Case No. 6:09-cv-06056-AA, (ECF Nos. 875, 1761).

**Government's Motion to Quash Defendant's Rule 17(c)**                         **Page 14**
**Subpoenas**

for production before trial, the proponent must also demonstrate that the subpoenaed materials are not available from any other source and their examination and processing should not await trial in the circumstances shown"). Further, "a Rule 17(c) subpoena "should be quashed or modified if it calls for privileged matter."" *Heine*, 2016 WL 1270907, at *1 (quoting *United States v. Reyes*, 239 F.R.D. 591, 598 (N.D. Cal. 2006). Additionally, "Rule 17(c)(2) provides that the Court may quash or modify a subpoena 'if compliance would be unreasonable or oppressive.'" *Heine*, 2016 WL 1270907, at *1(quoting *Nixon*, 418 U.S. at 702). Defendant Harder has not cleared these hurdles established by Nixon.

## ARGUMENT

### A. The Subpoenas to Former Receivers Michael Grassmueck and Maggie Lyons (Resolve Financial Group), and Subpoena to Geoff Winkler

Michael Grassmueck and Maggie Lyons are the former Receivers in the Sunwest and Harder bankruptcy and SEC cases. Geoff Winkler was employed as Director of Case Management for the Grassmueck Group and worked with Michael Grassmueck on the Sunwest Receivership. The defendant seeks issuance of Rule 17 (c) subpoenas for all three[11]. The government will refer to these three subpoenas as the Receivers Subpoenas. At the outset, the government notes that Mr. Grasmueck and Ms. Lyons no longer possess records of the Receivership. The defense has known this since November 2022. After Mr. Grassmueck retired, Mr. Winkler took possession of the remaining Grassmueck documentation associated

---

[11] The attachments to defendant's Grassmueck, Lyons and Winkler subpoenas are identical with one exception. In Attachment A to the Winkler subpoena, the request for Compliance with Court Orders Re: Records Retention, is missing (Exhibit 13, Winkler Subpoena Attachment A at p. 5 ¶ 26).

**Government's Motion to Quash Defendant's Rule 17(c)**                              **Page 15**
**Subpoenas**

with the Sunwest receivership.  The government has hired Mr. Winkler as an expert witness in this case.

At the defendant's request, the government contacted Mr. Grassmueck and Ms. Lyons in October 2022 to inquire if they still maintained records of the Receivership.  The defense gave the government a proposed subpoena attachment that it provided to David Zaro, former attorney for the receivers (Exhibit 7, 8).  Mr. Zaro indicated that Michael Grassmueck was retired and no longer had any records of the Receivership (Exhibit 8).  Ms. Lyons confirmed in an email to SA Smith that she no longer had records (Exhibit 9).  The government informed defense counsel of these facts, and on November 23, 2022, Mr. Pedigo replied in an email that the defense did not expect the USAO to pursue any additional contact with the former Receivers about documents they had, but the defense may issue subpoenas to the former Receivers to attend the restitution hearing (Exhibit 10).   Rather than abide by this representation, the defense seeks issuance of Rule 17(c) subpoenas to the former Receivers that greatly expands the scope of the proposed request the defense made in October 2022.

## 1.    The Subpoenas Lack the Necessary Specificity.

*Nixon's* specificity requirement ensures that "when a party seeks to enforce a subpoena under Rule 17(c), the 'subpoena must refer to specific documents, or at least to specific kinds of documents." *Heine*, 2016 WL 1270907, at *3.  The specificity requirement also helps ensure that Rule 17(c) subpoenas are made in good faith and not used as a "fishing expedition to see what may turn up." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951).  Thus, if the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought, but merely hopes that something useful will turn up, this is a sure sign

that the subpoena is being misused." *United States v. Noriega*, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991).

The Receivers Subpoenas request documents from seven other categories:  (1) Proceeds of Sunwest Asset Sales by Receivership or after November 20, 2008; (2) Mandatory Victim Restitution Act Statutory Requirements; (3) Property Returned to Investors and Its Value; (4) The Sale to Blackstone of Sunwest Properties and SRM; (5) Other Investor Recoveries and Fees Paid; (6) Receivership Accounting of Investor MIMO and Other Payments; (7) Identifying Scope of Unitary Enterprise Assets (Receivers Subpoenas, Attachment A at pp. 1-5).  The Grassmeuck and Lyons subpoenas also request documents in an eight category, Compliance With Court Orders Re Records Retention (Grassmueck and Lyons Receivers Subpoenas, Attachment A at p. 5).  In addition, the subpoena attachments reference thirteen exhibits and an Addendum[12].

Defendant's overly broad and ill-defined requests fail *Nixon*'s specificity requirement. For example, in the first category of requested documents, Proceeds of Sunwest Asset Sales by Receivership or after November 20, 2008, defendant demands production of "*all documents sufficient to identify* the sales proceeds received on all Exchanges involving SALF or any other Sunwest businesses or assets the Receivership managed, to include all sales proceeds from the approximately 140 SALF properties transferred to Blackstone." (Receivers Subpoenas, Attachment A at p.1 ¶ 1) (emphasis added).  In addition, he demands production of "*all documents related to the valuation* of SALF or other Sunwest businesses or assets either created by, provided to, or otherwise received during the Receivership." (Receivers Subpoenas,

---

[12] The defendant failed to make the exhibits available to the Court, so the government has provided a disk containing the exhibits for the Court's review.

**Government's Motion to Quash Defendant's Rule 17(c)**                          **Page 17**
**Subpoenas**

Attachment A at p.1 ¶ 2) (emphasis added).   Defendant's subpoenas are equally unspecific in

each of the other categories listed.  By way of example only, some of defendant's overbroad

additional demands call for the Receivers to produce "*documents sufficient to identify any*

*payment* by the Receiver to reimburse any person (including Investors) (Receivers Subpoenas,

Attachment A at p. 2 ¶ 3) ….; "*documents sufficient to identify all fees paid to "professionals" in*

*connection with an Exchange of SALF*…. or any other Consolidated Sunwest related entity…

(Receivers Subpoenas, Attachment A at p. 2 ¶ 4); *documents sufficient to identify any SAIF*

*which was impossible or impractical to return* to the TIC investors who owned the SALF prior to

the Receivership (Receiver Subpoenas, Attachment A at p. 2 ¶ 7); *any documents received from,*

*or related to, any Investor* completing the "FORM OF PAYMENT ELECTION" electing to be

paid, in whole or in part, with Cash …. (Receiver Subpoenas Attachment A at pp. 2-3 ¶ 8);

"*documents sufficient to identify* all third-party settlements showing direct payment to TIC

Investors.

         Defendant's Receivers Subpoenas in their entirety fail to specify with any particularity,

the documents he is seeking.  Likewise, defendant fails to specify any time period for his request.

"Within the Ninth Circuit, 'requesting entire files instead of specific documents indicates a

fishing expedition.'" *Heine*, 2016 WL 1270907, at *4 (quoting *United States v. Venecia*, 1997

WL 325328, at *3) (D. Or. May 16, 1997).   In *United States v. W. Titanium, Inc.*, Crim. No. 08-

CR-4229-JLS, 2010 WL 4569890, at *2 (S.D. Cal. Nov. 4, 2010), the Court noted that,

"[Defendant does not seek evidence of specified transactions, but rather has requested the

wholesale production of "any and all' documents relating to broad categories over a substantial

period of time in the hope that its suspicions will be borne out . . . this is precisely the type of fishing expedition forbidden under Rule 17(c)."

Here, defendant's subpoenas are unreasonably broad, precluded by the *Nixon* specificity requirement, and should be quashed on this basis alone.

## 2.  The Receiver Subpoenas Request Irrelevant Documents.

Defendant fails the relevancy test because he cannot show how the documents sought are relevant to his defense.[13]  To satisfy the relevancy prong of the *Nixon* test, a defendant must do more than show that the documents he seeks have some *potential* evidentiary use; he must show "a sufficient likelihood" that any document possessed by the subpoenaed person are relevant to the offenses charged in the indictment." *Nixon*, 418 U.S. at 699-700.  In this case, defendant must show that the documents would be relevant to the calculation of restitution.  Materials are relevant only if they have a "tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed.R. Evid. 401. "Thus, a subpoena is limited to evidentiary materials, and courts will not allow general requests for categories of only arguably relevant documents that indicate the subpoena falls in the category of the much-maligned fishing expedition." *Heine*, 2016 WL 1270907, at *2 (quoting Charles Alan Wright, Andrew J. Leipold, Peter J. Henning & Sarah N. Welling, *Federal Practice and Procedure* § 275 (4th ed. 2015) (*Federal Practice and Procedure*).  Further, "mere conclusory statements" of relevancy are insufficient to satisfy the *Nixon* requirement. *Eden*, 659 F.2d at 1381.

---

[13] In fact, defendant Harder knows that former receivers Grassmueck and Lyons don't possess any responsive material Exhibits 7-9).  *See generally, W. Titanium*, 2010 WL 4569890, at *2 (quashing a subpoena as irrelevant, in part, because the moving party failed to show the subpoenaed party possessed the documents).

By way of example only, defendant demands production of irrelevant materials that includes, but is not limited to: "documents related to the valuation of any SALF or other Sunwest businesses or assets either created by, provided to, or otherwise received during the Receivership." (Receiver Subpoenas Attachment A at p. 2 ¶ 2); "documents sufficient to identify any payment by the Receivership to reimburse any person (including Investors) for "lost income and necessary childcare, transportation and other expenses …." (Receiver Subpoenas Attachment A at p. 2 ¶ 3); "documents sufficient to identify all fees paid to "professionals" in connection with an exchange of a SALF …. "(Receiver Subpoenas Attachment A at p. 2 ¶ 4); "financial statements for the SALF at the date of transferring it, or any interest in it (including any associated property or cash), to the SALF's TIC Investors who owned an interest in the SALF which was returned or released to them as a term of a settlement of their claims against the Receivership, or to assets over which the Receivership exercised management or control." (Receiver Subpoenas Attachment A at p. 2 ¶ 6); "documents sufficient to identify any SALF in Column D of Exhibit A, which was *impossible* or *impractical* to return to the TIC Investors who owned the SALF prior to the Receivership." (Receiver Subpoenas Attachment A at p. 2 ¶ 7); "documents sufficient to identify the property transferred by either Receiver to any MIMO claimant for which the Receiver *did not* assert an Objection Code" (Receiver Subpoenas Attachment A at p. 3 ¶ 13); " documents sufficient to identify any SALF or Sunwest properties or assets that were *not* part of the 'single, integrated unitary business' or 'enterprise' (Exhibit H, p. 5) or the 'integrated enterprise of a collection of ALF's' (Exhibit H, p. 6) referred to in the plea agreement." (Receiver Subpoenas Attachment A at p. 5 ¶ 24); documents showing Jon Harder's control or ability to control the disposition of any SALF or other Sunwest assets or

business *after* the CRO Agreement (Exhibit J) was entered into by the parties." (Receiver Subpoenas Attachment A at p. 5 ¶ 25).

The government 's restitution figures are based on the MIMO (Money in/Money Out) theory whereby a victim receives restitution in the amount of funds they invested minus interest, dividend, or other payments made to them.  The defense has indicated that it disagrees with the government's position (Exhibit 11).  However, the defense has never articulated how it believes restitution should be calculated in this case and has never offered any restitution figures based on an alternative method of calculation.  They demand wholesale production of entire categories of records that are only arguably relevant.  Their subpoenas to the former Receivers and to Geoff Winkler fall into the category of a fishing expedition and consequently, should be quashed. *Heine*, 2016 WL 1270907, at *2.

**3.  The Subpoena Seeks Information Protected by the Attorney-Client Privilege**.

Because the subpoenas are so broadly drafted, it is likely that they seeks materials that are protected by the attorney-client privilege.  The attorney-client privilege shields the disclosure of communications made between an attorney and his or her client for the purpose of seeking and providing legal advice.  *In re Fischel*, 557 2d 209, 211 (9th Cir, 1977).  In most of defendant's requests, he is seeking "all documents" "any documents", or "documents sufficient to identify" broad categories of material.  Given that virtually every party involved in the Sunwest SEC and bankruptcy cases was represented, some by multiple attorneys, it highly likely that the information responsive to the subpoenas would include material falling under the attorney client privilege and/or the work product doctrine.

**Government's Motion to Quash Defendant's Rule 17(c) Subpoenas**                                                                **Page 21**

In addition, the defendant demands that Mr. Grassmueck and Ms. Lyons produce for inspection, "the 'work product files' which were the subject of the three-year preservation of evidence Order." (Receiver Subpoenas Attachment A at p. 5 ¶ 26). The defendant is not entitled to these materials. A Rule 17(c) subpoena 'should be quashed or modified if it calls for privileged matter.'" See *Heine*, 2016 WL 1270907, at *1; *Reyes*, 239 F.R.D. at 598.

### 4. Compliance with the Subpoena Would Be Unreasonable and Oppressive.

As noted above, former Receivers Grassmueck and Lyons no longer have records of the receivership. The remaining records are in Geoff Winkler's possession. Mr. Winkler has indicated that the hard drive contains approximately 103,325 files, not including the actual claims related forms. The hard drive contains approximately 107 GB of data. He estimates that it would take dozens of hours to pull this information from the hard drives. Requiring Mr. Winkler to spend the time, effort, and financial resources to retrieve the material to comply with the subpoena is unreasonable and oppressive. This is particularly so, when defendant cannot meet his burden of demonstrating that the subpoenaed material is specific and relevant. Defendant cannot even articulate what methodology he is employing to calculate restitution.

### B. The Rule 17 (c) Subpoenas to Clyde Hamstreet, Alvarez and Marsal, and William Bryan.

The Rule 17 (c) subpoenas the defense seeks to serve on Clyde Hamstreet, Alvarez and Marsal, and William Bryan, suffer from the same deficiencies as the subpoenas to the Receivers and Winkler. The subpoenas are overbroad, and defendant has failed to show how the documents he seeks are relevant to the calculation of restitution. *See Nixon*, 418 U.S. at 699-700.

    **1.**   **The Hamstreet subpoena.**

    In November 2008, Clyde Hamstreet began providing Sunwest with management and restructuring consulting services and was later appointed Chief Restructuring Officer (CRO) by Judge Hogan in the Sunwest SEC and bankruptcy cases.

    Defendant's subpoena to Mr. Hamstreet is overbroad and demands irrelevant material in contravention of *Nixon*, 418 U.S. at 699-700.  By way of example, the subpoena requires Mr. Hamstreet to produce: "documents sufficient to identify *any asset* or property of Sunwest Management or any Sunwest affiliated entity regardless of whether it was a senior housing property or non-senior housing asset which is not listed on Exhibit A to the CRO Agreement" (Hamstreet Subpoena Attachment A at p. 1 ¶ 1); "documents to identify any Sunwest Management or any affiliated entity which was not included within the scope of our authority granted pursuant to the CRO Agreement." (Hamstreet Subpoena Attachment A at p. 1 ¶ 2); "documents that relate to actions only Michael Grassmueck and Maggie Lyons were authorized to take pursuant to their respective appointment as a Sunwest receiver but which you were not authorized to perform pursuant to the CRO Agreement." (Hamstreet Subpoena Attachment A at p. 1 ¶ 3); "… the financial statements of the Sunwest Assisted Living Facility at the date of transferring it (and any associated property or cash) to its TIC investors who owed an interest in the facility returned or released to them as a term of a settlement of claim to Receivership assets." (Hamstreet Subpoena Attachment A at p. 2 ¶ 5); ("all documents related to valuating any of the Sunwest Assisted Living Facilities or other Sunwest businesses provided to, or received by, either Receiver or any valuation created by the Receiver." (Hamstreet Subpoena Attachment A at p. 2 ¶ 8); Documents sufficient to identify *all* third-party settlements . . ..  (Hamstreet

Subpoena Attachment A at p. 3 ¶ 11).  The Hamstreet subpoena fails the Nixon specificity and relevance tests.

### 2. The Alvarez and Marsal subpoena.

Alvarez & Marsal is a global professional services firm specializing in, inter alia, crisis management, turnaround management, and business advisory services.  In May 2008, V. Matthew Marcos, Senior Director in Alvarez and Marsal's Healthcare Investigatory Group began working with Sunwest as a restructuring advisor (*In re: Stayton SW Assisted Living, LLC, et. al.*, Case No. 09-cv-06082-HO, ECF No. 539, Declaration of V. Matthew Marcos, at p.5).  Mr. Marcos conducted a valuation of Sunwest to determine whether liquidation or reorganization of Sunwest had the highest economic value to the stakeholders (ECF No. 539, Declaration of V. Matthew Marcos, at p.7).  He determined that the Reorganization Plan had the optimal recovery for the stakeholders through a reorganized enterprise with a better chance to succeed as a business as compared to the existing Sunwest organization or through an orderly liquidation ( ECF No. 539, Declaration of V. Matthew Marcos, at p.11).

The subpoena to Alvarez and Marsal is also overbroad and requests irrelevant information.  By way of example, paragraphs of the subpoena demand production of "all documents," "any documents," "documents sufficient to identify," and "all documents relevant." (Alvarez and Marsal Subpoena, Attachment A, p. 1 ¶¶ 1-3; p.2 ¶¶ 4, 6, 7, 8, 9; p.3 ¶¶ 11, 12, 13, 15).  Certain paragraphs demand production of irrelevant material such as those documents that relate to actions the *Receivers* were authorized to take pursuant to their appointment as a Sunwest Receiver, but which they were not authorized to perform under the CRO Agreement (Alvarez and Marsal Subpoena, Attachment A, p. 1 ¶ 3).  The defendant has failed to show how

the documents requested by the subpoena to Alvarez and Marsal are specific and relevant to the issues in this case. *Nixon*, 418 U.S. at 699-700.

### 3. The William Bryan subpoena.

As noted above, William Bryan, was an investor and a member of the Management Committee in the Sunwest bankruptcy case (*In re: Stayton SW Assisted Living, LLC, et. al.*, Case No. 09-cv-06082-HO, ECF No. 2450), and the Chairman of the TIC Committee established in the Jon Harder Bankruptcy case, Case No. 08-37225 (*see Securities and Exchange Commission v. Jon M. Harder, et. al.*, Case No. 6:09-cv-06056-AA, ECF No. 19, Declaration of William Bryan in Response to Relief Sought by SEC).

In October 2022, Mr. Bryan provided SA Smith with documents in response to defense questions, and the government subsequently provided the records to the defense on November 1, 2022 (Exhibits 4, 5). These records consist of Sunwest Rollover Member LLC Agreement; a Blackstone Organization Chart; SRM Member Communication packet; letters to SRM investors about the status of their investments; tax information for the investors; and total SRM distributions.

On June 15, 2023, SA Smith and the undersigned spoke with Mr. Bryan, who indicated that the material he provided in October 2022 is all the information he has on Sunwest and the Blackstone sale with one exception. Mr. Bryan indicated that he has a file with investors' PII, including their tax information. He is reluctant to provide this material because of concerns about privacy and identity theft.

Defendant's proposed subpoena to William Bryan is overbroad. Like the other subpoenas requested by defendant, the Bryan subpoena demands production of "all documents,"

"any documents," "documents sufficient to identify," "documents for any investor," and "all documents relevant." (Bryan Subpoena, Attachment A, p. 1 ¶¶ 1-3; p.2 ¶¶ 5, 6, 7). The defendant has failed to show how the documents requested by the subpoena to Mr. Bryan are specific and relevant to the issues in this case. *Nixon*, 418 U.S. at 699-700. Moreover, Mr. Bryan has provided all the records related to Sunwest and the Blackstone sale in his possession, and defendant has those records. His subpoena is moot and should be quashed.

## CONCLUSION

The Sunwest Receivership was a process that took place over nearly 10 years, was carefully crafted by a legion of legal and financial professionals, and meticulously monitored by The Honorable Michael R. Hogan. Judge Hogan appointed the Receivers and the Sunwest Chief Restructuring Officer; determined that the Sunwest records were so reliable that the Receiver could use them in the claims process; approved the claims process; and approved the plan to sell assets and pay proceeds to investors in Jon Harder's scheme. Judge Hogan determined that the MIMO calculation of investors' losses was appropriate and ordered reimbursements according to the Receivers' use of the MIMO figures.

MIMO is the starting point for the government's restitution figures in this case. There is no indication that use of a MIMO calculation here is questionable or improper, yet defendant claims that MIMO does not apply here. He offers no other method to calculate restitution. Rather, defendant requests that the Court issue Rule 17(c) subpoenas that are overbroad, seek irrelevant material, and impose an undue burden on witnesses trying to comply.

Defendant's subpoena requests appear to be an effort to restart the entire Sunwest Receivership process from scratch. At the very least, the type and volume of materials defendant

**Government's Motion to Quash Defendant's Rule 17(c)**                                    **Page 26**
**Subpoenas**

subpoenas from each of the witnesses demonstrates that he seeks to audit every decision the Receivers made from inception to completion.  This is simply unwarranted and a waste of time.

It took defendant three months from the time his legal team mentioned the subpoenas to the Court in March 2023, to the time he filed his Rule 17(c) motion on June 5, 2023.  The subpoena requests came after the parties had agreed on a briefing schedule that requires them to file simultaneous opening briefs on July 24, 2023.  Given the amount of material the defendant is seeking, it is certain that he cannot review it in such a short period of time.   Defendant's request for the subpoenas is merely an attempt to delay the restitution hearing.

For the foregoing reasons, the government respectfully requests that the Court quash the Rule 17 (c) subpoenas to Michael Grassmueck, Resolve Financial Group (Maggie Lyons), Geoff Winkler, Clyde Hamstreet and Associates LLC, Alvarez and Marsal Disputes and Investigations, LLC, and William Bryan.

Dated: June 15, 2023                           Respectfully submitted,

NATALIE K. WIGHT
United States Attorney


*/s/ Claire M. Fay*
CLAIRE M. FAY, DCB #358218
Assistant United States Attorney