## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 3:12-cr-485-SI |
| v. | **OPINION AND ORDER REQUIRING RESTITUTION** |
| **JON MICHAEL HARDER**, | |
| Defendant. | |

Claire M. Fay, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Kevin M. Sali, KEVIN SALI LLC, 1500 SW First Avenue, Suite 1020, Portland, OR 97201; and K. Lawson Pedigo, MILLER KEFFER & PEDIGO PLLC, 3100 Monticello Avenue, Suite 480, Dallas, TX 75205. Of Attorney for Jon Michael Harder.

**Michael H. Simon, District Judge.**

Before the Court is the government's motion for an order requiring that Defendant Jon Michael Harder pay restitution to the victims of his fraudulent scheme. Mr. Harder opposes this motion. On October 12 and 13, 2023, the Court held a two-day evidentiary hearing. The government and Mr. Harder each presented two witnesses. Both sides offered exhibits, including summaries, which the Court received without objection. The parties presented oral argument and submitted legal memoranda, both before and after the evidentiary hearing. For the reasons stated below, the Court orders Mr. Harder to pay restitution in the total amount of $74,062,211.92

PAGE 1 – OPINION AND ORDER REQUIRING RESTITUTION

to 1,488 claimants, who will be identified by name, address, claim number, and amount due in Exhibit A to a forthcoming Second Amended Judgment. The Court will file Exhibit A under seal. The Court also waives interest on Mr. Harder's restitution obligation.

## PROCEDURAL BACKGROUND

In 2015, Mr. Harder pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1341 and one count of money laundering in violation of 18 U.S.C. § 1957, in connection with the operation of Sunwest Management, Inc. (SMI) and its affiliated businesses (collectively, Sunwest). The parties, however, did not agree on the scope of the fraud. Instead, they agreed that the Court would hold an evidentiary hearing, which occurred in 2015. The government called 14 witnesses and offered more than 200 exhibits, and the defense called seven witnesses and offered more than 400 exhibits. After extensive briefing and argument, the Court concluded that between January 1, 2006, and July 7, 2008, Mr. Harder deceived, lied to, and misled more than 1,200 investors nationwide. ECF 207 (Sentencing Memorandum and Order), *United States v. Harder*, 144 F. Supp. 3d 1233, 1234 (D. Or. 2015), *aff'd*, 705 F. App'x 643 (9th Cir. 2017). The Court concluded, for loss calculation purposes at sentencing, that Mr. Harder's conduct caused actual losses exceeding $120 million. ECF 207 at 2 (Sentencing Memorandum and Order); *see also* ECF 201 at 13 (Government's Sentencing Memorandum); ECF 194 ¶¶ 37, 53 (Presentence Investigative Report); ECF 189 (Amended Findings of Fact and Conclusions of Law at Phase I), *United States v. Harder*, 116 F. Supp. 3d 1197 (D. Or. 2015).

In the parties' plea agreement, the government agreed to recommend a sentence of imprisonment of not more than 15 years, and Mr. Harder agreed to recommend a sentence not less than five years. The parties also agreed that Mr. Harder would be required to pay restitution to his victims, as follows:

> The Court shall order restitution in the full amount to the victims as required by law for the counts of conviction and determined by the Court. *The defendant expressly consents to the entry of an order of full restitution for all victims that are outside the counts of conviction consistent with the court's determination in the initial sentencing proceeding of the scope of the defendant's scheme to defraud.* The government anticipates that restitution will not exceed $130,000,000. In entering this plea, defendant acknowledges and understands that restitution may be as much as $130,000,000.

ECF 109, ¶ 9 (emphasis added). The Court sentenced Mr. Harder to a term of imprisonment of 15 years and ordered him to pay restitution in an amount to be determined by the Court after the government provided victim-specific restitution calculations. The government, however, did not promptly provide that information.[1]

Mr. Harder began serving his prison sentence in February 2016. In December 2017, the Ninth Circuit affirmed Mr. Harder's conviction and sentence. *Harder*, 705 F. App'x 643. On January 13, 2021, then-President Donald J. Trump commuted Mr. Harder's prison sentence to time served but left "intact and in effect . . . all other components of [Mr. Harder's] sentence." Executive Grant of Clemency. ECF 267-2 at 1. Ninety-three days later, the government moved for an order of restitution. ECF 267. Mr. Harder opposed the government's motion. He argued that ordering restitution nearly six years after his sentence violated both the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A, and the Due Process Clause. He also

---

[1] In his opposition to the pending motion, Mr. Harder does not argue, nor does the evidence suggest, that the government's delay stemmed from anything other than possible negligence. When the government's delay in seeking restitution results from bad faith, a defendant may have an argument that the government has violated his due process rights. *See Dolan v. United States*, 560 U.S. 605, 617 (2010). In this case, however, the government did not act in bad faith. *See* ECF 277, *United States v. Harder*, 552 F. Supp. 3d 1144, 1151-52 (D. Or. 2021). Indeed, it is unclear to the Court when the final distributions to the victims were completed by the receiver in the related civil and bankruptcy actions discussed below. Thus, the only issue regarding delay is whether it caused unfair prejudice to Mr. Harder. As discussed below, the Court finds that it did not.

asserted that ordering restitution after the President commuted his sentence violated the principle of separation of powers. In a written Opinion and Order, the Court granted the government's request to order restitution, overruled Mr. Harder's objections, and directed the parties, after conferring, either to file a stipulation (without prejudice to Mr. Harder's right to appeal) regarding the precise amount of restitution to be ordered and a list of the victims to be paid or contact the Courtroom Deputy to schedule an evidentiary hearing on any remaining disputed matters. ECF 277, *United States v. Harder*, 552 F. Supp. 3d 1144 (D. Or. 2021). The parties conferred, exchanged numerous documents, and jointly requested and received numerous extensions from the Court. Ultimately, however, they were unable to agree, requiring that the Court hold an evidentiary hearing.

## FACTUAL BACKGROUND

A detailed factual background of Mr. Harder's scheme to defraud is thoroughly stated in the Court's Amended Findings of Fact and Conclusions of Law dated November 4, 2015. ECF 189, *Harder*, 116 F. Supp. 3d at 1208-27. In essence, Mr. Harder, both directly and through others under his control, solicited investments across the United States in various Sunwest-affiliated businesses. Sunwest acquired, managed, and constructed senior housing facilities, also known as "assisted living facilities" (ALFs). Investors were enticed with false promises, misrepresentations, and half-truths, including, among others: (l) that investor funds would be invested in a specific ALF; (2) that any return on an investor's investment, which would be paid to the investor in the form of "rent" from the specific facility into which the investor decided to invest, would be based solely on the financial performance of that facility and be independent of the success or failure of other Sunwest properties; (3) that Sunwest was a financially strong and successful company; (4) that Sunwest had a history of never missing a "rent" payment to an investor; and (5) that reserve accounts would cover expenses for a specific facility, including

"rent" payments, until that facility became profitable. In fact, however: (1) an investor's money in a particular ALF was commingled with investments from investors in other ALFs as well as with bank loans; and (2) at least as far back as 2006, Sunwest was losing millions of dollars each year. Through Sunwest, Mr. Harder raised more than $300 million from more than 1,400 investors throughout the United States. As Sunwest began to collapse and as its losses mounted, Mr. Harder went on an acquisition binge to fund his business empire and mask his losses and commingling of funds.

Mr. Harder solicited three types of investments related to Sunwest: tenancy-in-common (TIC) investments in existing (or already developed) ALFs; TIC "dirt" investments; and preferred membership interest (PMI) investments. Regarding TIC investments in existing ALFs, one of the benefits for many investors was beneficial tax treatment they could receive under Section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031 (§ 1031). That provision sets forth tax recognition rules for gains or losses that result from the "like-kind" exchange of certain types of real property. A tax deferral of gains is available for owners of real property who exchange one property for another of like kind, provided that certain additional requirements are satisfied. One requirement provides that the taxpayer designates, or identifies, a replacement property within 45 days after the first sale and then closes on the purchase of the replacement like-kind property within 180 days of that first sale. Another requirement is that the ownership interest being exchanged is not in a business entity, such as a partnership. In 2002, the Internal Revenue Service issued Revenue Procedure 2002-22, which provides guidelines for structuring exchange transactions involving TIC ownership interests in real property to make them more likely to qualify for tax-deferred treatment under § 1031. Sunwest offered investors TIC interests to facilitate the purchase of ALFs managed by Sunwest. Each TIC investor in a Sunwest-affiliated

ALF invested in a single purpose limited liability company (LLC). To maintain the tax advantages provided under § 1031, a TIC investor would sell real property and have the proceeds deposited directly with a third-party § 1031 accommodator. The accommodator would then transfer cash to Sunwest to complete the like-kind property acquisition of the investor's purchase of a TIC interest in the LLC.

In addition to selling TIC interests to persons interested in investing in existing ALFs, Sunwest sold two other types of investments, both of which involved purchasing undeveloped land (referred to, on occasion, as "bare land" or "dirt" deals), with the intention of later developing or building ALFs. Sunwest sold TIC investments as well as PMI investments in such development projects. In a PMI deal, as well as in a TIC "dirt" or development deal, an investor invests cash directly in an LLC that both purchases the land and intends to develop it. Thus, neither PMI investments nor TIC dirt deals qualify for tax deferred treatment under § 1031, and they were not marketed as such.

As Sunwest's acquisitions of facilities increased, Sunwest's liquidity crisis grew worse. Sunwest's commingling of funds and inter-facility transfers of money ballooned from 2004 through mid-2008. By then, the only sources of cash that Sunwest had were from: (1) refinancing existing properties; (2) obtaining external loans (from banks or other lending institutions); (3) internal borrowing (namely, inter-company lending and transfers); and (4) closing new projects with new money coming from investors.

Sunwest's problems spiked in 2007. More than half of its ALFs were operating at a loss, and Sunwest could not sustain itself without bringing in both new investors and new lenders. In addition, as Sunwest added more properties, its occupancy rates declined. As occupancy rates declined, less revenue came into a facility. As less revenue came into a facility, it became more

difficult to pay vendors on a timely basis, contributing further to deteriorating conditions and more declines in occupancy rates.

In 2006 and 2007, Sunwest was losing about $5 million per month. By 2008, Sunwest was losing about $10 million per month. In July 2008, Sunwest sent a letter to all its investors, including investors in ALFs and investors in other Sunwest properties under development, stating that there would be no "rent" payments made that month and none likely the following month as well. Soon thereafter, Sunwest filed Chapter 11 bankruptcy actions for ten senior housing facilities and 21 more in December 2008. Also that year, investors and creditors filed numerous lawsuits against Sunwest, Mr. Harder, and others. In December 2008, Mr. Harder filed for personal bankruptcy protection under Chapter 11. By the end of January 2009, nine foreclosures had taken place, 75 more were pending, and receivers controlled 30 facilities, with 15 more being added in February.

This is where the story ended for purposes of the Court's "scope of the fraud" decision, dated November 4, 2015. As the Court explained: "The final resolution and winding-up of the affairs of Sunwest is not relevant at Phase I of the sentencing proceeding." *Harder*, 116 F. Supp. 3d at 1222 n.106. The eventual winding up, however, is quite relevant for purposes of restitution.

On March 2, 2009, the Securities and Exchange Commission (SEC) charged SMI, Mr. Harder, and several Sunwest-related entities with securities fraud and sought an emergency court order freezing their assets as well as the assets of other Sunwest entities. *Secu. & Exch. Comm. v. Sunwest Mgmt., Inc.*, No. 6:09-cv-06056-HO (D. Or.) (the SEC Case). On March 10, 2009, U.S. District Judge Michael R. Hogan granted a preliminary injunction against the named parties in the SEC Case. The Court appointed Michael Grassmueck to act as the receiver

(Receiver) over the Sunwest entities, with authority to pursue claims against third parties and examine the past conduct of Sunwest. In April 2009, most of the bankruptcy cases filed against Sunwest were consolidated into a single case and transferred to Judge Hogan. *In re Stayton SW Assisted Living, L.L.C.*, No. 6:09-cv-06082-HO (D. Or.) (Consolidated Bankruptcy Case).

On October 2, 2009, Judge Hogan entered an order approving a plan of distribution (the Distribution Plan) in the SEC case. The Distribution Plan established how claims against the entities in the consolidated receivership actions (the Receivership Entities) would be calculated for purposes of establishing which claim would be allowed claims (Allowed Claims), how the Allowed Claims would be organized by priority and source of funds, what the sources of distributions would be, and how those distributions would be made. Judge Hogan's approval of the Distribution Plan recognized a unitary enterprise. The Distribution Plan also contemplated the use of a Chapter 11 reorganization plan.

On December 22, 2009, Judge Hogan ruled in the Consolidated Bankruptcy Case that the affairs of Sunwest were so inextricably entangled that the only way to make an equitable distribution to claimants and reduce their losses would be to recognize Sunwest as a unitary enterprise and consolidate all assets and liabilities in the estate of the Debtor (the Estate) for reorganization in the Consolidated Bankruptcy Case, which became subject to the Distribution Plan ordered in the SEC Case. The Distribution Plan provided that the Sunwest ALFs would be classified into one of three categories: approximately 140 properties with value that were to eventually be sold to an entity known as "Blackstone" (Holdco Properties); approximately 34 land or dirt parcels with value that the Receiver would hold for sale when real estate markets recovered, unless investors exercised an option to buy out the Estate's interest before then (Trustco Properties); and those properties that had little or no value and would be abandoned or

returned to the lenders (Divestco Properties). Despite these distributions to investors eventually made by the Receiver in the Sunwest SEC and Bankruptcy Cases, Mr. Harder still owed additional restitution to many victims of his fraudulent scheme in the approximate amounts of more than $60 million to TIC investors and more than $10 million to PMI investors.

## STATUTORY FRAMEWORK UNDER THE MVRA

In the MVRA, Congress directed federal courts to order defendants who are convicted of certain offenses to make restitution to their victims. 18 U.S.C. § 3663A(a); *Robers v. United States*, 572 U.S. 639, 640 (2014). Mandatory restitution under the MVRA applies only to certain identified crimes, which include offenses "committed by fraud or deceit . . . in which an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1).

For purposes of the MVRA,

> the term "victim" means a person directly and proximately harmed
> as a result of the commission of an offense for which restitution
> may be ordered including, in the case of an offense that involves as
> an element a scheme, conspiracy, or pattern of criminal activity,
> any person directly harmed by the defendant's criminal conduct in
> the course of the scheme, conspiracy, or pattern.

*Id.* § 3663A(a)(2).[2] Thus, unless an offense involves as an element a scheme, conspiracy, or pattern of criminal activity, restitution under the MVRA is available only to victims "directly and proximately harmed as a result of the commission of" a defendant's crime of conviction. *United States v. Yijun Zhou*, 838 F.3d 1007, 1012-13 (9th Cir. 2016).

The definition of "victim" under the MVRA expands, however, when the crime of conviction has as an element a conspiracy or a scheme or pattern of misconduct. Mail fraud and

---

[2] Under the Dictionary Act, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1.

wire fraud are among the crimes that have as an element such a scheme or pattern.[3] Accordingly, in the case of a conviction for mail or wire fraud (or conspiracy to commit mail or wire fraud), restitution may be ordered for all persons directly and proximately harmed by the entire scheme or conspiracy and is not limited to harm caused by the specific crime or crimes of conviction. *United States v. Thomsen*, 830 F.3d 1049, 1065-66 (9th Cir. 2016) ("[I]n the case of a conviction for a crime or crimes that require proof of a 'scheme, conspiracy, or pattern of criminal activity,' such as mail fraud, restitution may be ordered for all persons directly harmed by the entire scheme. Such restitution is not limited to harm caused by the particular counts of conviction (as it would be absent the scheme element)." (cleaned up) (emphasis omitted)). "In this context, a restitution order may be based on related but uncharged conduct that is part of a fraud scheme." *Id*. at 1066 (italics omitted). "The harm to the victim must, however, be closely related to the scheme, rather than tangentially linked." *Id*. (italics omitted).

As noted, under the MVRA, restitution requires that the defendant's offense (or scheme or conspiracy) be both the direct (or actual or "but for") cause of the victim's loss and the proximate cause of that loss. 18 U.S.C. § 3663A(a)(2); *United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013) ("Under the MVRA, restitution may be awarded only for losses for which the defendant's conduct was an actual and proximate cause. 'But for' cause is insufficient." (emphasis, citations, and quotation marks omitted)); *see also* 3 Charles Alan Wright, *et al.*, FEDERAL PRACTICE & PROCEDURE, CRIMINAL 4D § 546 (5th ed.) ("Generally, the government must show [for restitution] both that the defendant is the but for cause of the person's harm and

---

[3] In the Ninth Circuit, the first element of mail fraud under 18 U.S.C. § 1341 and the first element of wire fraud under 18 U.S.C. § 1343 is that the defendant knowingly participated in or devised "a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Ninth Cir. Crim. Jury Instr. 15.32, 15.35.

that the defendant was the proximate cause of the person's harm."); *cf. Burrage v. United States*, 571 U.S. 204, 210 (2014) ("The law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause. When a crime requires not merely conduct but also a specified result of conduct, a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the legal cause (often called the "proximate cause") of the result." (citation and quotation marks omitted)). For proximate causation under the MVRA, "[t]he basic question that a proximate cause requirement presents is 'whether the harm alleged has a sufficiently close connection to the conduct' at issue." *Robers*, 572 U.S. at 645 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 133 (2014)). Under the MVRA, however, a court need only reasonably estimate the amount of a victim's damages; "mathematical precision" is not required. *United States v. Kennedy*, 643 F.3d 1251, 1261 (9th Cir. 2011).

Finally, the MVRA provides that the order of restitution require, in a case involving an offense resulting in damage or loss of property of a victim, that the defendant return the property to the owner or, if that is "impossible, impracticable, or inadequate," to pay the victim "an amount equal to . . . the value of the property" less "the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B). In *Robers*, the Supreme Court explained this provision as follows:

> In our view, the statutory phrase "any part of the property" refers only to the specific property lost by a victim, which, in the case of a fraudulently obtained loan, is the money lent. Therefore, no "part of the property" is "returned" to the victim until the collateral is sold and the victim receives money from the sale. The import of our holding is that a sentencing court must reduce the restitution amount by the amount of money the victim received in selling the collateral, not the value of the collateral when the victim received it.

572 U.S. at 640-41.

**DISCUSSION**

In the Government's Restitution Memorandum (ECF 323) and related exhibits, including the exhibits received at the evidentiary hearing, the government presents detailed and extensive evidence showing the investments made by the many victims of Mr. Harder's fraudulent scheme. As the government explains, the starting point for its restitution request is the "MIMO" amount, which refers to the acronym "Money-In/Money-Out." This was also the methodology approved by Judge Hogan for distributions by the Receiver in the underlying SEC and Bankruptcy Cases. *See* ECF 323 at 29. By the time of the evidentiary hearing, Mr. Harder did not challenge the accounting accuracy of any details in the government's victim list and MIMO spreadsheet. Those challenges occurred during the lengthy conferral process that took place before the evidentiary hearing and resulted in the government modifying its "victim spreadsheet" several times, resulting in MVRA Victim Spreadsheet, Version 7.0, which is the version adopted by the Court in this Opinion and Order Requiring Restitution.

Instead, Mr. Harder raises what are best characterized as methodological challenges. According to Mr. Harder, if any of his methodological arguments are accepted, then no restitution should be awarded in this case to anyone. ECF 325 at 38 ("The defense expects that the net result of that analysis will be that no restitution remains to be awarded.") The Court now addresses Mr. Harder's specific challenges.

**A.  Whether a TIC Investor May Recover Both Real Property and Restitution**

Mr. Harder argues that there is a flaw in the government's "decision to include in the MVRA Spreadsheet TIC investors who recovered their interest in the specific Sunwest ALF Facility." ECF 325 at 26. Mr. Harder states that "[t]here should be no alleged 'Balance Due' to these TIC Investors." *Id*. Mr. Harder explains:

> During the Receivership proceedings . . . a subset of TIC Investors recovered their interest in the Sunwest ALF Property interest they originally bargained to receive in the Section 1031 Exchange with Sunwest. *Each such TIC Investor received a return of the real property interest to hold (or dispose of) as an owner in the improved (commercial) real property and thus were no longer "stakeholders" in the Sunwest Asset Pool.*

*Id*. at 27 (emphasis added). In theory, the Court agrees with Mr. Harder, and apparently so does the government.

In its latest version of the MVRA Spreadsheet, Version 7.0, the government deleted claims from all such investors. As the government explained during the recent evidentiary hearing, the government is seeking restitution only: (a) for those investors who invested money with Sunwest; (b) have not received back all the money that they invested; and (c) did not recover any originally bargained-for (or any other) real property interest. According to the government, only MIMO claims are listed in the MVRA Spreadsheet, Version 7.0, and, more importantly, none of the claimants listed on that sheet are seeking restitution if they are a TIC investor who elected to accept from the Receiver a property interest in an ALF. The government states that those investors are not entitled to any restitution and are not included in the government's latest MVRA spreadsheet. As the government explained during the evidentiary hearing, these investors, also known as "TIC Take Backs," have no claim for restitution and are not listed on the government's MVRA Spreadsheet, Version 7.0.[4]

## B.  Whether the Economic Effects of the Great Recession Are Legally Relevant

Mr. Harder also asserts that he should be responsible to pay restitution "only for that portion of the decrease in a victim's property's value directly and proximately caused by his

---

[4] If the Court has in any way misunderstood the government's position on this issue, the government shall promptly inform both the Court and counsel for Mr. Harder, and Mr. Harder will be allowed to seek reconsideration of this portion of the Court's Order.

offense conduct." ECF 325 at 30. Specifically, Mr. Harder argues that "the Court must further determine what portion of the decrease was caused by the offense conduct and what portion was caused by other factors." *Id*. At the evidentiary hearing, Mr. Harder proffered expert testimony regarding "the amount of diminution to Sunwest Assets caused by the Great Recession based on the dates and total consideration paid by the TIC Investors . . . and Preferred Investors to acquire their investment in Sunwest." *Id*. The assumption underlying Mr. Harder's argument is that "to the extent the alleged Investor losses are less than their quantified economic loss caused by the Great Recession, as a matter of law, the Government has failed to prove any MVRA restitution obligation." *Id*. at 30-31. Because the Court concludes that Mr. Harder's assumption is incorrect as a matter of law, the expert testimony provided by his expert witness on the economic effects of the Great Recession is legally irrelevant.

As previously noted, the Supreme Court in *Robers* stated: "The basic question that a proximate cause requirement presents is whether the harm alleged has a sufficiently close connection to the conduct at issue." *Robers*, 572 U.S. at 645 (quotation marks omitted). As the Supreme Court explained:

> Fluctuations in property values are common. Their existence (though not the direction or amount) is foreseeable. And losses in part incurred through a decline in the value of collateral sold are directly related to an offender's having obtained collateralized property through fraud. That is not to say that an offender is responsible for everything that reduces the amount of money a victim receives for collateral. Market fluctuations are normally unlike, say, an unexpected natural disaster that destroys collateral or a victim's donation of collateral or its sale to a friend for a nominal sum—any of which, as the Government concedes, could break the causal chain.

*Id*. at 645-46. Applying *Robers* shortly after it was decided, the Ninth Circuit held that "[f]oreseeable causes usually do not break the causal chain." *United States v. Luis*, 765

F.3d 1061, 1068 (9th Cir. 2014) (noting that "selling defaulted loans, a very common method of mitigating loss, was foreseeable").

Both before and after *Robers*, courts in the Ninth Circuit have rejected similar causation objections by loan fraud and investor fraud defendants who argued that financial crises, changes in company leadership, or borrowers' inability to repay loans had severed the causal link between their own fraudulent representations and the victims' investment losses or loan defaults. *See, e.g.*, *United States v. Peterson*, 538 F.3d 1064, 1077 (9th Cir. 2008); *United States v. Holmes*, --- F. Supp. 3d ---, 2023 WL 3489320, at *5 (N.D. Cal. May 16, 2023); *United States v. Sarad*, 227 F. Supp. 3d 1153, 1159 (E.D. Cal. 2016); *cf. United States v. Hackett*, 311 F.3d 989, 993 (9th Cir. 2002) (finding causation where defendant's conduct "created the circumstances under which the harm or loss occurred").

In *Sarad*, which involved a fraud conviction, the district court rejected a defendant's argument that the 2008 financial crisis and subsequent leadership of his company were to blame for devaluing investors' investments. *See Sarad*, 227 F. Supp. 3d at 1159. The court explained:

> [E]ven where other "contributing factors" might have compounded the victims' losses giving rise to restitution, the district court does not have to apportion restitution, where, as here, the defendant has been found culpable and the causal chain "is not extended so far as to become unreasonable." *United States v. Peterson*, 538 F.3d 1064, 1077 (9th Cir. 2008). Moreover, Sarad cannot alleviate his own liability by citing subsequent factors that depreciated Telemolecular stock further, because Sarad is the one who bears the risk for the loss of investments he fraudulently obtained. *See* [*United States v.*] *Gordon*, 393 F.3d [1044,] 1053 [(9th Cir. 2004)] (when determining restitution in securities fraud cases, it is appropriate for "district courts to place the risk of downward fluctuations in stock prices on defendants rather than victims") (citation omitted).

PAGE 15 – OPINION AND ORDER REQUIRING RESTITUTION

*Id.*[5]

Here, it was foreseeable that Mr. Harder's fraudulent sale of investments in the Sunwest ALFs and his related commingling and diversion of investor funds would cause the failure of Sunwest and the subsequent receivership.[6] At the Phase I sentencing hearing in May 2015, Clyde Hamstreet, Sunwest's chief restructuring officer, testified that during his time at Sunwest, he tracked all public companies in the same industry as Sunwest. Sunwest was the largest privately held ALF business in the country in 2008. Mr. Hamstreet stated that although all the publicly held companies during the financial crisis struggled, Sunwest was in a much worse situation than the rest. Mr. Hamstreet noted that none of the publicly held companies collapsed, yet the privately held Sunwest did. According to Mr. Hamstreet, the lack of liquidity and the mishandling of funds by Mr. Harder caused the crisis within Sunwest, not the 2008 economic downturn. ECF 224 at 79 (Tr. from May 12, 2015).[7]

---

[5] *Sarad* relies on *Gordon*, 393 F.3d at 1053, which was later abrogated in part on other grounds by *Lagos v. United States*, 138 S. Ct. 1684 (2018).

[6] It also was foreseeable that the receivership was the only way to marshal the assets of a nationwide, multi-million-dollar company and sell them to compensate the victims of Mr. Harder's massive fraudulent scheme.

[7] Mr. Harder attempts to support his argument here with *dicta* from the Ninth Circuit's decision in *United States v. Berger*, 587 F.3d 1038 (9th Cir. 2009). In *Berger*, the defendant was convicted of criminal securities fraud. At sentencing, the defendant urged the district court to import the civil loss causation principle announced by the Supreme Court in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-48 (2005), to the sentencing guidelines loss enhancement. The district court declined to do so, and the Ninth Circuit agreed, but vacated and remanded for resentencing on other grounds. *Id.* at 1039-40. In a footnote, the Ninth Circuit stated, in *dicta*: "We note that, based on this reasoning, *Dura Pharmaceuticals may be* more relevant in the context of criminal restitution under, for instance, the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A, which, unlike the sentencing enhancement scheme, focuses on harm to the victims as opposed to loss caused by the defendant." *Id.* at 1044 n.7 (emphasis added). The Court is unaware of any case adopting this approach for determining restitution. Indeed, this *dicta* from 2009 is inconsistent with the Supreme Court's interpretation of the MVRA in *Robers*, which was decided in 2014.

**C.  Whether Money-Out Calculations May Be Net of Receiver's Fees and Costs**

Mr. Harder also challenges the government's "money-in/money-out" methodology to the extent that the "money-out" figures are net of the "professional fees and costs and other non-MVRA amounts" that he contends "are prohibited from being included" in calculating an MVRA award. ECF 325 at 31. Mr. Harder primarily relies on the Ninth Circuit's decision in *United States v. Lomow*, 266 F.3d 1013 (9th Cir. 2001). In that case, the Ninth Circuit held that a defendant's restitution obligation should be reduced by the costs that a receiver incurred in returning property to the victims of the defendant's crime. *Id*. at 1020. The Court rejects Mr. Harder's argument on two grounds. First, *Lomow* did not arise under the MVRA. Second, the Supreme Court's 2014 decision in *Robers*, which did interpret and apply the MVRA, requires a court to credit a defendant only with property actually returned to the victims.

In *Lomow*, the Ninth Circuit arrived at a restitution amount by interpreting provisions of a plea agreement and the then-applicable restitution statute, 18 U.S.C. § 3663. *See* 266 F.3d at 1020. The fraudulent transactions at issue in that case occurred between 1991 and 1995. *Id*. at 1017. The MVRA was passed in 1996[8] and significantly changed the law of restitution. Congress declared that the purpose of the MVRA was to "improve the administration of justice in Federal criminal cases by requiring Federal criminal defendants to pay full restitution to the identifiable victims of their crimes." S. Rep. 104-179, at 12 (Dec. 6, 1995), *available at* govinfo.gov/app/details/CRPT-104srpt179. After surveying existing restitution statutes, including 18 U.S.C. § 3663, Congress determined that new statutory provisions were needed to "ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due." *Id*. at 12-14, 17-18. Here, the government seeks restitution under the MVRA, not the

---

[8] Pub. L. 104-132, Title II, 204(a) (Apr. 24, 1996).

superseded provisions of § 3663 that were interpreted and applied in *Lomow*. Indeed, § 3663 was later amended to exclude its application to offenses subject to the MVRA, including fraud. *See* 18 U.S.C. § 3663 (a)(1)(A) (noting that § 3663 is applicable to a list of offenses "other than an offense described in 3663(c)").

In addition, *Lomow* is factually distinguishable from the present case. In *Lomow*, the court ordered restitution to be paid to a receiver, not the victim. *See* 266 F.3d at 1020. Thus, the court in *Lomow* evaluated whether that order was complied with by determining the value of assets provided to the receiver, rather than the value that the receiver later paid to the victim. *Id*. In the pending case, however, the MVRA requires the Court to order Mr. Harder either to return property to his victims or "pay an amount equal to . . . the value of the property on the date of sentencing, less . . . the value . . . of any property that is returned." 18 U.S.C. § 3663A(b)(1)(A), (B). This text is found in the MVRA and was not the text interpreted by the Ninth Circuit in *Lomow*.[9]

In *Robers*, the Supreme Court interpreted the text of § 3663A and held that when a victim has been defrauded of *money*, only money returned to the victim can reduce the amount due in restitution. 572 U.S. at 646. Mr. Harder's argument that he should receive credit for the gross receipts of the receivership, rather than the net money that was actually returned to victims, is

---

[9] Mr. Harder cites *United States v. Carter*, 742 F.3d 440 (9th Cir. 2014), as a decision from the Ninth Circuit citing *Lomow* and applying its framework to the MVRA. *See id.* at 447. The government, however, correctly observes that the Ninth Circuit decided *Carter three months before* the Supreme Court's decision in *Robers*. *Carter* relied on *United States v. Yeung*, 672 F.3d 594, 601 (9th Cir. 2012), a case explicitly overruled by *Robers*. *See* n.10, *infra*. *Carter* also failed to analyze the text of § 3663A, which formed the basis of the *Robers* holding. Because *Robers*' analysis of the MVRA is clearly irreconcilable with *Carter*, *Robers* controls. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) ("We hold that the issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.").

therefore contrary to controlling Supreme Court authority.[10] Mr. Harder's victims were

fraudulently deprived of the cash they invested with Sunwest. Thus, only the cash they received

back is "property . . . returned" to them for purposes of reducing Mr. Harder's restitution

obligation, not the gross receipts of the receivership. *See* 18 U.S.C. § 3663A(b)(1)(A).

Finally, this is the approach adopted by the Second Circuit in *United States v. Yalincak*,

853 F.3d 629 (2nd Cir. 2017). In that case, the Second Circuit held:

> Amounts recovered by a bankruptcy trustee for the benefit of the
> bankruptcy estate, and consumed in the administration of the estate
> or distributed to non-victim creditors, plainly are not
> "recovered . . . by the victim[s]" of a crime; only amounts actually
> distributed to the victim creditors fit that description.

*Id.* at 635 (alterations in original). Precisely the same reasoning applies here.

## D.  Whether MIMO Is the Correct Methodology

Mr. Harder further argues that the government is improperly seeking *cash* payments to

Sunwest investors. As previously discussed, the government's MIMO methodology is the same

methodology that was approved by Judge Hogan for distributions by the Receiver in the

---

[10] As noted, the Supreme Court in *Robers* reversed the Ninth Circuit's ruling in *Yeung*, which had held that restitution should be reduced by the value of collateral at the time it was returned to a lender. *See Robers*, 572 U.S. at 642. *Yeung* relied on a series of earlier Ninth Circuit cases reaching similar conclusions, including *United States v. Smith*, 944 F.2d 618 (9th Cir. 1991), and *United States v. Catherine*, 55 F.3d 1462 (9th Cir. 1995). *See Yeung*, 672 F.3d at 601, 604. *Robers* effectively overruled this entire line of cases when the question before the court requires the application of the MVRA. *Lomow* relied on the same line of cases. *See Lomow*, 266 F.3d at 1020 (citing *Catherine*, 55 F.3d at 1465). Thus, although neither *Yeung* nor *Robers* specifically mentions *Lomow*, the Ninth Circuit's earlier practice of crediting defendants for value above what a victim actually received was repudiated in *Robers*.

Indeed, *Robers* is now routinely cited as settled law, including cases outside the mortgage context. *See Luis*, 765 F.3d at 1067; *United States v. Zogheib*, 2022 WL 15798663, at *2 (9th Cir. Oct. 28, 2022) (Ponzi scheme) (memorandum disposition); *Maasen v. United States*, 2022 WL 3644850 (9th Cir. Aug. 24, 2022) (SBA loan) (memorandum disposition); *United States v. Sarad*, 227 F. Supp. 3d 1153, 1158-59 (E.D. Cal. 2016) (securities fraud); *Holmes*, 2023 WL 3489320, at *4-5 (investment fraud).

underlying Sunwest SEC and Bankruptcy Cases. This approach begins with the amount of

money (cash) invested by an investor with Sunwest and then reduces that amount by all cash

paid to the investor (whether through "rent," by distribution from the Receiver, or otherwise),

and what remains, if anything, is the amount due that investor in restitution. Further, if an

investor was offered the opportunity by the Receiver to accept an interest in real property in lieu

of cash payments and accepted that offer, that investor is not included in the government's

MVRA Spreadsheet, Version 7.0.

In Defendant's Prehearing Memorandum, Mr. Harder argues that the TIC investors

> owned interests in Sunwest entities which, in turn, owned
> commercial real estate. Accordingly, unlike in a *Robers*-type loan
> situation, there is no basis to treat each victim as a creditor having
> bargained to receive a return of all funds invested such that any
> reduction in funds ultimately recouped constitutes a compensable
> loss for MVRA purposes.

> Again, MVRA analysis focuses on the value of the property
> returned to the victim. The Sunwest investments were by their
> nature illiquid investments in real property contemplated from the
> inception to be held for a significant length of time. Common to all
> such investments, values are not accurately measured according to
> the cash that could be realized in an immediate, distressed
> liquidation event—especially during an economic Black Swan
> event like the Great Recession. Even if the Sunwest Investors
> could sell their interests to a willing buyer, there is no factual basis
> to conclude cash amounts received under such circumstances
> represented the value of property returned to the victim for MVRA
> purposes.

ECF 325 at 34.

The critical flaw in Mr. Harder's argument is that the TIC investors did invest *cash* in

Sunwest. They did *not* transfer real property to Sunwest. Although a TIC investor typically

owned other real property before investing in Sunwest, the investor sold that property to a third-

party purchaser (not Sunwest), directed that the sales proceeds be deposited with another third-

party (a § 1031 accommodator to preserve tax advantages), and then directed the § 1031

accommodator to transfer funds, *i.e.* cash, to Sunwest to purchase the TIC investor's Sunwest investment. Thus, contrary to Mr. Harder's statement above, there is a "basis to treat each victim as a creditor having bargained to receive a return of all funds invested such that any reduction in funds ultimately recouped constitutes a compensable loss for MVRA purposes." Further, there also is a "factual basis to conclude cash amounts received [after the Receiver's court-approved distributions] . . . represented the value of property returned to the victim for MVRA purposes." This is precisely the MIMO (Money-In/Money-Out) approach urged by the government and adopted by this Court.

**E.  Whether the Government Must Show Individual Reliance for Each Victim**

Mr. Harder argued for the first time at the evidentiary hearing that that the government had not shown for each victim claiming restitution reliance on Mr. Harder's misrepresentations and half-truths. Mr. Harder did not raise this argument in his prehearing written submissions. *See* ECF 325 (Defendant's Prehearing Memorandum); ECF 326 (Defendant's Reply to the United States' Restitution Memorandum). Accordingly, Mr. Harder has waived this argument. Even if he had not waived this argument, however, is it incorrect as a matter of law. To prove causation, the government need not present individualized evidence that every victim-investor "actually relied" on defendant's misrepresentations and half-truths. As the Ninth Circuit has explained:

> Defendants argue that the district court could not have concluded, without more evidence, that those clients were victims of the conspiracy. We disagree. Defendants were convicted of criminal conspiracy to defraud clients specifically by recommending the house stocks; *in the circumstances shown in this record, it is reasonable to infer that all clients of Defendants who purchased the house stocks were duped by the conspiracy*. Except as described below, Defendants did not offer any evidence to rebut that inference.

*United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010) (emphasis added). The Eleventh Circuit has similarly held.

PAGE 21 – OPINION AND ORDER REQUIRING RESTITUTION

> As we see it, the government may show reliance in a securities fraud case either through direct evidence or specific circumstantial evidence. The government may of course introduce individualized evidence of reliance—that is, direct evidence that each individual investor read the false information and relied on it when deciding to purchase stock. But, as the district court aptly recognized, requiring individualized proof of reliance for each investor is often infeasible or impossible. *Thus, in cases such as this one involving numerous investors, the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information.*

*United States v. Stein*, 846 F.3d 1135, 1153-54 (11th Cir. 2017) (citations omitted) (emphasis added). It is enough to show that Mr. Harder caused material misrepresentations and half-truths to be made to the investors when soliciting their investments, which tended to elicit reliance on those misrepresentations and half-truths. These facts have been amply shown.

Mr. Harder's reliance on *Holmes* is misplaced. There, the misrepresentations at issue were alleged to have been in the conspirators' own utterances and certain marketing materials that might never even have reached certain investors. They were not featured in the investment documents and representations that nearly every victim investor received, as the misrepresentations and half-truths were in this case. *See* Sentencing Memorandum at 7-8, *United States v. Holmes*, No. 5:18-cr-00258-EJD (N.D. Cal. Nov. 11, 2022), ECF No. 1643 at 7-8 (summarizing offense conduct). Thus, *Holmes* does not aid Mr. Harder under the facts here.

**F.  Whether Defendant Has Suffered Prejudice from the Government's Delay**

Mr. Harder argues that due to the government's delay in seeking restitution, certain materials have been lost. According to Mr. Harder, these include: (a) closing statements, which could have been used to demonstrate which TIC Investors received their property back, the amount of proceeds from the transactions at issue and where they went, how much each victim in fact received, and what portion of these funds was used for non-MVRA purposes; (b) the

Receivers' financial records providing further documentation of the actual sources and uses of the funds generated by a liquidation of the Sunwest assets; and (c) the claims packet and supporting documentation for the Sunwest Investors to determine what amounts were approved and paid by the Receiver for non-MIMO amounts. ECF 325 at 35. The Court previously denied Mr. Harder's arguments regarding prejudice. ECF 277, *Harder*, 552 F. Supp. 3d at 1149-51. Mr. Harder now asks the Court to revisit this issue, citing *Dolan v. United States*, 560 U.S. 605, 617 (2010) (stating that where delay in holding a restitution hearing causes prejudice to a defendant, "perhaps by depriving him of evidence to rebut the claimed restitution amount[,] the defendant remains free to ask the court to take that fact into account upon review"). After considering this issue and the specific arguments now made by Mr. Harder, which are discussed above, it is even clearer that Mr. Harder suffered no prejudice caused by the government's delay in seeking restitution. *See United States v. Ray*, 578 F.3d 184, 200 (2d Cir. 2009) ("To prove a due process violation as a result of a sentencing delay, the prejudice claimed by the defendant, absent extraordinary circumstances, must be substantial and demonstrable.").

## CONCLUSION

The Court orders Mr. Harder to pay restitution in the total amount of $74,062,211.92 to 1,488 claimants, who will be identified by name, address, claim number, and amount due in Exhibit A to a forthcoming Second Amended Judgment. The Court will file Exhibit A under seal. The Court also waives interest on Mr. Harder's restitution obligation.

**IT IS SO ORDERED**.

DATED this 26th day of October, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge